IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

SOUTH BROWARD HOSPITAL
DISTRICT, D/B/A MEMORIAL
HEALTHCARE SYSTEM,
on its own behalf and on
behalf of other similarly
situated healthcare facilities,

       Plaintiff,

   vs.

ELAP SERVICES, LLC,
a Pennsylvania limited liability company,
and GROUP & PENSION ADMINISTRATORS,
INC., a Texas corporation,

       Defendants
_____/

**<u>CLASS ACTION COMPLAINT & DEMAND FOR JURY TRIAL</u>**

<u>**TABLE OF CONTENTS**</u>

<u>**INTRODUCTION**</u> .................................................................................................... **1**

<u>**PARTIES**</u> ................................................................................................................. **3**

<u>**JURISDICTION AND VENUE**</u> .......................................................................... **4**

<u>**FACTUAL BACKGROUND**</u> ............................................................................... **4**

   I.   The Genesis of ELAP's Deceptive and Illegal Scheme.................................... 4

      A.   ELAP's use of Reference Based Pricing results in lower payments to hospitals and greater patient financial responsibility................................................................... 5

      B.   ELAP's use of Reference Based Pricing in its business model violates federal law...... 8

      C.   ELAP's marketing ropes employers into ELAP's web. ................................. 9

      D.   ELAP pays itself millions of dollars at the expense of providers, and leaves patients holding the bag................................................................................................... 12

   II.   ELAP's Conduct Deceives Healthcare Providers like Plaintiff......................................... 14

      A.   ELAP conceals its identity and Reference Based Pricing on insurance cards............. 15

          1.   The ID card conceals ELAP's name and role........................................ 15

          2.   The ID card references a PPO network familiar to providers to trick them into expecting fair compensation. ........................................................... 16

      B.   ELAP conceals its role as "Designated Decision Maker." ........................... 19

      C.   ELAP's front man, GPA, lends legitimacy to ELAP's scheme.................................. 20

      D.   ELAP deceives and misleads providers throughout the claim adjudication process.... 20

      E.   ELAP reveals itself as the decision maker during the appeal process, but refuses to meaningfully discuss resolution of the claims. ................................................... 21

      F.   ELAP defends patients to obstruct and deter providers' collection efforts. ................ 22

      G.   ELAP directs plan members to ignore providers and breach their Patient Agreements... ................................................................................................... 23

   III.   Plaintiff and the Proposed Classes Have Been Damaged by ELAP and GPA's Scheme. ................................................................................................... 24

<u>**CLASS ALLEGATIONS**</u> ................................................................................... **25**

<u>**CLAIMS FOR RELIEF**</u> ...................................................................................... **30**

<u>**DEMAND FOR JURY TRIAL**</u> .......................................................................... **40**

Plaintiff South Broward Hospital District d/b/a Memorial Healthcare System ("Memorial" or "Plaintiff") sues ELAP Services, LLC ("ELAP") and Group and Pension Administrators, Inc. ("GPA") (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.     ELAP touts its service as a way for businesses to save money on healthcare by fighting expensive hospital bills. ELAP convinces its clients — employers with self-funded insurance plans — to let ELAP handle the administration of their employees' healthcare claims, including the decisions on how, and in what amount, each employee's healthcare claim will be paid.

2.     ELAP refers to its service as a "fair" promotion of "responsible and sustainable management of healthcare costs."

3.     There is nothing fair, responsible, or sustainable about ELAP's service.

4.     ELAP has devised a scheme to make tens of millions of dollars off the backs of hospitals and healthcare facility providers while adding zero value to the provider – patient – health insurance relationship.[1]

5.     The crux of the scheme is ELAP's systematic method of underpaying healthcare providers, like Plaintiff, for the healthcare services provided to ELAP's clients. ELAP refers to its underpayment scheme as a healthcare reimbursement model called "Reference Based Pricing."

6.     ELAP's application of Reference Based Pricing is arbitrary, uniform, and unilateral. ELAP relies on this Reference Based Pricing to direct its employer clients to pay healthcare providers a fraction of the reasonable value of their services for each healthcare claim

---

[1] For clarity, Plaintiff and the putative classes of healthcare facility providers will generally be referred to simply as hospitals or providers.

that ELAP reviews. Remarkably, while ELAP holds itself out as responsibly managing healthcare costs by fighting excessive hospital bills, ELAP is actually compensated based on a percentage of the very hospital bills it claims are excessive.

7.      ELAP knows that, because of its extreme underpayment scheme, no healthcare provider would knowingly or voluntarily do business with ELAP.  So ELAP conceals its involvement in the patient-provider process, and exploits state and federal laws that require hospitals to treat patients in emergency situations without inquiring about their ability to pay.

8.      ELAP conspires with two other ostensibly legitimate companies to perpetrate its scheme.  First, it directs its clients to contract with Defendant GPA, a third-party claims administrator that is familiar to healthcare providers like Plaintiff.

9.      ELAP then creates insurance cards for its clients' members that not only omit any reference to ELAP or Reference Based Pricing, but also include the logos for both GPA and another established healthcare company, MultiPlan.  MultiPlan operates a well-known health insurance network with contracts and pre-negotiated rates with many healthcare providers, including Plaintiff.

10.      The GPA and MultiPlan logos dupe healthcare providers like Plaintiff, which contracts with MultiPlan and is in MultiPlan's paid provider network, into providing treatment under the belief that they will be reimbursed at their contracted rates with MultiPlan.

11.      But the hospitals will never receive payment at the MultiPlan rates, because ELAP directs its clients to honor the MultiPlan rates only for physician and healthcare professionals; for the actual hospitals, ELAP directs its clients to pay a fraction of the MultiPlan rates. This means that the doctors get paid their MultiPlan rates, while the hospitals get paid whatever ELAP decides using its Reference Based Pricing.

2

12.     ELAP only reveals its involvement to the providers once the healthcare services have already been provided and billed, and after ELAP has unilaterally and arbitrarily decided how much the provider will be paid — at a fraction of the reasonable value of the provider's services.

13.     When a provider tries to combat ELAP's deceit by appealing the arbitrary payment, ELAP responds with uniform boilerplate denials, forcing the healthcare provider to seek full reimbursement from the patient.

14.     But if the provider actually seeks reimbursement from a patient, ELAP sends intimidating and threatening attorney letters designed to deter the hospital from obtaining full payment for its services.

15.     ELAP's scheme funnels hard-earned revenues from healthcare providers like Plaintiff into ELAP's pocket.

16.     ELAP has made hundreds of millions of dollars as a result of this scheme.

17.     This is a class action to expose ELAP's deception.

18.     Plaintiff, on behalf of itself and the putative class, seeks to recover the millions of dollars that ELAP and GPA have stolen from healthcare providers like Plaintiff, and to enjoin ELAP and GPA from their continued deceptive and unfair trade practices.

## PARTIES

19.     Plaintiff is an independent special tax district and healthcare system in Broward County, Florida, consisting of various healthcare facilities and providers, including hospitals, physicians, and outpatient facilities.

