UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 20-cv-61007-SINGHAL

SOUTH BROWARD HOSPITAL DISTRICT,
d/b/a/ Memorial Healthcare System, on its own
behalf and on behalf of other similarly situated
healthcare facilities,

      Plaintiff,

v.

ELAP SERVICES, LLC and GROUP &
PENSION ADMINISTRATORS, INC.,

      Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court on Defendants' Joint Motion to Dismiss Plaintiff's

Amended Complaint, or Alternatively, to Dismiss or Strike the Class Allegations ("Motion")

(DE [29]).  Plaintiff South Broward Hospital District ("The District") brings this putative

class action to recover additional payments for hospital services it provided to patients

covered by certain ERISA[1] plans ("ERISA Plans").  The District brings claims under

Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), *see* Fla. Stat. §§

501.201–.203, and for unjust enrichment, against Defendant ELAP Services, LLC

("ELAP"), a co-fiduciary and designated decisionmaker of the ERISA Plans, and

Defendant Group & Pension Administrators, Inc. ("GPA"), the ERISA Plans' third-party

administrator (collectively, "Defendants").  The District alleges that Defendants deceived

_____

[1] *See generally* Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et
seq.

it into treating patients by deliberately withholding information about each patient's health plan.  It seeks to recover a yet-to-be determined millions of dollars that it contends Defendants have "stolen" from healthcare facilities and providers, and to enjoin Defendants from continuing their unfair and deceptive practices.

The Court has reviewed the Motion, Plaintiff's Response in Opposition ("Response") (DE [31]), Defendants' Reply in Support ("Reply") (DE [32]), a notice of supplemental authority filed by the District (DE [33]) and Defendants' response (DE [36]), as well as the relevant case law.  Because the District has alleged sufficient allegations at this point of the proceeding, and for the following reasons explored below, the Motion is **DENIED**.

## I.      BACKGROUND

### A.      The Parties and Reference-Based Pricing

The District is an independent special tax district, operating as a large, public healthcare system in Broward County, Florida.  Am. Compl. ¶ 22 (DE [24]).  It consists of several healthcare providers and facilities, including hospitals, physicians, and outpatient clinics.  *Id.*  ELAP holds itself out as providing claim auditing, repricing, and legal services to self-funded ERISA plans.  *Id.* ¶ 29.  In short, ELAP touts itself as a corporation that offers businesses assistance in saving money on healthcare by, what it represents as, "fighting excessive hospital bills."  *Id.* ¶¶ 58–60.  ELAP becomes the administrator of the self-funded ERISA plans, which gives it authority to make decisions on how each employee's healthcare claim will be paid.  *Id.* ¶ 1.  ELAP, in turn, contracts with GPA to provide third-party administrator services for ELAP-designed self-funded plans.  *Id.* ¶ 31.

Together, ELAP and GPA market themselves as "leaders and co-founders of metric-based pricing," more commonly known as "Reference-Based Pricing." *Id.* ¶ 32. According to the District, this Reference-Based Pricing is an "arbitrary, uniform, and unilateral" reimbursement model that Defendants use systematically to underpay healthcare providers in Florida and around the country. *Id.* ¶¶ 33–34. This Reference-Based Pricing model serves as part of the allegations against Defendants in this case.

### B.   A (Quick) Primer on ERISA Self-Funded Plans

Before diving deep into the specifics of the allegations of deceptive and unfair practices by Defendants, however, it is prudent to establish some basics regarding ERISA and the District's remuneration model. ERISA's purpose is to "establish a uniform administrative scheme [with] standard procedures to guide processing of claims and disbursement of benefits." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan,* 555 U.S. 285, 300 (2009) (internal quotations omitted). ERISA affords certain employers the opportunity to "self-fund" their employees' health insurance. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1324 (11th Cir. 2014). A self-funded ERISA plan is a healthcare plan where an employer assumes the financial risk of providing healthcare benefits to its employees. *Id.* ("[I]n this model, it [is] . . . the employer . . . that endures the financial risk associated with being responsible for paying health care charges incurred by its employees."). Because employers typically lack the knowledge and resources to determine how to process and pay their employees' health-insurance claims, they often outsource claims-handling functions to third-party administrators. Am. Compl. ¶ 30. Self-

funded ERISA plans are each governed by the "Plan Document,"[2] *id.* ¶ 57; *see also* Ex. 8 to 2d Decl. of J.W. Dewbre (DE [30-8]), which establish the terms for administering the plan, including reimbursement limits. *See* Am. Compl. ¶ 57.