20.     ELAP is a limited-liability company organized and existing under the laws of Pennsylvania, with its principal place of business in Chesterbrook, Pennsylvania.

21.     GPA is a corporation organized and existing under the laws of Texas, with its principal place of business in Dallas, Texas.

3

**JURISDICTION AND VENUE**

22.     This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA") and 28 U.S.C. § 1332(d) because members of the proposed Class are citizens of states different from ELAP's and GPA's home states of Pennsylvania and Texas, and upon information and belief the total amount in controversy in this action exceeds $5,000,000 exclusive of interest and costs.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Defendants pursuant to Florida Statutes §§ 48.193(1)(a)(1) and (1)(a)(2) because (i) Defendants operate, conduct, engage in, or carry on business in this state; and (ii) Defendants have committed tortious acts within this state.  This Court also has personal jurisdiction over Defendants pursuant to Florida Statutes § 48.193(2) because Defendants engage in substantial and not isolated activity within this state.

24.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff is domiciled and resides in this judicial district and it is where a substantial part of the events giving rise to this action occurred.

25.     All conditions precedent to this action have occurred, been performed, or have been waived.

**FACTUAL BACKGROUND**

**I.      The Genesis of ELAP's Deceptive and Illegal Scheme**

26.     ELAP holds itself out as providing healthcare claims auditing, repricing, and legal support services to self-funded plans.

27.     A "self-funded" plan is a healthcare plan where an employer assumes the financial risk of providing healthcare benefits to its employees.  Because employers lack the knowledge and resources to determine how to process and pay their employees' health insurance claims, they often

4

outsource claims handling functions to third-party administrators, such as GPA, who handle the administration of the policies.

28.     ELAP contracts with Defendant GPA to provide third-party administrator services for the ELAP-designed self-funded plans. GPA touts itself, together with ELAP, as "leaders and co-founders of metric based pricing."

29.     What ELAP and GPA refer to as "metric based pricing" is more commonly known as Reference Based Pricing.

   *A.     ELAP's use of Reference Based Pricing results in lower payments to hospitals and greater patient financial responsibility.*

30.     Reference Based Pricing is a payment model that some health plans are implementing in lieu of traditional PPOs.

31.     In a Reference Based Pricing regime, the health plan sets an arbitrary amount it will pay healthcare providers. This arbitrary amount is referred to as the "allowed amount."  Plans that use Reference Based Pricing unilaterally determine the maximum amount they will pay, and then the patient is financially responsible for paying the difference between the provider's charges and the allowed amount.

32.     Transparent and fair Reference Based Pricing is not inherently wrong, but requires the plan to (1) set a reimbursement level that providers would actually accept, and (2) disclose the reimbursement level before service to allow the member to either shop for a provider who will accept the reimbursement amount, or plan to pay the difference between the reimbursement amount and what the provider will accept.  Transparent and fair Reference Based Pricing also complies with applicable state and federal laws, rules, and regulations regarding reimbursement for emergency services, which are designed to prevent patients from being forced to pay excess amounts of money out of their own pocket.

33.     ELAP does not operate or apply a transparent and fair Reference Based Pricing model.  ELAP designed and operates a deceptive and unfair Reference Based Pricing model that fails to comply with applicable laws, sets unreasonably low reimbursement levels, conceals information from providers and members, stonewalls providers that attempt to resolve billing disputes, and cheats everyone involved in the process to enrich itself.

34.     ELAP's Reference Based Pricing structure typically sets their allowed amount at 120%-125% of what Medicare pays.

35.     ELAP's reliance on Medicare cannot serve as a reasonable foundation for fair reimbursement, because those payment rates are set by federal law, rather than through an arm's-length negotiation process as with private insurers.[2]

36.     In a January 2019 fact sheet entitled "Underpayment by Medicare and Medicaid" published by the American Hospital Association, Medicare and Medicaid payment rates are "currently set below the costs of providing care, resulting in underpayment."[3]  In the aggregate, both Medicare and Medicaid payments fall below costs:

- Combined underpayments were $76.8 billion in 2017. This includes a shortfall of $53.9 billion for Medicare and $22.9 billion for Medicaid.

- For Medicare, hospitals received payment of only 87 cents for every dollar spent by hospitals caring for Medicare patients in 2015.

---

[2] While hospital participation in Medicare is technically voluntary, Medicare and Medicaid account for more than 60 percent of all care provided by hospitals, so very few hospitals can elect not to participate in these programs.  *See* UNDERPAYMENT BY MEDICARE AND MEDICAID, AHA (Jan. 2019), https://www.aha.org/system/files/2019-01/underpayment-by-medicare-medicaid-fact-sheet-jan-2019.pdf.

[3] *See id.* Underpayment means the difference between the expected reimbursement and the payment for delivering care to patients. Underpayment occurs when the payment received is less than the reasonable value of the healthcare services provided.

- In 2017, 66 percent of hospitals received Medicare payments less than cost.[4]

37.   Medicare-based pricing methodologies like Reference Based Pricing employed by ELAP (1) have no bearing on commercial claims, (2) are far lower than what is usual and customary in the industry, and (3) are drastically below the reasonable value of the healthcare services that hospitals provide.

38.   Patients with ELAP's Reference Based Pricing plans believe they have insurance that will cover their treatment and are often surprised by large medical bills after the services are rendered.  These surprise medical bills create conflict between the healthcare providers and their patients. The patient and the healthcare provider do not and cannot discover this unilateral and arbitrary allowed amount until after the services are rendered.

39.   Patients frequently cannot afford the medical bills created by ELAP's Reference Based Pricing, and the result is that the healthcare providers are inadequately compensated for the care they furnish.

40.   Conversely, under the traditional PPO model, healthcare providers like Plaintiff enter into participation agreements with PPOs that are composed of insurance companies, third-party administrators, and rental networks.

41.   These PPO participation agreements include discounted reimbursement rates that the self-funded plans agree to pay healthcare providers, so payment of the pre-negotiated rate constitutes payment in full.  And under these participation agreements, healthcare providers are not permitted to "balance bill" patients for the difference between the discounted rate and the healthcare provider's full billed charges.

42.   Self-funded plans contract with PPOs to ensure their members have access to the

---

[4] *See id.*

PPO's network and quality healthcare at a more cost-effective price.  Providers agree to discount their charges for PPOs for a variety of reasons, including prompt payment of their bills, payment certainty, and increased volume of patients that a PPO can supply.

43.     Patients whose plans do not have a participation agreement with a healthcare provider (i.e., they are out-of-network) do not receive discounts on healthcare goods and services. Rather, the patients' payment obligations are governed by the patient agreements entered into between the providers and the patients prior to rendering services.

**B.      ELAP's use of Reference Based Pricing in its business model violates federal law.**

44.     ELAP's business model uses Reference Based Pricing to shift financial responsibility for healthcare services from employer to employee/patient. But patient responsibility is regulated — and capped — under the Patient Protection and Affordable Care Act ("ACA"). ELAP nevertheless designs its benefit plans in a way that end runs clear prohibitions of the ACA.