To secure particular reimbursement rates, the District enters into participation agreements with preferred provider organizations ("PPOs") that are comprised of insurance companies, third-party administrators, and so-called "rental networks." *See* Am. Compl. ¶¶ 44–45, 95. Pursuant to "PPO Participation Agreements," the District agrees to provide services to members of health plans that have contracted with the PPO at pre-negotiated reimbursement rates. *See id.* ¶¶ 44–45, 95. For such plans, the District's facilities are considered "in-network," and the District accepts payment at these pre-negotiated, bargained-for rates. *Id.* ¶ 78.

However, here, from the face of the Amended Complaint (though not entirely clear from any of the pleadings), it appears the ERISA Plans at issue in this action do ***not*** have such contracts with the District for pre-negotiated reimbursement rates. *E.g.*, *id.* ¶ 140. Accordingly, rather than being "in-network," the ERISA Plans are considered "out-of-network." *See id.* And for out-of-network plans—those with no express contract governing reimbursement rates—the District is entitled to the reasonable value of its services. *Id.* Under the terms of the Plan Documents, the allowable claim limit is the amount that the plans will reimburse an out-of-network provider for covered services, less any amounts owed by the member. *Id.* ¶ 34.

---

[2] The full title of these documents is "Plan Document and Summary Plan Description." *See* Ex. 8 to 2d Decl. of J.W. Dewbre (DE [30-8]). The Court will refer to them simply as "Plan Document" throughout this order.

### C.      The Alleged Scheme

The District accuses Defendants of the following "comprehensive scheme":  ELAP directs its plan members to contract with GPA.  Am. Compl. ¶¶ 8, 31.  GPA, in turn, contracts with another established healthcare company, MultiPlan.  *Id.* ¶ 9.  MultiPlan appears to be referred to also as Private Health Care Systems, Inc., or "PHCS." *Id.* ¶¶ 96–97.

The District and many other healthcare providers are familiar with MultiPlan, as it operates a well-known health insurance network with contracts and pre-negotiated rates with many of them.  *Id.*  In ELAP's case, GPA's contracts with MultiPlan are only for *physician* services, *not* facility services.  *Id.* ¶ 99.

ELAP's insurance cards omit any reference to its identity or application of Reference-Based Pricing.  *Id.* ¶ 9.  Rather, the insurance cards bear the logos *only* for both GPA and MultiPlan.  *Id.*  No reference to, indication of, or representation that: ELAP is the administrator of the plan; the plan would be subject to Reference-Based Pricing; or that the pre-negotiated agreement to pay is only for physician services, not facility services.  *Id.*  The following depicts a typical ELAP insurance card provided to the insured:





*Id.* ¶ 96 (markup in original).

The District contends that this scheme dupes healthcare providers into providing treatment to ELAP plan members under the belief that they will be reimbursed at their otherwise contracted-for rates with MultiPlan. *Id.* ¶ 10. In fact, however, Defendants provide a fraction of those otherwise contracted-for rates because, again, they remit payment only for physician services, not facility services. *Id.* ¶ 99. ELAP does all of this knowing that providers like the District also have contracts with MultiPlan—except that those contracts do not permit MultiPlan to carve out physician-only plans. *Id.* ¶¶ 94, 102–03. Further, ELAP pays the provider based on the application of its Reference-Based Pricing. *Id.* ¶¶ 104–05.

According to the District, it is impossible for providers to realize the scheme until the healthcare services have already been provided and billed, and only after ELAP has "unilaterally and arbitrarily" decided that the provider will be paid at a fraction of the reasonable value of the provider's services. *Id.* ¶¶ 117–23. When a provider tries to combat ELAP's deceit by appealing the arbitrary payment, ELAP announces its involvement and replies with a generic template response that does not address the provider's specific arguments in its appeal. *Id.* ¶¶ 123–24. If a provider ends up seeking reimbursement from the patient, ELAP attorneys, purporting to act on behalf of ELAP plan

members, send intimidating and threatening letters designed to deter the facility from obtaining full payment for its services.  *Id.* ¶ 130.

D.      **The Putative Class and Procedural Posture**

The District brings two counts against Defendants: (1) violation of FDUTPA; and (2) unjust enrichment.  According to the Amended Complaint, the District seeks to certify and maintain this action as a class action with the following classes and subclasses:

The Nationwide Emergent Class:

All healthcare facility providers in the United States with underpaid emergent claims for healthcare services provided to ELAP plan members.