45.     The ACA requires self-insured welfare plans like ELAP's plans to limit their members' cost-sharing obligations (i.e., out-of-pocket) to a certain maximum amount. *See* 42 U.S.C. § 18022(c)(1).  In 2019, this maximum amount was $7,900.00 for an individual and $15,800.00 for a family.

46.     The United States Departments of Labor, Health and Human Services, and the Treasury anticipated that Reference Based Pricing might result in increased patient financial responsibility, so they only allowed the use of Reference Based Pricing if it "[d]oes not function

as a subterfuge for otherwise prohibited limitations on coverage."[5]

47.     Thus, according to the Departments, plans cannot use Reference Based Pricing for emergency services because doing so end runs the ACA's cost-sharing maximum requirement.

48.     But ELAP's plans do exactly what the Departments tried to prohibit: they end run the ACA's cost-sharing maximum requirement.

49.     ELAP has developed a template benefit plan that uses Reference Based Pricing to come up with an arbitrary allowed amount.  Under ELAP's plans, plan members are financially responsible for any amounts in excess of the allowed amount. Because ELAP's allowed amounts are well below the reasonable value of the providers' services, plan members are stuck with out-of-pocket obligations exceeding what is permitted by the ACA.

50.     All of ELAP's violations further its deceptive and unfair scheme to the detriment of healthcare providers like Plaintiff.

**C.     *ELAP's marketing ropes employers into ELAP's web.***

51.     ELAP's clients are employers with self-funded benefit plans that pay ELAP to administer and audit their healthcare claims.

52.     To further its scheme, ELAP regularly markets its Reference Based Pricing strategy to prospective and current clients as a "fair" pricing methodology. ELAP markets itself as empowering "employers, employees, and their families to get the most value from their health spend — while bringing clarity, consistency, and <u>fairness</u> to the entire plan experience."[6]

---

[5] ACA FAQ 21 (October 10, 2014), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-xxi.pdf.

[6] A Decade of Success with Reference Based Pricing, ELAP, https://www.elapservices.com/10-year-trend-report/ (emphasis added).

53.     According to ELAP, "[t]he health plan documentation defines pricing limits upon which claims will be paid, ensuring that <u>fair</u> prices are paid for medical services," and ELAP builds "meaningful connections with employers, members, and hospitals and health systems to ensure a <u>fair</u> price for quality healthcare."[7] ELAP's marketing material include the following:




54.     ELAP also tells prospective and current clients that they "can be confident that

---

[7]     MANAGING   HEALTHCARE   COSTS,   A   TRANSFORMATIVE   SOLUTION,   ELAP, https://www.elapservices.com/managing-healthcare-costs-a-transformative-solution/   (emphasis added).

medical facilities will be compensated fairly and promptly."[8] Even ELAP's mission statement touts alleged fairness: "[t]o recognize a medical provider's actual cost in delivering services and to allow a fair margin above that cost."[9]

55.     GPA markets itself as a third-party administrator that is "small enough to care, but large enough to deliver." According to GPA, it "combines industry leading technology and tools with 'high-touch' patient care to deliver the healthiest employees and the 'healthiest' bottom line." GPA also advertises that (a) employees will not be denied care by facilities; (b) employees' credit will not be impaired due to non-payment of medical bills in excess of the allowed amount; and (c) the plan and plan members are protected.

56.     As part of ELAP's marketing ploy, it promises plans and plan members that they will not be held responsible for any charges above what ELAP sets as the plan's allowed amount. ELAP tells prospective and current clients that its services will reduce the risk of balance billing "because the solution is focused on fair payment to medical providers," so providers will be unlikely to seek additional payment from the plan member.[10]

57.     ELAP knows there is no law that prohibits providers like Plaintiff from balance billing self-funded employer group plan members[11]; and there is no federal law that prohibits

---

[8]  ELAP  OVERVIEW  WITH  BLINDED  SAVINGS  DATA  (July  6,  2015), https://houstonbch.starchapter.com/images/downloads/Program_Presentations/hbch_june_24_elap_presentation.pdf.

[9] *Id.*

[10]  DEBUNKING  THREE  MYTHS  ABOUT  REFERENCE-BASED  PRICING,  ELAP, https://www.elapservices.com/debunking-three-myths-about-reference-based-pricing/  (emphasis added).

[11] There are certain state laws that prohibit balance billing, which typically do not apply because they are preempted by ERISA.

providers from balance billing plan members for emergent and non-emergent services.

58.     ELAP goes a step further, however, and directs plan members not to enter any payment arrangements with providers like Plaintiff, or agree to make upfront payments. ELAP advises plan members to "NEVER sign a payment plan at a facility/hospital as this will take ELAP out of the process, due to the facility/hospital now having that YOU (the member) are taking responsibility for any outstanding balance. If you are asked to do such an act, please contact GPA immediately."[12]  ELAP also advises subscribers that "[s]ince ELAP will often reduce the amount you owe after auditing a bill, you could overpay by paying up front and the facility will not reimburse you."[13]

59.     ELAP's deceptive marketing practices mislead employers into believing that they can use ELAP's plans to save millions of dollars, unaware that the Reference Based Pricing methodology is unfair, deceptive, misleading, and in many cases, in violation of the ACA.

### D.     *ELAP pays itself millions of dollars at the expense of providers, and leaves patients holding the bag.*

60.     ELAP's scheme has caused irreparable harm to the provider-patient relationship, and left countless patients holding the bag while ELAP has made millions off the backs of providers like Plaintiff.

61.     Ironically, ELAP claims that the amounts billed by providers are excessive and inflated despite the fact that ELAP is paid based solely on those amounts.  That is to say, ELAP

---

[12]  U.S. Cotton, *Your 2019 Benefits*, http://www.explainmybenefits.com/wp-content/uploads/2018/11/Final-US-Cotton-2019-OE-Guide-11.13.18v2.pdf.

[13]  FREQUENTLY ASKED QUESTIONS, ELAP, https://www.explainmybenefits.com/wp-content/uploads/2018/11/ELAP_EMPLOYEE_FAQs2_FINAL-NoCrops-10.26.17.pdf.

charges its clients 12% of the provider's total billed charges for any claim. So, as providers' billed charges go up, the more ELAP gets paid by its clients.

62.     GPA is paid in various ways, including the number of enrolled employees, access fees, a percentage of the plan's savings, or a fee for administering the claims. Defendants accordingly profit exponentially as more members are enrolled and providers like Plaintiff are paid less.

63.     Defendants have no incentive to reduce the billed charges they claim are "unconscionable," because that would hurt their bottom line.

64.     To the contrary, their scheme is designed to underpay providers, take high fees from their clients (e.g. 12% of billed charges), and stick patients with the remaining balance of billed charges, leaving patients exposed to collection efforts and lawsuits, and unable to access providers for non-emergent care.