The Nationwide Nonemergent Class:

All healthcare facility providers in the United States with underpaid non-emergent claims for healthcare services provided to ELAP plan members.

The Florida Emergent Subclass:

All healthcare facility providers in Florida with underpaid emergent claims for healthcare services provided to ELAP plan members.

The Florida Nonemergent Subclass:

All healthcare facility providers in Florida with underpaid nonemergent claims for healthcare services provided to ELAP plan members.

*Id.* ¶¶ 147–50.  The District seeks various forms of relief, including declaratory relief, stating Defendants' conduct is unlawful, deceptive, or unfair; injunctive relief, enjoining Defendants from continuing its conduct; disgorgement or restitution; compensatory damages; and attorneys' fees.

Defendants now move to dismiss the Amended Complaint.  In addition to arguing that the District has failed to state a claim for both FDUTPA and unjust enrichment, they

also raise the issue of ERISA preemption.  Finally, in the alternative, they move to strike the class-action allegations.  Each will be discussed in turn.

## II.     LEGAL STANDARD ON A MOTION TO DISMISS

"'When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); s*ee also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Worthy*, 930 F.3d at 1217.  The Court is guided by the well-known principle that, on a motion to dismiss for failure to state a claim, the Court assumes all well-pled allegations in the Complaint are true and views them in the light most favorable to the plaintiff.  *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1534 (11th Cir. 1994).

## III.    FDUTPA CLAIM

The District's first claim against Defendants is for a violation of FDUTPA.  FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  Florida law instructs the courts to construe the terms of FDUTPA liberally in order "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  *Id.* § 501.202(2); *see also Davis v. Powertel, Inc.*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000) ("[FDUTPA] is designed

to protect not only the rights of litigants, but also the rights of the consuming public at large.").

"'A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Calderon v. Sixt Rent a Car, LLC*, 2020 WL 700381, at \*7 (S.D. Fla. Feb. 12, 2020) (quoting *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012)).  "[T]o state a claim for equitable relief, a plaintiff must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) an unfair or deceptive practice which is injurious to consumers."  *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019).  As for the first element, whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a question of fact for the jury to determine.  *Calderon*, 2020 WL 700381, at \*7.

Defendants argue the District's FDUTPA claim fails because FDUTPA applies only to specific types of conduct, none of which is alleged in the Amended Complaint.  They contend the Amended Complaint does not allege that Defendants advertised, solicited, provided, offered, or distributed a good or service specifically *to the District*.  Their position is the District cannot bring a FDUTPA claim because it was not a "consumer"; rather, in their view, it was the seller in the subject healthcare transactions.  Finally, they argue the District has failed to plead any unfair or deceptive conduct.

## A.     Defendants' Business Is "Trade or Commerce" Under FDUTPA

FDUTPA defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of

value, wherever situated."  Fla. Stat. § 501.203(8).  Defendants' business model falls within FDUTPA's scope.  Indeed, "the rendering of healthcare services falls within [FDUTPA's] definition of 'trade or commerce.'"  *See State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1325 (S.D. Fla. 2017).  Similarly, because "billing practices are considered part of 'trade or commerce,'" *Baker v. Baptist Hosp., Inc.*, 115 So. 3d 1123, 1126 (Fla. 1st DCA 2013), the claims adjudication process between Defendants and facilities like Memorial amounts to "trade or commerce" between the parties, *see, e.g.*, *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomms., Inc.*, 642 F. Supp. 2d 1318, 1328–29 (M.D. Fla. 2009) (determining a "bill" sent by utility to excavator for repair of underground cable, that did not disclose corporate overhead and claims processing charges, was in "trade or commerce").  Here, the parties are involved in a basic commercial relationship.  The District provides medical treatment to a patient, while Defendants provide a service to the facility in the form of coordinating payment for the treatment.  This satisfies the scope of FDUTPA.

**B.**    **The District Does Not Need to Be a Buyer of the Defendants' Goods or Services to Maintain a FDUTPA Claim**

Defendants next argue the alleged conduct falls outside FDUTPA's "limited remedial scope" because they were not involved in "trade or commerce" with *the District*. In other words, they argue that the District "was the seller and not the buyer here."  Indeed, it goes without saying, a FDUTPA claim must allege that the defendant unfairly or deceptively advertised, solicited, provided, offered, or distributed a good or service *to the plaintiff*.  *See* Fla. Stat. § 501.211(2).