65.     Defendants are aware that providers may refuse non-emergent services to plan members who have a balance with the provider because of Defendants' actions. Yet Defendants do nothing to rectify the billing dispute because they have already made their money. Instead, they simply direct the plan member to another provider who similarly falls victim to Defendants' systemic scam.

66.     Ultimately, Defendants make millions of dollars in profits as a result of their scheme, leave plan members exposed to balance billing, and, in some cases, unable to get non-emergent services from a provider because of Defendants' actions.

67.     The only entities that benefit from Defendants' business model are the Defendants themselves.  Patients lose out on care and are exposed to balancing billing and legal action.  The self-funded plans fail to provide comprehensive medical care for their members and fail to provide

the quality of coverage they promise.  And providers are forced into a Hobson's choice of eating massive underpayments or balance billing unsuspecting patients, either eroding the overall quality of care they can provide or destroying the relationship they have with individual patients.

68.     Upon information and belief, GPA's revenue in 2018 was approximately $150 million and ELAP's revenue was approximately $180 million.

## II.     ELAP's Conduct Deceives Healthcare Providers like Plaintiff.

69.     Once ELAP has duped plans into buying ELAP's services, ELAP sets its sights on its true victims — healthcare providers like Plaintiff.

70.     When a self-funded plan member goes to a provider like Plaintiff, or any other class member, for medical treatment, he or she provides an identification card. The identification card is a representation to the provider that the patient is covered by insurance issued by his or her self-funded plan. The identification card identifies the self-funded plan's third-party administrator, and usually instructs the provider to submit the patient's claim for payment to that third-party administrator.

71.     The identification card also shows the provider whether the patient has access to PPO networks, and providers like Plaintiff rely on this information to determine whether the services are "in-network" and will be paid at a pre-negotiated contractual rate.

72.     Providers like Plaintiff are not required to seek authorization from a self-funded plan for emergent services. But for non-emergent claims, the provider contacts the plan's third-party administrator to obtain prior authorization and to ensure the healthcare services are covered. The third-party administrator's authorization induces the provider to provide non-emergent services to the patient, who could otherwise receive healthcare services at another location.

73.     When a self-funded plan member seeks services at a facility like Plaintiff's, he or she enters into a contract with the hospital called the "Patient Agreement." Under the Patient

14

Agreement, the plan member agrees to pay the provider's billed charges as a precondition to receiving services, and to be legally responsible for billed charges in the absence of a pre-determined discount.

74.    After the provider provides its services, it submits a claim form to the third-party administrator for processing which describes the services it provided to the patient.  The claim contains the provider's standard billed charges.  If the provider is in-network with the self-funded plan, the provider is entitled to payment at the pre-negotiated (discounted) contractual rate.  But if the provider is out-of-network with the plan, the provider is entitled to payment at its full billed charges.

75.    Once the provider submits a claim, the third-party administrator must respond to the provider, explaining whether the plan denied or approved each billed procedure code and the reasons for any denial.  If the self-funded plan is in-network, the process to appeal a denial or underpayment is controlled by the applicable participating provider agreement.

76.    ELAP's scheme deceives and frustrates providers like Plaintiff from the moment ELAP's plan members walk through the facility doors until providers attempt to collect payment on their medical services.

**A.     *ELAP conceals its identity and Reference Based Pricing on insurance cards.***

77.    ELAP designs the insurance ID cards that plan members present to providers like Plaintiff.  The cards are designed to deceive providers in a number of ways.

**1.     The ID card conceals ELAP's name and role.**

78.    First, ELAP omits its name or any connection to Reference Based Pricing on the identification card.

79.    ELAP knows that if it revealed itself to providers on the ID card, no reasonable

provider would provide medical treatment — beyond treatment it is legally obliged to provide — to an ELAP plan member without securing payment up-front.

> ## 2. The ID card references a PPO network familiar to providers to trick them into expecting fair compensation.

80.     Second, ELAP uses a third-party PPO network called Multiplan (also sometimes referred to as PHCS) to dupe providers like Plaintiff into expecting reimbursement for its services at agreed "in-network" contract rates.

81.     Multiplan is a PPO which enters into contracts with numerous health care providers including Plaintiff.

82.     These providers agree to provide services to Multiplan clients at discounted rates. The group of providers as a whole is referred to as the PPO network.

83.     Multiplan also enters into agreements with health insurance companies and administrators, including ELAP and GPA, which gives these companies and administrators access to the discounted rates of the PPO network.

84.     The insurance companies offer incentives to their members to use participating providers like Plaintiff in the form of lower co-pays and deductibles.

85.     In exchange for agreeing to a discounted rate, these providers receive an increase in the number of patients, as the majority of the patients will seek medical services from providers in the PPO network.

86.     When one of these providers renders services to a member of one of Multiplan's clients, Multiplan "reprices" the claim to reflect the discounted rate.

87.     ELAP's deception with MultiPlan works as follows: providers like Plaintiff contract with MultiPlan to offer discounted healthcare goods and services to MultiPlan's clients, which include self-funded plans like ELAP's clients.  GPA also contracts with MultiPlan and

offers its clients access to MultiPlan's network. As a result, these plans are permitted to access discounted healthcare services from the provider through its contract with MultiPlan.

88.    The relationship between the provider (here Plaintiff), MultiPlan, and ELAP's self-funded plans is represented by the below diagram:



89.    MultiPlan's clients place the MultiPlan/PHCS logo on their insurance identification cards:

17

| **Front of Insurance Card** | **Back of Insurance Card** |
|---|---|



90.    This represents to providers like Plaintiff that the plan is part of the MultiPlan network and that the provider will be paid the contracted rate. That contracted rate applies to both (1) facility services, i.e., healthcare goods and services provided at a healthcare facility, such as a hospital; and (2) physician services, i.e., healthcare goods and services provided by a physician.

91.    ELAP uses its and/or GPA's relationship with MultiPlan to trick providers like Plaintiff into expecting reimbursement at the MultiPlan rate for facility services through a two-step process.

92.    First, ELAP requires its plans to only contract with MultiPlan for physician services — not facility services.

93.    This ensures that the MultiPlan logo will appear on the patient insurance ID card, and gives providers like Plaintiff a reasonable business expectation — upon seeing the ID card with the MultiPlan logo — that they will be paid at the rates contained in their MultiPlan contract for any client listed on MultiPlan's client list.[14]

---

[14] The reasonableness of the provider's expectation is bolstered by the fact that (1) MultiPlan does not have a separate "physician only" network, and (2) healthcare providers like Plaintiff have contracts with MultiPlan that do not permit MultiPlan to carve out services for physicians.

94.    ELAP's tactics result in providers like Plaintiff receiving payments far below the level consistent with the terms of their MultiPlan contract.

95.    As Step Two, ELAP directs its plans to refuse to honor the provider's contract with MultiPlan for facility services, so that ELAP can pay these "facility" claims at its arbitrary Reference Based Pricing allowed amount.