Defendants rely on *Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1322 (S.D. Fla. 2012).  In *Williams*, the plaintiff alleged that Nationwide violated FDUTPA by making dozens of automated calls to her cell phone for the purpose of collecting a debt her ex-husband owed to American Express Centurion Bank.  *Id.* at 1322.  Nationwide moved to dismiss, arguing FDUTPA did not apply because it was not engaged in any "trade or commerce" with the plaintiff.  *Id.* at 1321.  The plaintiff responded that Nationwide "provid[ed] a 'service' to American Express [and] ma[de] debt collection phone calls" on its behalf."  *Id.*  She argued that she was "aggrieved by Nationwide's relationship to American Express, because that relationship led to collection phone calls."  *Id.*  The court rejected this.  *Id.* at 1322.  In the court's view, regardless of how unfair or deceptive the phone calls were, "[n]o goods or services were offered to her," and thus "Nationwide was not engaged [in] 'trade or commerce' as to Plaintiff in making those calls."  *Id.*  Defendants compare this case to *Williams*, arguing that the District does not allege that Defendants advertised, solicited, provided, offered, or distributed any good or service *to the District*. The Court is not persuaded.

In construing its state's statute, Florida's district courts[3] have held that "an entity does not have to be a consumer in order to have standing to bring a FDUTPA claim." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015); *see also Bailey v. St. Louis*, 196 So. 3d 375, 382–83 (Fla. 2d DCA 2016).  Because the District has alleged that Defendants' unfair and deceptive

---

[3] *McMahan v. Toto*, 311 F.3d 1077, 1080 (11th Cir. 2002) ("[A]bsent a decision from the state supreme court on an issue of state law, [courts] are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently.")

practices "were likely to cause consumer harm," its  FDUTPA claim can proceed.  *See CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, 2018 WL 905752, at *15 (S.D. Fla. Feb. 15, 2018); *see also CWELT-2008 Series 1045 LLC v. PHH Corp.*, 2020 WL 2744191, at *4–5 (S.D. Fla. May 27, 2020) (allowing non-consumer standing because "Florida state courts have ruled uniformly that non-consumers can bring FDUTPA actions").

C.   **The District Has Sufficiently Alleged Facts to Establish Unfair and Deceptive Conduct by Defendants**

As stated above, Florida law employs an objective test to determine whether alleged conduct is unfair or deceptive.  *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017).  In other words, "the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances, rather than actual reliance on the representation or omission at issue." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016) (quotation omitted). "A deceptive act is one which 'is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'"  *Hill Dermaceuticals, Inc.*, 228 F. Supp. 3d at 1302 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). "An unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by countervailing benefits to the consumer or to competition."  *Angelo v. Parker*, 275 So. 3d 752, 755 (Fla. 1st DCA 2019) (quotation omitted).

The District's primary allegation is that Defendants "deceived" it into providing services to certain plan members without prepayment because Defendants did not disclose during the admission process that the plans used ELAP to determine ERISA

Plan reimbursement limits.  Much of the dispute focuses on ELAP's insurance cards and, specifically, how conspicuously (or inconspicuously) they identified the terms and policies.

The District argues the insurance cards failed to adequately disclose that the patient's ELAP plan contracts with MultiPlan only for physician services, not facility services.  It contends the cards *inconspicuously* includes a small, grayed out "Practitioner Only" reference under a much larger ALL CAPS "PHCS" logo at the top of the card.  The location, font size, color, and wording of the "Practitioner Only" reference fails to adequately disclose to providers that ELAP is involved, and that ELAP will apply its Reference-Based Pricing.  Instead, the prominent PHCS/MultiPlan logo gives providers the reasonable expectation that they will be paid rates contained in their contracts with MultiPlan.  And providers do not realize that they have been deceived by Defendants' scheme until after they receive notices from GPA indicating they will be paid only a fraction of the payments expected pursuant to their contracts with MultiPlan.

Defendants respond with the PHCS logo on the insurance cards specifies that the patient's plan is part of a "Practitioner Only" network.  "Practitioner Only" means that the Plan's network only applies to physician and ancillary services, and not hospital facilities. The cards instruct the reader to "Find Physicians at www.multiplan.com."  The MultiPlan website shows that MultiPlan offers a "PHCS Practitioner and Ancillary Network" and a "MultiPlan Practitioner and Ancillary Network."  Further, according to Defendants, the cards also disclose ELAP's involvement and the plan reimbursement limits.  Under the notice to "Providers," the cards instruct Plaintiff to visit planlimit.com "for more information."  As the name "planlimit.com" indicates, the website outlines the plan's reimbursement limits: the plan's PPO network applies to only physician and ancillary

services, and not facilities; the Plan uses ELAP as its designated decisionmaker; and the plan will reimburse facility services via formulas using industry standard benchmarks.