96.    The result is that a physician rendering services at the healthcare facility will be fully compensated for his work at the MultiPlan-contracted amount, but the provider — the facility — will be drastically underpaid.

97.    At the time of service, providers like Plaintiff reasonably expect their services will be paid in accordance with their contract with MultiPlan and have no knowledge that the patient is covered by a plan that uses Reference Based Pricing or that the plan will not honor the rates in the provider's MultiPlan contract.

   **B.    *ELAP conceals its role as "Designated Decision Maker."***

98.    ELAP also conceals its involvement as the plan's "Designated Decision Maker."

99.    When ELAP creates (or modifies) a benefit plan for one of its clients, it designates itself as the decision maker. Through this alleged authority, ELAP purportedly audits the claims line-by-line. Using Reference Based Pricing, ELAP reprices Plaintiff's claims, and the claims of other providers like Plaintiff, unilaterally deciding the allowed amount, and directs the plan to pay Plaintiff in that amount.

100.    By concealing ELAP's involvement as the plan's decision maker, providers like Plaintiff are unable to make an informed decision as to whether to provide non-emergent services to ELAP plan members or whether to seek advance payment before providing care.  ELAP conceals its involvement as the decision maker because it knows providers like Plaintiff will not

voluntarily treat ELAP plan members for non-emergent services because ELAP's model is designed to deceive and underpay them.

### C.   ELAP's front man, GPA, lends legitimacy to ELAP's scheme.

101.   In addition to ELAP's deceptive conduct vis-à-vis the insurance cards, ELAP uses GPA to misrepresent the plans' benefits to providers.

102.   For non-emergent claims, plan members' identification cards direct providers like Plaintiff to contact the plans' third-party administrator to determine if prior authorization is required for the services.

103.   GPA, ELAP's third-party administrator, tells Plaintiff, and other providers like Plaintiff, that prior authorizations are not required for the services and there are no limits on out-of-network benefits.  GPA fails to disclose to the provider that the services will be paid using Reference Based Pricing and that the rates in the provider's contract with MultiPlan will not be applied to facility services (as opposed to physician services).

104.   GPA uniformly omits this information, which induces the provider to provide non-emergent services to patients in ELAP-operated self-funded plans.  If the provider knew that ELAP was making the decision to pay it at the Reference Based Pricing rate for the services, and not in accordance with its contract with MultiPlan, it would not provide non-emergent services to an ELAP plan member without prepayment.

### D.   ELAP deceives and misleads providers throughout the claim adjudication process.

105.   Once ELAP has deceived providers into providing medical services, it continues its deceptive practices during the claim adjudication and payment processes.

106.   After Plaintiff, or a similarly situated provider, submits a claim to GPA as the third-party administrator, as described in paragraph 74 above, GPA sends an underpayment and an

explanation of that payment to the provider's lockbox account/address, rather than directly to the provider. Lockbox banking is a service provided by banks to companies for the receipt of payment from customers. Under the service, the payments made by customers are directed to a special post office box instead of going to the company. The bank goes to the box, retrieves the payments, processes them, and deposits the funds directly into the company's bank account.

107.    Accordingly, the provider does not see the explanation of payment until weeks later — after the underpayment has already been deposited by the bank.

108.    ELAP deceptively adds a sentence in the explanation of payment that the payment — which has already been deposited in the provider's lockbox account — amounts to an accord and satisfaction of the claim, even though the provider had no prior knowledge of the Reference Based Pricing rate and did not have the ability to decline payment.

109.    ELAP also provides explanations of payment that are confusing, deceiving, and misleading to further delay the process. The explanation of payment does not identify ELAP or provide any reasons why a particular service was denied or reduced, and does not give providers like Plaintiff sufficient information to articulate an informed response in an initial appeal.

110.    The explanation of payment does disclose, for the first time in the entire provider-patient relationship, that the claim is being repriced based on Medicare rates. This, of course, ignores the fact that the billed rates are governed by contract, such as participation agreements like Plaintiff's contract with MultiPlan or its Patient Agreement with members of ELAP's self-funded plans. Even though the claims have nothing to do with Medicare, ELAP misleadingly uses Medicare as its illegitimate justification for underpaying providers.

### E.    *ELAP reveals itself as the decision maker during the appeal process, but refuses to meaningfully discuss resolution of the claims.*

111.    When a provider like Plaintiff appeals the plan's underpayments, it receives a

response from ELAP, at which point ELAP finally announces its involvement and reveals to the provider that ELAP is the decision maker.

112.    ELAP uniformly replies to providers with the same generic template response that does not address the provider's specific arguments in its appeal.

113.    For example, ELAP's generic response includes language that the provider accepts ELAP's determination and waives any right to recover expenses from the plan member if it participates in the appeal.

114.    These letters are designed to create a catch-22 for providers — they can either exhaust administrative remedies by appealing the plan determination, which could potentially waive their right to collect from the patient, or they can forego their right to take legal action against the plans and pursue the balance due from the patient.   Unbeknownst to the providers, ELAP never changes its arbitrary determination — and the appeals process is a sham.

115.    The generic response letters also claim there is no contract between the facility and plan, even though the plans are subject to PPO participation agreements, and the plan members are subject to the Patient Agreements.

116.    ELAP's template responses are designed to wear down providers like Plaintiff, and drive up providers' administrative costs.

   **F.     ELAP defends patients to obstruct and deter providers' collection efforts.**

117.    ELAP knows there is no law that prohibits providers like Plaintiff from balance billing self-funded employer plan members, but nevertheless deceptively advises plans and plan members that they will not be financially responsible for amounts beyond the allowed amount.

118.    If the provider does balance bill the patient, ELAP pays for a legal defense to deter further collection activity.  ELAP's attorneys, purporting to act on behalf of the plan members (but

being paid by and taking direction from ELAP), send the same template demand letter to providers, without addressing any of the issues the provider raised in its appeals.  The template letter asserts the provider cannot balance bill the plan member because the provider's billed charges are purportedly "unconscionable, deceptive, and discriminatory."

119.    ELAP's business model is built around the expectation that providers, like Plaintiff, will give up and accept ELAP's insufficient payment because the cost to collect exceeds the outstanding balance.

120.    For example, GPA boasts that from July 2008 to April 2016, there were only 171 lawsuits filed against GPA's plan customers who used the Reference Based Pricing model, and claims that all lawsuits were successfully defended.

121.    For ELAP, providing the legal defense for plans and plan members relating to the Reference Based Pricing scheme is a small cost of doing business because they are making millions in return.

### G.    ELAP directs plan members to ignore providers and breach their Patient Agreements.

122.    Pursuant to the Patient Agreement that all patients receiving treatment sign, members of self-funded plans (both ELAP and non-ELAP plans) agree to pay Plaintiff's billed charged for healthcare goods and services received at Plaintiff's facilities.

123.    ELAP encourages its plan members to obtain healthcare services at providers' facilities, knowing they will not pay in full for the services rendered.