Based on this, if nothing else, dismissal would be unwarranted.  Again, "whether specific conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine.'" *Calderon*, 2020 WL 700381, at *7.  It would be improper for the Court to take that decision away from the jury, especially in cases like this, where each side has laid out not only extensive and detailed argument as to how this so-called scheme was (or was not, from Defendants' view) unfair or deceptive, but each of their arguments is compelling in its own right.

**IV.**   **UNJUST-ENRICHMENT CLAIM**

The second claim against Defendants is for unjust enrichment.  The nature of unjust-enrichment claims has long befuddled courts and scholars.  The majority view appears to be that they are equitable in nature, "based on a legal fiction created by courts to imply a 'contract' as a matter of law." *E.g.*, *Williams v. Burger King Corp.*, 2020 WL 5083550, at *6 (S.D. Fla. July 20, 2020) (internal quotation omitted).  Other courts, however, identify them as "actually an action at law to enforce a quasi-contract." *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1369 (S.D. Fla. 2007) (tracing the origin of unjust-enrichment claims to common-law actions of assumpsit); *see also Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So.2d 383, 390 (Fla. 4th DCA 1997).  Either way, to state a claim for unjust enrichment, "a plaintiff must allege (1) the plaintiff conferred a benefit on the defendant, (2) the defendant had knowledge of the benefit, (3) the defendant accepted or retained the benefit conferred, and (4) the circumstances indicate that it would be inequitable for the defendant to retain the benefit

without paying fair value for it."  *Surgery Ctr. of Viera, LLC*, 2020 WL 4726864, at *9 (internal quotation omitted).

Defendants argue the District's unjust-enrichment claim fails for two reasons.  First, the District's rights and remedies—namely, its right to reimbursement—are governed by express contracts, or the Plan Documents.  Second, even if the Plan Documents are not viewed as contracts between the District and Defendants, they argue the District did not confer any direct benefit on Defendants for which it would be inequitable.

### A.      There Is No Express Contract Between the District and Defendants

Legal-versus-equitable debate aside, what is not unclear is that "the existence of a contractual relationship between the parties typically precludes an unjust-enrichment claim," *Williams*, 2020 WL 5083550, at *6, because such claims call on a court "to imply a contractual obligation where there otherwise is none," *Berry*, 497 F. Supp. 2d at 1369. It follows that "[t]he Court cannot do so if a contract is already in place that directly addresses the matter complained of."  *Id.*

Defendants argue the Plan Documents govern the District's right to reimbursement, thus acting as a contract between them and the District.  In other words, the District's claim for unjust enrichment seeks to recover its lost benefit of the bargain under the Plan Documents for providing services to members.  They rely on *Berry* and provide only a cursory parenthetical.  *Berry*, however, is unrelated to the matters at issue here.

The existence of a contractual relationship between the parties that would bar a claim for unjust enrichment requires more than just a commercial relationship; it requires an *express* contract.  *See Agritrade, LP v. Quercia*, 253 So. 3d 28, 34 (Fla. 3d DCA 2017)

(barring unjust enrichment claims "where an express contract exists concerning the same subject matter").  It also requires privity between the parties.  *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584–85 (11th Cir. 2013).  "Privity is a mutuality of interest, an identification of interest of one person with another."  *AMEC Civil, LLC v. PTG Const. Servs. Co.*, 106 So. 3d 455, 456 (Fla. 1st DCA 2012).  Florida courts, as well as courts in this district applying Florida law, have maintained these types of claims for unjust enrichment brought by healthcare providers and facilities against health-plan administrators and repricing entities like Defendants.  *See, e.g.*, *Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp.*, 899 So. 2d 1222, 1227–28 (Fla. 1st DCA 2005); *see also Kowalski v. Jackson Nat'l Life Ins. Co.*, 2013 WL 11941583, at *4 (S.D. Fla. Aug. 30, 2013) (citing *Shands Teaching Hospital & Clinics, Inc.* in ruling "the existence of the insurance policy does not preclude" unjust-enrichment claims).  While the Plan Documents indeed govern the District's remuneration, they are not contracts between the District and Defendants.

### B.  The District Has Sufficiently Alleged Conferral of a Direct Benefit

"Under Florida law, no unjust enrichment claim will lie unless the plaintiff conferred a direct benefit on the defendant."  *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1236 (S.D. Fla. 2015).  Defendants cite to a line of "well settled" case law that establishes, where a medical provider treats a patient, the "benefit" flows to the patient, not the health plan or its agents.  *E.g.*, *Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, 2004 WL 6225293 (S.D. Fla. Mar. 8, 2004).