124.    ELAP advises plan members that they can obtain care wherever they like regardless of cost. ELAP tells plan members that they are not responsible for costs in excess of their co-pay, coinsurance, or deductible; and directs them not to pay any upfront money to providers like Plaintiff other than these amounts.

125.    ELAP knows its plan members have entered into the Patient Agreement with providers like Plaintiff. ELAP still encourages its plan members to disregard the terms of their Patient Agreements by misrepresenting that they are not required to pay the balance of the bill, directing plan members to ignore provider collections requests, and promising to pay for legal counsel to defeat the provider's efforts to collect.

126.    ELAP thus interferes with the provider's ability to enforce the Patient Agreements and collect anything beyond ELAP's unilaterally established allowed amount. ELAP knows that once valuable care has been received, the entirety of the benefit of the health care transaction has been bestowed on the plan member, leaving the provider with the burden of trying to collect the amount the plan member already agreed to pay.

### III.    Plaintiff and the Proposed Classes Have Been Damaged by ELAP and GPA's Scheme.

127.    Plaintiff and the proposed Class members provided emergent and nonemergent healthcare services to Defendants' plan members.

128.    Plaintiff and the proposed Class members provided these services because they trusted that they would be reimbursed for the reasonable value of their services — not the allowed amount arbitrarily and unilaterally imposed by ELAP.

129.    As a result of Defendants' conduct, Plaintiff and the proposed Class members were harmed and have suffered actual damages in the form of the difference between the reasonable value of the medical services, and the allowed amount arbitrarily and unilaterally imposed by ELAP.

130.    Plaintiff and the proposed Class members were deprived of the benefit of their bargain. They did not receive the actual and reasonable value of the healthcare services they provided to ELAP plan members, as a direct result of ELAP's deceptive and unfair conduct.

131.    ELAP and GPA have each unjustly benefited from their scheme, and Plaintiff and

the proposed Class members were deprived of the actual and reasonable value of the healthcare services they provided to ELAP plan members, as a direct result of ELAP and GPA's deceptive and unfair conduct.

132.    Plaintiff brings this action on behalf of itself and the putative Class members to recover their actual damages and their lost benefit of the bargain, and to enjoin ELAP and GPA from their continued deceptive and unfair trade practices.

## CLASS ALLEGATIONS

*Class Definitions:*

133.    Plaintiff brings this action on its own behalf, and on behalf of all healthcare providers similarly situated, pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

134.    Plaintiff brings this class action and seeks to certify and maintain it as a class action under Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and the following proposed Nationwide classes, and Florida state subclasses.

**The Nationwide Emergent Class:**

135.    Plaintiff alleges a nationwide class on behalf of:

**All healthcare facility providers in the United States with underpaid emergent claims for healthcare services provided to ELAP plan members.**

**The Nationwide Nonemergent Class:**

136.    Plaintiff alleges a nationwide class on behalf of:

**All healthcare facility providers in the United States with underpaid non-emergent claims for healthcare services provided to ELAP plan members.**

**The Florida Emergent Subclass:**

137.    Plaintiff alleges a Florida statewide class action claim on behalf of:

**All healthcare facility providers in Florida with underpaid emergent claims for healthcare services provided to ELAP plan members.**

**The Florida Nonemergent Subclass:**

138.    Plaintiff alleges a Florida statewide class action claim on behalf of:

**All healthcare facility providers in Florida with underpaid non-emergent claims for healthcare services provided to ELAP plan members.**

139.    Excluded from each class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

140.    Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate, including as to particular issues or subclasses pursuant to Rule 23(c)(4)–(5).

141.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### Numerosity

142.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are thousands of healthcare facility providers nationwide who have been deceived by Defendants, including hundreds in Florida.  Individual joinder of all Class members is impracticable.

143.    The identity of Class members is ascertainable, as the names and addresses of all

26

Class members can be identified in Defendants' or their agents' books and records.  Plaintiff anticipates providing appropriate notice to each certified class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**<u>Commonality</u>**

144.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes.  These common questions predominate over any questions affecting only individual Class members.   The predominating common or Class-wide fact questions include, without limitation:

a. Whether Defendants' unilateral, arbitrary, and uniform application of Reference Based Pricing is likely to deceive or mislead reasonable healthcare facility providers;

b. Whether Defendants' unilateral, arbitrary, and uniform application of Reference Based Pricing constitutes an unfair, deceptive, unlawful, and/or fraudulent act or practice;

c. Whether Defendants' unilateral, arbitrary, and uniform application of Reference Based Pricing compensates healthcare facility providers for the reasonable value of the facility provider's services;

d. Whether Defendants' uniform omissions and concealment of identity and application of Reference Based Pricing on insurance ID cards is likely to deceive or mislead reasonable healthcare facility providers;

e. Whether Defendants' uniform omissions and concealment of identity and application of Reference Based Pricing on insurance ID cards constitutes an unfair, deceptive, unlawful, and/or fraudulent act or practice;

f. Whether ELAP's conduct throughout the claims adjudication process constitutes unfair, deceptive, unlawful and/or fraudulent acts or practices;

g. Whether ELAP's legal defense of patients to obstruct and exhaust collection efforts constitutes unfair, deceptive, unlawful, and/or fraudulent acts or practices;

h. Whether ELAP's direction to plan members to not respond to facility providers and violate patient agreements constitutes unfair, deceptive,

27

unlawful, and/or fraudulent acts or practices;

i.   Whether a reasonable healthcare facility provider likely would be misled by Defendants' conduct; and

j.   Whether Plaintiff and the facility provider classes suffered damages as a result of Defendants' unfair, deceptive, unlawful and/or fraudulent acts or practices.

**Typicality**

145.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Defendants.  Each Class member provided healthcare services to ELAP plan members and as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiff in the form of underpayment of those claims.  The relief Plaintiff seeks in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

146.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

147.    To prosecute this case, Plaintiff has chosen the undersigned law firms, who have substantial experience in the prosecution of large and complex class action litigation and have the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation.  Plaintiff and their counsel will fairly and adequately protect the interest of all Class members.

28

**Superiority**

148.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.  The joinder of individual Class members is impracticable because of the vast number of healthcare facility providers who have been deceived by Defendants' conduct.

149.     Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions.  The burden imposed on the judicial system by individual litigation, and to the Defendants, by even a small fraction of the Class members, would be enormous.

150.     In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D).

151.     Plaintiff is unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination,

certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Fed. R. Civ. P. 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Fed. R. Civ. P. 23(c)(5) to divide any Class into subclasses.

### Requirements of Fed. R. Civ. P. 23(b)(2)

152.    Defendants have acted or failed to act in a manner generally applicable to the Class members in the Nationwide Classes and the Florida Subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to any or all of the classes.

### CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* against Defendants on behalf of Plaintiff and the Florida Subclasses

153.    Plaintiff incorporates by reference paragraphs 1 – 152 as though fully set forth herein.

154.    Plaintiff and the members of the Florida subclasses are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA.  Fla. Stat. § 501.203 (7), (8).