As a matter of law, a healthcare provider can state a claim for unjust enrichment where it alleges that "it would be inequitable for . . . healthcare insurers 'to be allowed to

collect premiums from their members and subscribers in return for agreeing to properly reimburse providers . . . that render covered medical services without paying the value thereof' to the provider."  *Surgery Ctr. of Viera, LLC*, 2020 WL 4726864, at \*9.  These types of unjust-enrichment claims may also be brought against health plan administrators and repricing entities like Defendants.  *See, e.g.*, *Shands Teaching Hosp. & Clinics, Inc.*, 899 So. 2d at 1227–28.

Further, the District argues that, as a matter of fact, it has adequately alleged that it conferred a benefit on Defendants by providing ELAP plan members with medical services at a discounted rate pursuant to the MultiPlan contract and by providing treatments to patients with ELAP plans for which Defendants are legally obligated to provide and pay.  This is certainly sufficient, at this stage of the proceedings, to withstand a motion to dismiss.  Because this a question of fact that cannot be resolved at this stage of the proceedings, *see Wilson*, 77 F. Supp. 3d at 1237, the Court cannot dismiss this claim.

## V.     ERISA PREEMPTION

In the alternative to dismissal for failure to state a claim, Defendants next argue that the District's state-law claims are preempted under ERISA.

### A.     The Standard for ERISA Preemption of State-Law Claims

"ERISA includes expansive pre-emption provisions, . . . which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004) (internal quotations omitted).  There are two types of ERISA preemption: (1) conflict preemption and (2) complete preemption. *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1343 (11th Cir.

2009).  "Conflict preemption, also known as defensive preemption, is a substantive defense to preempted state law claims."  *Id.* at 1344.  It is an affirmative defense, *e.g.*, *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1012 n.6 (11th Cir.2003), that preempts any state-law claim that "relates to" an ERISA plan, *Conn. State Dental Ass'n*, 591 F.3d at 1344; *see also* 29 U.S.C. § 1144(a).  On the other hand, "[c]omplete preemption, also known as super preemption, is a judicially-recognized exception to the well-pleaded complaint rule.  It differs from defensive preemption because it is jurisdictional in nature rather than an affirmative defense."  *Conn. State Dental Ass'n*, 591 F.3d at 1344; *see also Ervast*, 346 F.3d at 1012 ("Whether complete preemption applies is a jurisdictional issue, which must be addressed first and is separate and distinct from whether a defendant's ERISA § 514, 29 U.S.C. § 1144, preemption defenses apply.").  Defendants argue the District's claims are preempted under conflict preemption.

### B.    The District's Claims Under FDUTPA and for Unjust Enrichment Do Not "Relate to" an ERISA Plan

Conflict preemption provides that ERISA "shall supersede any and all [s]tate laws insofar as they may now or hereafter ***relate to*** any employee benefit plan."  29 U.S.C. § 1144(a) (emphasis added); *see also In re Managed Care Litig.*, 595 F. Supp. 2d 1349, 1355 (S.D. Fla. 2008).  Because it is an affirmative defense, Defendants bear the burden of proof.  *See  Candies Shipbuilders, LLC v. Westport Ins. Co.*, 2016 WL 614694, at *6 (E.D. La. Feb. 16, 2016).

Defendants contend that the "central, predominant issue" at the heart of this case is "ELAP's systematic method of underpaying health care providers, like the District, for the  health  care  services  provided  to  ELAP's  clients."   Therefore,  they  contend,  the District's claims seek "nothing more than additional benefits from ERISA plans."  Courts,

indeed, tend to define "relates to" expansively.  Take, for instance, the definition in *Shaw*: A state-law claim "relates to" an ERISA plan "if it has a connection with or reference to such a plan."  *Id.* at 96–97; *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 43, 57 (1987) ("[S]tate common law tort and contract actions asserting improper process of a claim for benefits [are preempted by ERISA]."); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 136, 139–40 (1990) (defining "relates to" as an ERISA plan being "a critical factor in establishing liability").  But, while courts are instructed to apply conflict preemption broadly in order to advance Congress's intent to ensure uniform regulation of employee welfare benefit plans, *see Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 98 (1983), this position by Defendants fails for several reasons.