155.    Defendants engage in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

156.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

157.    Each Plaintiff and Class member is an "aggrieved" person under § 501.211, Fla. Stat. and so has standing to pursue this claim.

158.    Defendants engaged in unfair and deceptive trade practices that violated FDUTPA,

including but not limited to the following:

     a. ELAP and GPA concealed ELAP's identity and the application of Reference Based Pricing throughout the patient admission process;

     b. ELAP concealed its identity and the application of Reference Based Pricing on insurance ID cards;

     c. ELAP and GPA concealed the fact that facility services, such as the healthcare services provided by hospitals like Plaintiff, will not be reimbursed in accordance with the terms of the facility provider's contract with MultiPlan;

     d. ELAP deceived and misled facility providers throughout the claim adjudication process;

     e. ELAP provided a legal defense for patients to obstruct facility providers' collection efforts; and

     f. ELAP directed plan members to not respond to facility providers and violate patient agreements.

159. ELAP and GPA's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about its involvement in the patient-provider relationship and its boilerplate application of Reference Based Pricing, had a tendency or capacity to mislead; tended to create a false impression in healthcare facility providers; and were likely to, and did in fact, deceive reasonable healthcare facility providers, including Plaintiff and the members of the Florida subclasses, about GPA and ELAP's role in the patient-provider relationship; ELAP's application of Reference Based Pricing; and ELAP's efforts to obstruct and exhaust collection efforts from patients.

160. ELAP and GPA knew or should have known that its conduct violated FDUTPA.

161. Plaintiff and the members of the Florida subclasses were and are injured as a result of GPA and ELAP's conduct because Plaintiff and the members of the Florida subclasses provided healthcare services anticipating reimbursement at contractually agreed upon rates and instead received underpayments resulting from ELAP's arbitrary and uniform application of Reference

31

Based Pricing.

162.    ELAP and GPA's failure to disclose, and active concealment of, their role in the patient-provider relationship was material to Plaintiff and the members of the Florida subclasses. Healthcare services provided to plan members that are reimbursed at contractually agreed upon rates are reimbursed at higher rates than those decided by ELAP using its arbitrary application of Reference Based Pricing.

163.    Plaintiff and the members of the Florida subclasses have suffered ascertainable losses as a result of GPA and ELAP's misrepresentations and failure to disclose information about their role in the patient-provider relationship and their use of Reference Based Pricing. Had they been aware of ELAP's role and application of Reference Based Pricing, Plaintiff and the members of the Florida subclasses would not have provided the healthcare services to ELAP plan members without seeking prepayment. Plaintiff and the members of the Florida subclasses did not receive the benefit of their bargain due to GPA and ELAP's misconduct.

164.    As a direct and proximate result of GPA and ELAP's violations of FDUTPA, Plaintiff and the members of the Florida subclasses have suffered injury-in-fact and actual damages.

165.    Plaintiff and the members of the Florida subclasses are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

166.    Moreover, Defendants' deceptive and unfair conduct is continuing, and continues to harm consumers in Florida and throughout the United States.

167.    Section 501.211(1), Florida Statutes, states:

Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

168.    Plaintiff is entitled to declaratory and injunctive relief pursuant to Section 501.211(1), Florida Statutes, declaring that Defendants' deceptive and unfair conduct violates FDUTPA and harms the consuming public of Florida and the United States, and enjoining Defendants from further such violations.

169.    Plaintiff, on behalf of itself and the members of the Florida subclasses, accordingly request that the Court award them actual damages and issue an order enjoining Defendants' conduct and requiring ELAP to notify the members of the Florida subclasses of its role in the patient-provider relationship and its arbitrary application of Reference Based Pricing, awarding Plaintiff and the members of the Florida subclasses' attorneys' fees; and any other just and proper relief available under FDUTPA.

## COUNT II
## FRAUD BY CONCEALMENT
### against Defendants on behalf of Plaintiff, the Nationwide Nonemergent Class, and the Florida Nonemergent Subclass

170.    Plaintiff re-alleges and incorporates by reference paragraphs 1 – 152 as if fully set forth herein and further alleges as follows.

171.    Plaintiff brings this claim on behalf of Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass under the common law of fraudulent concealment, as there are no true conflicts of law (case-dispositive differences) among the various states.  In the alternative, Plaintiff brings this claim against Defendants under the laws of Florida where Plaintiff and the Florida Nonemergent Subclass members were damaged by Defendants. To the extent this claim is brought on behalf of the Florida Nonemergent Subclass, it is pled in the alternative to Count I.

172.    Defendants concealed and suppressed material facts concerning their involvement

33

in the patient-provider relationship and their boilerplate application of Reference Based Pricing, including, but not limited to, ELAP's identity, Reference Based Pricing on insurance cards, and the application of Reference Based Pricing throughout the patient admission process.   Defendants knew these representations and omissions were false when made.

173.    Defendants had a duty to disclose their involvement because they consistently represented that healthcare services would be reimbursed at contractually agreed upon rates, when in truth ELAP's arbitrary and uniform application of Reference Based Pricing was known only to Defendants, who had superior knowledge and access to the facts, and knew that the facts were not known to or reasonably discoverable by Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass. These omitted and concealed facts were material because they directly impacted the reimbursement of the healthcare services provided by Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass, and Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass's willingness to provide those services to ELAP's plan members.

174.    Defendants actively concealed or suppressed these material facts, in whole or in part, to induce Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass to provide valuable healthcare services to ELAP's plan members, at the expense of Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass.

175.    Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass were unaware of these omitted material facts and would not have acted as they did had they known of the concealed or suppressed facts. Plaintiff's and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass's actions were reasonable

and justified.

176.     Representative examples of Defendants' misconduct include the following:

*__Patient "CS"__*

177.     Patient CS sought nonemergent healthcare services from Plaintiff in March 2019.

178.     Patient CS presented an identification card to Plaintiff identifying Defendant GPA as the third party administrator, and including the MultiPlan logo.

179.     Before providing such healthcare services, Plaintiff sought and received "preadmit" authorization from Defendant GPA via telephone to provide the services on or around March 6, 2019.

180.     Defendant GPA provided authorization for the services to Plaintiff, but omitted from Plaintiff that ELAP was responsible for determining Plaintiff's reimbursement and would arbitrarily reimburse Plaintiff for only a fraction of the reasonable value of Plaintiffs' services to Patient CS by applying ELAP's arbitrary Reference Based Pricing model.

181.     Based on these omissions, Plaintiff provided nonemergent healthcare services to Patient CS on March 7, 2019.

182.     Plaintiff's billed charges for the healthcare services provided to Patient CS totaled $19,389.00.

183.     On March 29, 2019, Defendant GPA delivered to Plaintiff a Notice of Adverse Benefit Determination, advising Plaintiff that of its $19,389.00 in billed charges, the allowed amount for its reimbursement had been reduced to $2,743.99.