First, a broad application of the doctrine does not bestow on a defendant broad immunity from state-law remedies just because the alleged deceptive business practices directly involved healthcare-related commerce.  The District points to a line of cases that do, indeed, limit the otherwise broad definition of "relates to" in certain circumstances. *E.g.*, *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533 (11th Cir. 1994).  In this line of case law, courts have been prone to cut off the broad application of the definition of "relates to" when the state-law claim is "too tenuous, remote, or peripheral" to the plan. *See id.*  In fact, "courts have, with near unanimity, found that independent state law claims of third party healthcare providers are not preempted by ERISA."  *Surgery Ctr. of Viera, LLC*, 2020 WL 4726864, at *6.

In *Boca Raton Community Hospital, Inc. v. Great-West Healthcare of Fla.*, 2008 WL 728538 (S.D. Fla. Mar. 17, 2008), the court held that ERISA did not defensively preempt unjust-enrichment claims and other state statutory claims for underpaid hospital

services.  *Id.* at *6–7.  The court was presented with an implied-contract claim, and one of the main issues was the applicability of pricing set by PHCS (or, MultiPlan).  *Id.* at *1–3.  In rejecting the defendant's preemption argument, the court wrote: "[S]everal of the Circuits, including the Eleventh, have found that state law claims brought by health care providers against plan insurers have too remote an effect on ERISA plans to be preempted by [ERISA]."  *Id.* at *6.

*Surgery Center of Viera* is highly comparable and, being in Florida and within the Eleventh Circuit, highly persuasive.  There, plaintiff Surgery Center of Viera, LLC treated a patient by way of an operation that defendant UnitedHealthcare deemed "'medically necessary' and would be covered at the network level because 'there was not a doctor, health care professional, or facility in [the patient's] area to provide the services.'"  *Surgery Ctr. of Viera, LLC*, 2020 WL 4726864, at *1.  The plaintiff understood that communication as authorizing the patient's treatment as "in-network," and billed the defendant over $400,000 for the procedure.  *Id.*  The defendant remitted just over $40,000, disputing that the plaintiff was "in-network" as it did not have an "in-network provider agreement" with the defendant.  *Id.*  Among many other things, the plaintiff filed suit for breach of contract and unjust enrichment.  *Id.* at *2.  The defendant moved to dismiss all state-law claims, arguing conflict preemption.  *Id.* at *4.  The court rejected this premise, citing specifically to *Lordmann*.  *Surgery Ctr. of Viera, LLC*, 2020 WL 4726864, at *4.  The court's rationale is compelling:

> Applying the reasoning of the numerous circuit and district court decisions discussed above, the state law claims brought in this case are not the types of claims that are defensively preempted.  In the cases in which individual employees or physicians brought state law claims to recover for medical services, ***the plaintiffs were either parties to the ERISA plans or sought to enforce terms of the ERISA plans*** and, accordingly,

Congress created uniform federal causes of action for their recovery under the ERISA statute. ***In cases such as [this], in which the Plaintiff is an out-of-network or "non-participating" healthcare provider and not seeking payment under the Plan, the state law claims do not "relate to" the ERISA plan.***

*Id.* (emphasis added).

Like the plaintiff in *Surgery Center of Viera*, the District is not seeking payment under the ERISA Plans. In fact—and as discussed above—the ERISA Plans at issue in this action do ***not*** have such contracts with the District for pre-negotiated reimbursement rates. Therefore, the ERISA Plans are considered "out-of-network." The District does not ask the Court to interpret or rely on any provision of an ERISA plan whatsoever. Its claims are premised on misrepresentations and omissions by Defendants, not pre-approval to perform medical services based on the plans.

Defendants cite to three cases, none of which is persuasive. *See Alcalde v. Blue Cross & Blue Shield of Fla., Inc.*, 62 F. Supp. 3d 1360, 1365 (S.D. Fla. 2014) (finding ERISA preempted provider's claims against health plan for breach of contract, unjust enrichment, and FDUTPA because determining any amounts owed by health plan required reference to ERISA plan); *Columna, Inc. v. UnitedHealthcare Ins. Co.*, 2019 WL 2076796, at *3 (S.D. Fla. Apr. 29, 2019) (dismissing quasi-contract claims as preempted by ERISA); *FFP, LLC v. UnitedHealthcare Ins. Co.*, 2018 WL 11152202, at *2–3 (S.D. Fla. June 6, 2018) (finding ERISA preempted provider's contract and quasi-contract claims for underpayments because amount insurer owed would be determined specifically under an ERISA plan). Although the cases come from this district, they are not entirely analogous. Unlike the claims here, the claims there sought specifically to enforce the terms of ERISA plans. For instance, in *Alcalde*, the plaintiff-dentist provided

necessary medical services to patients who were members of the defendant-insurer's health insurance plan, which were governed by ERISA.  62 F. Supp. 3d at 1364.  The defendant "pre-approved" these services but did not make full payment.  *Id.*