184.     On April 24, 2019, Plaintiff delivered an appeal letter to Defendant GPA regarding this underpayment.

185.     On May 14, 2019, Defendant ELAP revealed itself to Plaintiff for the first time,

delivering a boilerplate letter to Plaintiff identifying itself as the Designated Decision Maker.

186.   Plaintiff delivered an appeal letter to ELAP on August 7, 2019.

187.   ELAP responded to Plaintiff's appeal letter on September 9, 2019 with a boilerplate response letter denying Plaintiff's appeal.

### *Patient "MJ"*

188.   Patient MJ sought nonemergent healthcare services from Plaintiff in April 2019.

189.   Patient MJ presented an identification card to Plaintiff identifying Defendant GPA as the third party administrator, and including the MultiPlan logo.

190.   Before providing such healthcare services, Plaintiff sought and received "preadmit" authorization from Defendant GPA via telephone to provide the services on or around April 22, 2019.

191.   Defendant GPA provided authorization for the services to Plaintiff, but omitted from Plaintiff that ELAP was responsible for determining Plaintiff's reimbursement and would arbitrarily reimburse Plaintiff for only a fraction of the reasonable value of Plaintiffs' services to Patient CS by applying ELAP's arbitrary Reference Based Pricing model.

192.   Based on these omissions, Plaintiff provided nonemergent healthcare services to Patient CS on April 23, 2019.

193.   Plaintiff's billed charges for the healthcare services provided to Patient CS totaled $32,327.32.

194.   On May 30, 2019, Defendant GPA delivered to Plaintiff a Notice of Adverse Benefit Determination, advising Plaintiff that of its $32,327.32 in billed charges, the allowed amount for its reimbursement had been reduced to $9,047.48.

195.   On June 25, 2019, Plaintiff delivered a letter to Defendant GPA regarding its

underpayment.

196.    On July 30, 2019, Defendant ELAP revealed itself to Plaintiff for the first time, delivering a boilerplate letter to Plaintiff identifying itself as the Designated Decision Maker.

197.    Plaintiff delivered an appeal letter to ELAP on August 7, 2019.

198.    ELAP responded to Plaintiff's appeal letter on September 9, 2019 with a boilerplate response letter denying Plaintiff's appeal.

### *Defendants' Continued Misconduct Causes Damage*

199.    Defendants still make no disclosure of their role or their application of Reference Based Pricing, despite having knowledge that healthcare facility providers are deceived and induced to provide such services to ELAP's plan members.

200.    Because of the concealment or suppression of the facts, Plaintiff and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass sustained damages because they did not receive the benefit of their bargain and the value of their healthcare services has not been reimbursed, which is a direct result of Defendants' wrongful conduct.

201.    Defendants' acts were done oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the members of the Nationwide Nonemergent Class and the Florida Nonemergent Subclass's rights and well-being to enrich itself. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT III
### UNJUST ENRICHMENT
### against Defendants on behalf of Plaintiff and the Nationwide Classes

202.    Plaintiff re-alleges and incorporates by reference paragraphs 1 – 152 as though fully set forth herein.

203.     Plaintiff brings this claim on behalf of itself and all Nationwide Class members under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Plaintiff brings this claim under the laws of Florida where Plaintiff and the members of the Florida Subclasses were damaged by Defendants. To the extent this claim is brought on behalf of the Florida Subclasses, it is pled in the alternative to Count I.

204.     Defendants have received and retained a benefit from Plaintiff and the Nationwide Class members and inequity has resulted.

205.     Plaintiff and the Nationwide Class members directly conferred benefits on Defendants by providing plan members with medical services at a discounted rate pursuant to PPO agreements such as Plaintiff's agreement with MultiPlan.

206.     Plaintiff and the Nationwide Class members also conferred benefits on Defendants by rendering services to plan members, which Defendants and their plans are legally and contractually obligated to provide and pay for.

207.     Plaintiff and the Nationwide Class members provided healthcare services to Defendants' plan members in reliance on Defendants' representations and omissions.  Plaintiff and the Nationwide Class members would not have provided their healthcare services as they did, if not for these representations.

208.     Defendants benefitted through their unjust conduct by receiving, *inter alia*, 12% of the facilities' total billed charges, a percentage of the plans' savings (i.e. the amount the facility is underpaid), and valuable medical services rendered to plan members.

209.     It is inequitable for Defendants to retain these benefits. Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each Nationwide Class

member is entitled to recover the amount by which Defendants were unjustly enriched at their expense.

210.    Plaintiff does not have an adequate remedy at law.

211.    The amount of Defendants' unjust enrichment should be disgorged, in an amount to be proven at trial.

212.    Plaintiff, on behalf of itself and all similarly situated Nationwide Class members, seeks an award against Defendants in the amount by which it has been unjustly enriched at Plaintiff's and the Nationwide Class members' expense, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and all other similarly situated Class members, requests that the Court enter judgment against Defendants as follows:

1)    Declare this action to be a proper class action maintainable under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiff as class and subclass representative and Plaintiff's chosen counsel as Class Counsel;

2)    Declare that Defendants' conduct as alleged herein is unlawful, deceptive, fraudulent, or unfair and issue an order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this action;

3)    Declare that Defendants must disgorge, for the benefit of Plaintiff and the Class members, all or part of the ill-gotten gains they received from their misconduct, or make full restitution to Plaintiff and Class members;

4)    Award Plaintiff and Class members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under

the applicable claims;

5)    Award Plaintiff and Class members their reasonable attorneys' fees and costs, as allowed by law;

6)    Award Plaintiff and Class members pre-judgment and post-judgment interest as provided by law; and

7)    Award Plaintiff and Class members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial for any and all issues triable by a jury.

Respectfully submitted:  May 21, 2020.

| | |
|---|---|
| /s/*Gail McQuilkin* | /s/ *Douglas A. Wolfe* |
| **Gail McQuilkin, Esq.** | **Douglas A. Wolfe, Esq.** |
| gam@kttlaw.com | doug@wolfepincavage.com |
| Fla. Bar No.:969338 | Fla. Bar No.:28671 |
| **Tal J. Lifshitz, Esq.** | **Danya J. Pincavage, Esq.** |
| tjl@kttlaw.com | danya@wolfepincavage.com |
| Fla. Bar No.:99519 | Fla. Bar No.:14616 |
| | **Omar Ali-Shamaa, Esq.** |
| | omar@wolfepincavage.com |
| **KOZYAK TROPIN &** | Fla. Bar No.: 121461 |
| **THROCKMORTON LLP** | |
| 2525 Ponce de Leon Blvd., 9th Floor | **WOLFE \| PINCAVAGE** |
| Coral Gables, FL 33134 | 2937 SW 27th Ave. |
| Telephone:   (305) 372-1800 | Suite 302 |
| Facsimile:    (305) 372-3508 | Miami, FL 33133 |
| | Telephone: (786) 409-0800 |
| *Counsel for Plaintiff* | |
| | |
| | *Counsel for Plaintiff* |