Finally, while not necessary at this point, the Court notes the District's footnote citations to several out-of-circuit, district court orders that support its position.  *E.g.*, *Centura Health Corp. v. Agnew*, 2018 WL 3454976, at *5–8 (D. Colo. July 18, 2018) (finding preemption did not apply to hospital's claim for declaratory judgment against ELAP over its interference with the hospital's contracts with patients); *Twin Cities Cmty. Hosp., Inc. v. Ennis, Inc.*, 2011 WL 13046851, at *2–4 (C.D. Cal. Aug. 2, 2011) (finding hospital's implied-contract and state-law claims against ELAP and GPA not defensively preempted by ERISA).

The District raises an alternative reason why its claims are not preempted by ERISA.  It is clear that ERISA preemption applies only to claims by ERISA entities; hospitals are not ERISA entities.  *See Boca Raton Cmty. Hosp., Inc. v. Great-W. Healthcare of Fla.*, 2008 WL 728538, at *7 (S.D. Fla. Mar. 17, 2008) ("[U]nlike employers and employees who gave up state law causes of action because of ERISA in exchange for obtaining federal causes of action under ERISA, health care providers are not parties to the ERISA 'bargain' and they do not have an independent, direct private right of action under the statutory scheme as an ERISA participant.").

## VI.    CLASS-ACTION ALLEGATIONS

Finally, Defendants move in the alternative to dismiss or strike the District's class-action claims and allegations.  Federal Rule of Civil Procedure 23(c)(1)(A) instructs courts to determine whether to certify a class action "[a]t an early practicable time."  Construing

this rule, some courts have been inclined to rule on the issue of class certification "[w]hen the propriety of a class action procedure is plain from the initial pleadings," even prior to the filing of a motion seeking class certification.  *MRI Assocs. of Saint Pete v. State Farm Mut. Auto. Ins. Co.*, 755 F. Supp. 2d 1205, 1207 (M.D. Fla. 2010).  But this appears to be the exception, not the rule.  *See Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) ("[T]he parties' pleadings alone are often not sufficient to establish whether class certification is proper.").  In fact, courts in this district have erred on the side of passing on this question when attached to a motion to dismiss.  *See Martorella v. Deutsche Bank Nat'l Tr. Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013) ("The question of class certification is generally not addressed on a motion to dismiss.").  In fact, in *Randy Rosenberg, D.C., P.A. v. GEICO Gen. Ins. Co.*, 2019 WL 6828150, at *6 (S.D. Fla. Dec. 13, 2019), the court noted that dismissal of class allegations at the motion to dismiss stage "is an *extreme remedy* appropriate only where a defendant demonstrates from the face of the complaint that it will be *impossible* to certify the classes alleged by the plaintiff regardless of the facts that the plaintiff may be able to prove."  (Emphasis added).

Based on this alone, it is premature to dismiss the District's class-action claims.  Of course, "the shape and form of a class action evolves only through the process of discovery, and it is premature to draw such a conclusion before the claim has taken form."  *Randy Rosenberg, D.C., P.A.*, 2019 WL 6828150, at *6.  Defendants cannot, at this point, demonstrate that it would be "impossible" to establish any of the five factors under Rule 23(a) to certify the putative class.  *See Vision Power, LLC v. Midnight Express Power Boats, Inc.*, 2020 WL 808284, at *2 (S.D. Fla. Feb. 18, 2020) (delineating the five factors under Rule 23(a) as "numerosity, commonality, typicality, and adequacy, as well as the

implicit requirement of ascertainability").  Nor can Defendants demonstrate that it would be "impossible" to certify a "damages class," *see* Fed. R. Civ. P. 23(b)(3), and an "injunction class," *see* Fed. R. Civ. P. 23(b)(2).

## VII.   <u>**CONCLUSION**</u>

Based on the foregoing, it is **ORDERED AND ADJUDGED** that Defendants' Joint Motion to Dismiss Plaintiff's Amended Complaint, or Alternatively, to Dismiss or Strike the Class Allegations (DE [29]) is **DENIED**.  Defendants shall file their answer to the Amended Complaint within **fourteen (14) days** from the date of this order.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 3rd day of December 2020.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies to counsel via CM/ECF

24