UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61007-CIV-SINGHAL/VALLE

SOUTH BROWARD HOSPITAL DISTRICT d/b/a
MEMORIAL HEALTHCARE SYSTEM, on its own
behalf and on behalf of other similarly situated
healthcare facilities,

      Plaintiff,

v.

ELAP SERVICES, LLP, and GROUP & PENSION
ADMINISTRATORS, INC.,

      Defendants.

_____/

## ORDER

**THIS CAUSE** has come before the Court upon Defendants' Motion for Summary Judgment (DE [149]).  Defendants filed the Motion and supporting Statement of Material Facts ("Defs.' SOMF") (DE [150]) on February 3, 2023.  Plaintiff filed its Opposition ("Pl.'s Opp.") (DE [155]) and Statement of Material Facts ("Pl.'s SOMF") (DE [156]) on March 14, 2023, and Defendants filed a Reply in Support of its Motion (DE [164]) and Reply Statement of Material Facts ("Defs.' Reply SOMF") (DE [163]) on April 11, 2023.  For the reasons discussed below, the Motion is granted.

### I.  BACKGROUND

Plaintiff South Broward Hospital District d/b/a Memorial Healthcare System ("Memorial") filed this putative class action against Defendants, ELAP Services, LLC ("ELAP") and Group & Pension Administrators, Inc. ("GPA") alleging underpayment of its hospital services.  Third-party claims administrators like Defendant GPA partner with

ELAP to manage the administration of employee health claims for employers with self-funded insurance plans.  *See* (Am. Compl. (DE [24] at ¶¶ 1–3)).  While ELAP purports to determine "fair" and "reasonable" reimbursement amounts for provider services, Plaintiff maintains that, in effect, ELAP's reimbursement formula results in the consistent underpayment of services rendered by healthcare providers like Memorial.  *See* (Defs.' SOMF (DE [150] at ¶¶ 3–4)); (Am. Compl. (DE [24] at ¶ 5)).  Plaintiff additionally alleges that Defendants conceal their involvement in the claims process to deceive hospitals into treating ELAP members.  Plaintiff challenges Defendants' actions under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* and under the common law theory of unjust enrichment.

### A.  The Parties

#### i.  Plaintiff South Broward Hospital District ("Memorial")

Plaintiff Memorial is a nonprofit hospital system, which consists of several healthcare providers and facilities, including hospitals, physicians, and outpatient clinics.  *See* (Am. Compl. (DE [24] at ¶ 22)).  Following discovery, Plaintiff estimates that it has incurred approximately $2 million in damages due to underpayment from Defendants for its hospital services.  (Pl.'s Opp. (DE [155] at 6[1])).

#### ii.  Defendant ELAP Services, LLP

ELAP is a "health care cost containment company" which audits hospital bills received by self-funded health plans and assesses the appropriate amount to pay hospitals for such services.  *See* (Defs.' SOMF (DE [150] at ¶ 20)); (Pl.'s SOMF (DE [156] at ¶ 20) (disputing use of Plaintiff's class certification as basis for Defendants'

---

[1] All page numbers reference the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

statement.)).  Defendant ELAP emerged in 2002 to help self-funded health plans determine the extent of their healthcare coverage.  *See* (Defs.' SOMF (DE [150] at ¶ 2)); (Pl.'s SOMF (DE [156] at ¶ 2) ("Undisputed.")).  ELAP's founders, Steve Kelly and Woody Waters, soon discovered that health plans required assistance in "determining the fair and reasonable amount to pay hospitals for health care services."  (Defs.' SOMF (DE [150] at ¶ 3)); (Pl.'s SOMF (DE [156] at ¶ 3) ("Undisputed.")).  In 2007, ELAP launched its reference-based pricing services, which assisted ELAP in auditing hospital bills for its clients, self-insured healthcare plans.  *See* (Defs.' SOMF (DE [150] at ¶¶ 4–5)); (Pl.'s SOMF (DE [156] at ¶¶ 4–5) ("Undisputed.")).

### iii.  Defendant Group & Pension Administrators, Inc.

Defendant GPA is a third-party administrator ("TPA") for self-funded healthcare companies.  *See* (Am. Compl. (DE [1] at ¶ 8)).  Though GPA is one of many TPAs that partners with ELAP's clients, GPA is ELAP's largest TPA by claim volume.  *See* (Defs.' SOMF (DE [150] at ¶ 22)); (Pl.'s SOMF (DE [156] at ¶ 22) ("Undisputed.")).  GPA partners with established healthcare companies like MultiPlan, also referred to as Private Health Care Systems, Inc. ("MultiPlan/PHCS"), which, in turn, operates a well-known insurance network with contracts and preapproved rates with several hospital systems, including Plaintiff.  *See* (Am. Compl. (DE [24] at ¶¶ 96–97)).  Critically, GPA's contracts with MultiPlan/PHCS are for physician services, not facility services.  *See* (Am. Compl. (DE [24] at ¶ 99)).  Any pre-approved rates that Plaintiff or other hospitals may have with MultiPlan/PHCS, therefore, would not apply to facility services and such services are subject to ELAP's Allowable Claim Limit auditing.  *See* (Pl.'s Opp. (DE [155] at 10)).

### B.  Reference Based Pricing and Allowable Claim Limits

Plaintiff's allegations center on Defendants' "metric-based pricing" regime,

otherwise known as "Reference-Based Pricing" ("RBP").  *See* (Am. Compl. (DE [24] at ¶ 32)).  ELAP's RBP is premised on the idea that "[p]eople should pay a fair, reasonable price for quality healthcare."  *See* https://www.elapservices.com/about/ (last viewed on 9/27/2023).  ELAP defines the amount its clients should pay as its Allowable Claim Limit ("ACL").  *See* (Defs.' Mot. (DE [149] at 1)).  The ACL is calculated as the "greater of (a) the hospital's actual cost to provide the service plus 12% ('Cost +12%') or (b) the Medicare allowed amount for the services in the hospital's geographic region plus an additional 20% ('Medicare+20%')."  (Defs.' SOMF (DE [150] at ¶ 8)).  ELAP maintains that it developed its ACL methodology by consulting industry experts, attorneys, cost data, profit margin data, and publications–in short, "anything [they] could get [their] hands on" and "anyone whose path [it] crossed regarding the operation of employee benefits or hospitals" before testing and adjusting its formula.  *See* (Defs.' SOMF (DE [150] at ¶ 8)).  The goal, as ELAP explains, was to arrive at an ACL that provided a "fair margin" to hospitals like Plaintiff.  *Id.* at ¶ 11.  ELAP notes that it implemented its ACL methodology many years before 2016, when it audited the earliest bill at issue in this case.  *See id.* at ¶ 12.  ELAP also claims that it "never seriously considered" altering its ACL metrics where hospitals accepted the ACL amounts "without objection approximately 90% of the time."  *Id.* at ¶ 12.

Plaintiff disputes ELAP's ACL methodology and calculations.  *See* (Pl.'s SOMF at (DE [155] at ¶¶ 8–12)).  As for the first calculation method, Cost+12%, Plaintiff contends that ELAP relies on hospital-specific cost-to-charge ratios, which hospitals report to the federal government annually, as opposed to the actual cost to hospitals.  *See id.* at ¶¶ 8–9.  Plaintiff cites to Mr. Waters' testimony that the Cost+12% methodology was a "judgment call," which ELAP accepted without any expertise in hospital operations or

management. *Id.* at ¶ 10.  According to Plaintiff, ELAP added the second calculation method, Medicare+20%, as a backstop measure once it realized that Cost+12% did not always exceed the amounts paid by Medicare.  *See id.*  Still, Plaintiff maintains that the Medicare+20% formula results in underpayment where ELAP uses a Medicare base rate that "excludes payments for outliers and disproportionate share hospital ('DSH') payments." *Id.* at ¶ 8.  Finally, Plaintiff challenges ELAP's 90% ACL acceptance rate and maintains that the figure "is based on hospitals not further pursuing additional payments." *Id.* at ¶ 12.

### C. Memorial Healthcare Claims and Charges

The parties largely agree as to the number and charges associated with Plaintiff's healthcare claims.  Plaintiff has identified 626 healthcare claims audited by ELAP, for which Plaintiff billed $8,867,228.  *See* (Defs.' SOMF (DE [150] at ¶¶ 13–14)); (Pl.'s SOMF (DE [156] at ¶¶ 13–14) ("Undisputed.")).  Plaintiff, through its expert J. Mark Abernathy, assesses that the reasonable value of the claims falls between $3,021,848 and $3,694,907.  *See* (Defs.' SOMF (DE [150] at ¶ 15)); (Pl.'s SOMF (DE [156] at ¶ 15) ("Undisputed.")).  ELAP's ACL for the claims amounts to $1,567,859.  *See* (Defs.' SOMF (DE [150] at ¶ 16)); (Pl.'s SOMF (DE [156] at ¶ 16) ("Undisputed.")).

Of the 626 claims, 225 relate to non-emergent cases for which Plaintiff billed $2,873,083 and ELAP's ACL totals $529,730.  *See* (Defs.' SOMF (DE [150] at ¶ 17)); (Pl.'s SOMF (DE [156] at ¶ 17) ("Undisputed.")).  The remaining 401 claims relate to emergent cases, for which Plaintiff billed $5,994,145 and ELAP's ACL amounts to $1,038,129.  *See* (Defs.' SOMF (DE [150] at ¶ 18)); (Pl.'s SOMF (DE [156] at ¶ 18) ("Undisputed.")).

Plaintiff can balance bill its patients for what it cannot recoup from Defendants.

*See* (Pl.'s Opp. SOMF (DE [156] at ¶ 74)); (Defs.' Reply SOMF (DE [163] at ¶ 74) ("Undisputed.")).   Defendants maintain there is no record evidence that Plaintiff ever collected more than the ACL from any ELAP plan member for the services rendered.  *See* (Defs.' SOMF (DE [150] at ¶ 44)).   In support, Defendants cite to deposition testimony of Plaintiff's corporate representative, which reflects that Memorial has not balance billed its patients since July 2016.  *See id.*  Plaintiff, on the other hand, cites to record evidence that it has balance billed ELAP members in the past, including one invoice sent to a bad-debt collection agency.  *See* (Pl.'s Opp. SOMF (DE [156] at ¶ 44)).  Plaintiff also maintains that it has balance billed 17% of Defendants' plan members.  *See* (Pl.'s Opp. (DE [155] at 11)).

### D.  Disclosure of ELAP Involvement

#### i.  ELAP Insurance Cards

The extent to which ELAP's involvement and its use of RBP methodology can be gleaned from ID cards issued to ELAP plan members is up for debate.  Per Defendants, ELAP takes "several steps" to guarantee that hospitals have access to information regarding its ACL metrics.  (Defs.' Mot. (DE [149] at 7)).  Defendants maintain that the ID cards contain the "appropriate physician only network logo" which ELAP notes is designed by non-party MultiPlan/PHCS.  (Defs.' SOMF (DE [150] at ¶ 23)).  The ID cards, according to Defendants, also contain a "separate statement that the network is for physicians only."  *Id*.  Defendants note that Plaintiff was aware that MultiPlan/PHCS was offering a PHCS practitioner or physician only network.  *See id.* at ¶ 25; (Pl.'s SOMF (DE [156] at ¶ 25)) ("Undisputed that, around March 2016, certain employees of Memorial were aware that MultiPlan was offering a PHCS practitioner or physician only network.").  Defendants further cite to two call transcripts in which GPA informed Memorial employees

6

that "[their] facility claims are audited by ELAP."  (Defs.' SOMF (DE [150] at ¶¶ 46–47)).

By contrast, Plaintiff explains that ELAP takes deliberate measures to conceal its involvement from plan members' ID cards.  *See* (Pl.'s Opp. (DE [155] at 9)).  Plaintiff posits that "[n]ot all ID cards generated for ELAP plan members include a physician only network logo."  (Pl.'s SOMF (DE [156] at ¶ 23)).  Plaintiff maintains that the "only way" for a hospital employee to learn of ELAP's involvement from a plan member's ID card is to visit the website listed as a source "for more information," titled, "www.planlimit.com."  (Pl.'s Opp. (DE [155] at 9)).

While Plaintiff agrees that certain of its members were aware of the MultiPlan/PHCS physician only network offering, it still contends that "not all Memorial employees would understand what it means to be a practitioner-only network."  (Pl.'s SOMF (DE [156] at ¶ 26)).  In practice, Plaintiff notes that a physician's office at a large hospital system like Plaintiff's may register the patient as in-network through MultiPlan/PHCS, which is correct for a physician's office.  *See* (Pl.'s Opp. (DE [155] at 11)).  When the same physician registers the same ELAP plan member for a hospital procedure, however, Plaintiff states that the Multiplan/PHCS rates do not apply for facility services.  *See id.*  According to Plaintiff, the result in such circumstances is that the ELAP plan member is registered as in-network correctly for the physician's office and incorrectly for the hospital.  *See id.*

ii.  Memorial's Internal Coding for Physician Only Plans

On or about March 2016, Plaintiff's "Insurance Matrix Team" identified a solution which would have enabled Plaintiff to properly code physician only plans, separate from the contracts between PHCS and Plaintiff, which would have potentially avoided registration errors.  *See* (Defs.' SOMF (DE [150] at ¶ 31); (Pl.'s SOMF (DE [156] at ¶ 31)

(noting deponent "could not say that his idea would eliminate errors.") (internal quotations omitted)).   Although Plaintiff's employee identified the PHCS physician only coverage solution on or about March 2016, Plaintiff's hospital system did not implement the change until September 19, 2019.  *See* (Defs.' SOMF (DE [150] at ¶ 35)); (Pl.'s SOMF (DE [156] at ¶ 35)) ("Undisputed that Memorial created a PHCS physician only coverage within its system on September 19, 2019.").   One month later, Plaintiff created a flyer to advise its employees of the change and instructed employees to identify physician only plans from the face of a plan member's ID card.  *See* (Defs.' SOMF (DE [150] at ¶¶ 36–37)); (Pl.'s SOMF (DE [156] at ¶¶ 36–37)).   Plaintiff advised its employees to look out for certain "keywords" to identify if the insurance is limited to "Practitioner" or "Physician only" and included sample images of insurance cards to this effect.  (Defs.' SOMF (DE [150-14])).



Revenue Cycle Management Flyer                                                      Date: October 2019

**PHCS – Practitioner Only**

There are many PHCS coverages that are for **Physician visits ONLY** and **NOT FOR HOSPITAL VISITS**. Whenever the patient shows you their insurance card or if you're working on the account, it is important to look at the copy of the card for keywords to verify if this is for Practitioner/Physician only.

For PB you will only add the coverage as **MPG Practitioners Only Generic**.

For HB (Hospital Access Areas) need to add the coverage **Commercial Generic NC**.





(Defs.' SOMF (DE [150-14])).

Plaintiff maintains that its flyer was meant to educate employees on how to correctly register PHCS Practitioner-only plans. *See* (Pl.'s SOMF (DE [156] at ¶ 38)). According to Plaintiff, if the plan member was correctly registered as out-of-network, then the hospital would not schedule such patients for non-emergent services. *See id.* Plaintiff also instructed its staff to direct any patients with non-contracted healthcare plans to other facilities for non-emergent services. *See* (Defs.' SOMF (DE [150] at ¶ 42)); (Pl.'s SOMF (DE [156] at ¶ 42)). By law, Plaintiff is required to treat patients in emergent cases regardless of their insurance. *See* (Pl.'s SOMF (DE [156] at ¶ 42)). On certain occasions, Plaintiff has refused to admit members of Defendant-affiliated plans in non-emergent circumstances. *See* (Pl.'s SOMF (DE [156] at ¶ 43)). Plaintiff has also balance billed Defendant's plan members. *See id.* at ¶ 44.

ELAP prefers that its logo should not appear on any plan member's ID card. *See* (Pl.'s SOMF (DE [156] at ¶ 68) ("[i]t was ELAP's practice and policy to refuse to allow any client to reference ELAP on a member ID card."); (Defs.' Reply SOMF (DE [163] at ¶ 68) ("Undisputed.")). Plaintiff maintains that ELAP omits its logo to obscure its involvement, while Defendant notes that ELAP's logo does not convey its reimbursement methodology

and "may cause confusion."). *See* (Pl.'s SOMF (DE [155] at ¶ 68); (Defs.' Reply SOMF (DE [163] at ¶ 68)).  ELAP also maintains that hospitals review ID cards to determine the payer and network, and ELAP is neither.  *See* (Defs.' SOMF (DE [150] at ¶ 51)).

iii.   ELAP Repricing Notices

ELAP prepares a Notice of Adverse Benefit Determination letter and audit sheet for each audit it performs.  *See* (Defs.' SOMF (DE [150] at ¶ 49)); (Pl.'s SOMF (DE [156] at ¶ 49) ("Undisputed.")).  Plaintiff receives the Notice and audit sheet, though the letter does not disclose ELAP's involvement.  *See* (Defs.' SOMF (DE [150] at ¶ 50)); (Pl.'s SOMF (DE [156] at ¶ 50)).

**E.  ELAP's Fee Structure**

Generally, ELAP charges fees totaling 12% of the hospital's billed charges for its auditing services.  *See* (Defs.' SOMF (DE [150] at ¶ 53)); (Pl.'s SOMF (DE [156] at ¶ 53) ("Undisputed.")).  ELAP's services include auditing provider claims and defending the results of its audit by retaining attorneys in connection with any disputes arising from its reimbursement rates.  *See* (Defs.' SOMF (DE [150] at ¶ 54)); (Pl.'s SOMF (DE [156] at ¶ 54) ("Undisputed.")).  ELAP initially set its rate at 12% of hospital charges to remain competitive with others in the market that charge a percentage of savings, between 25% and 30%.  *See* (Steve Kelly Depo. (DE [150-2] at 39:8–40:1)).  ELAP opted against a percentage-of-savings fee structure to avoid a conflict of interest that might incentivize ELAP to reduce its ACL to increase its fees. *See* (Defs.' SOMF (DE [150] at ¶ 57)); (Pl.'s SOMF (DE [156] at ¶ 57) ("Undisputed")).  On occasion, ELAP coordinated alternate fee arrangements with its clients.  *See* (Defs.' SOMF (DE [150] at ¶ 55)); (Pl.'s SOMF (DE [156] at ¶ 55) ("Undisputed.")).

### F.  The Putative Class

Plaintiff brings the instant action on its own behalf and on behalf of all similarly situated hospitals.  According to Plaintiff's Motion for Class Certification (DE [141]), Plaintiff seeks to certify three classes:

1. The Florida Emergent Class

   "All hospitals in Florida with emergent Claims for healthcare services provided to ELAP plan members within the applicable statute of limitations."  (DE [141] at 10).

2. The Florida Nonemergent Class

   "All hospitals in Florida with non-emergent Claims for healthcare services provided to ELAP within the applicable statute of limitations."  (DE [141] at 10).

3. The Nationwide Issue Class

   "On the issue of whether ELAP and GPA unjustly retained benefits realized due to their application of RBP, all hospitals nationwide that have Claims for providing healthcare services to ELAP plan members within the applicable statute of limitations."  (DE [141] at 11).

### G.  Defendants' Motion to Dismiss

Earlier in this litigation, Defendants moved to dismiss Plaintiff's FDUTPA and unjust enrichment claims.  *See* (DE [29]).  In the alternative, Defendants argued Plaintiff's claims were ERISA-preempted and moved to strike Plaintiff's class action allegations.  This Court denied Defendants' Motion to Dismiss on December 3, 2020.  *See* (DE [37]).  On Plaintiff's FDUTPA claim, this Court recognized that the claims adjudication process between Defendants and facilities like Plaintiff's constituted "trade or commerce," such that Defendants fall within FDUTPA's scope.  *See* (DE [37] at 9–10).  Specifically, this Court noted a commercial relationship between the parties:  Plaintiff "provides medical

treatment to a patient, while Defendants provide a service to the facility in the form of coordinating payment for the treatment." *Id.* at 10. The Court also determined that Plaintiff did not need to be a consumer to have standing to bring its FDUTPA claim and allowed the same claim to proceed where Plaintiff alleged that Defendants' unfair and deceptive acts "were likely to cause consumer harm." *Id.* at 11–12 (quoting *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, 2018 WL 905752, at *15 (S.D. Fla. Feb. 15, 2018)). Finally, this Court held that Plaintiff had sufficiently alleged facts establishing unfair and deceptive conduct by Defendants. *See id.* at 12. The Court considered Plaintiff's core argument–that Defendants concealed their involvement at the admission stage through misleading insurance ID cards and, in so doing, deceived Plaintiff into providing services to select plan members without prepayment. *See id.* at 12. The Court noted that the issue of whether Defendants' "specific conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine." *Calderon v. Sixt Rent a Car, LLC*, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), aff'd, 5 F.4th 1204 (11th Cir. 2021).

Defendants' challenge to Plaintiff's unjust enrichment claim fared no better. Defendants argued that Plaintiff failed to sufficiently allege its unjust enrichment claim where (i) the Plan Documents comprised express contracts between the parties; and (ii) even if not, Plaintiff failed to show that it conferred any direct benefit on Defendants. *See id.* at 14–15. The Court rejected Defendants' first argument and found that a mere contractual relationship would not preclude a claim for unjust enrichment absent any express contract. *See id.* at 15–16 (citing *Agritrade, LP v. Quercia*, 253 So. 3d 28, 34 (Fla. 3d DCA 2017)). The Court also determined that, at the Motion to Dismiss stage, Plaintiff had sufficiently alleged conferral of a direct benefit upon Defendants. *See id.* at

16–17.  The Court recognized that Plaintiff adequately alleged that it rendered ELAP plan members with medical services at a discounted rate pursuant to the MultiPlan/PHCS contract and, in exchange, Defendants were legally obligated to pay for such services. *See id.* at 17.  Finally, the Court determined that Plaintiff's claims were not ERISA-preempted where they did not "relate to" an ERISA plan as alleged and where this Court determined that hospitals like Plaintiff are not ERISA entities.  *See* (DE [37] at 21–22)).

### H.  Defendants' Motion for Summary Judgment

Defendants now argue that they are entitled to summary judgment on Plaintiff's FDUTPA and unjust enrichment claims.  Defendants move for summary judgment as to Plaintiff's FDUTPA claim on three grounds; namely, that Defendants' billing practices (i) are not deceptive or unfair; (ii) do not result in consumer harm; and (iii) did not cause Plaintiff any damages.  *See* (Defs.' Mot. (DE [149] at 9–16)).  Defendants also argue that Plaintiff's unjust enrichment claim fails where Plaintiff conferred no direct benefit upon Defendants.  *See id.* at 17–19.  Defendants conclude that any argument by Plaintiff relating to underpayment or inaccurate appeals is preempted under ERISA.

## II.  <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a));[2] *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

---

[2] The 2010 Amendment to Rule 56(a) substituted the phrase "genuine dispute" for the former "'genuine issue' of any material fact."

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  An issue is "genuine" if a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).  And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014).  However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).  "[T]his, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

### III. <u>ANALYSIS</u>

#### A. FDUTPA

FDUTPA aims to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat.

Ann. § 501.202. A consumer claim for damages under FDUTPA is comprised of three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016). "[T]o state a claim for equitable relief, a plaintiff must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Under Florida law, an objective test is applied to determine whether a practice constitutes a deceptive or unfair practice. *See Calderon*, 2020 WL 700381, at *7, (citing *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017)).

Defendants move for summary judgment on Plaintiff's FDUTPA claim and argue that their actions do not constitute deceptive or unfair practices, do not result in consumer harm, and did not cause any damages for Plaintiff. *See* (Defs.' Mot. (DE [149] at 10)). While the Court is not convinced by Defendants' first and final contentions, its second – that Plaintiffs fail to demonstrate consumer harm – carries the day.

                i.      <u>Whether Defendants Engaged in Unfair or Deceptive Conduct</u>

FDUTPA does not define "unfair or deceptive acts or practices," but Florida courts have. First, as for unfair trade practices, the parties urge this Court to apply two different definitions supplied by Florida courts. Defendants propose the definition of unfair trade practice contained in the Federal Trade Commission (FTC) Policy Statement and used by Florida's Third DCA in *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090 (Fla. 3d DCA 2014)). This definition interprets an "unfair act or practice" as requiring a (1) substantial injury that (2) must not be outweighed by any countervailing benefits to consumers or competition; and (3) could not have been reasonably avoided. Plaintiff,

however, proposes the Florida Supreme Court's definition of "unfair practice" as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to customers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (cleaned up).  The parties' positions underscore a split in the caselaw as to what constitutes actionable deception and an unfair practice. Defendants' definition of an "unfair act or practice" applies a subjective test, which asks whether Plaintiff was actually deceived and, if so, whether Plaintiff's reliance was reasonable.  *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So.3d 1090, 1096–1100 (Fla.Dist.Ct.App.2014) (denying class certification where certain class members could avoid buying easily purloined headlights better than others).  Plaintiff's definition, however, relies on a purely objective analysis.  The Eleventh Circuit favors Plaintiff's objective test, and this Court will do the same.  *See Democratic Republic of the Congo v. Air Cap. Grp.*, LLC, 614 F. App'x 460, 471 n.7 (11th Cir. 2015) ("deception is judged from an objective point of view.") (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla.2003)); *see also Marrache v. Bacardi U.S.A, Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (applying *PNR*'s definition of "unfair trade practice").  Second, Florida courts define "deception" as "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015) (emphasis omitted).

The Court now turns to consider whether Defendants' actions can be construed as unfair or deceptive.  Plaintiff primarily alleges two different types of deceptive and unfair conduct by Defendants.  First, Plaintiff alleges that Defendants "deceived" Plaintiff into providing services to ELAP plan members without prepayment by issuing misleading ID

cards that concealed ELAP's involvement. *See* (Am. Compl. (DE [24] at ¶¶ 82–110)). Second, Plaintiff alleges that Defendants' RBP practice is deceptive and unfair because it results in underpayment to providers like Plaintiff. *See id.* at ¶¶ 33–47.

This Court examined Plaintiff's allegations relating to ELAP plan members' ID cards at length in its Order denying Defendants' Motion to Dismiss. *See* (DE [37] at 12–14). At the Motion to Dismiss stage, the Court concluded it would be "improper for the Court to take that decision away from the jury, especially in cases like this, where each side has laid out not only extensive and detailed argument as to how this so-called scheme was (or was not, from Defendants' view) unfair or deceptive, but each of their arguments is compelling in its own right." *See id.* at 14. At this juncture, however, the Court has the benefit of the parties' extensive discovery and will reexamine this issue accordingly. In their Motion, Defendants argue that Plaintiff was not deceived by the ID cards because its "Insurance Matrix Team" identified a solution in or around March 2016 that would have allowed Memorial to properly code physician only plans. *See* (Defs.' Mot. (DE [149] at 6–7)). In September 2019, Plaintiff updated its system to allow for physician only coding. *See* (Defs.' SOMF (DE [150] at ¶ 35)); (Pl.'s SOMF (DE [156] at ¶ 35)). Plaintiff even prepared a handout for its employees with this information. *See* (Defs.' SOMF (DE [150] at ¶¶ 36–37)); (Pl.'s SOMF (DE [156] at ¶¶ 36–37)). Plaintiff's flyer apparently instructs employees on how to identify physician only plans simply by reviewing the face of the ID card. *See* (Defs.' SOMF (DE [150] at ¶¶ 36–37); (Pl.'s SOMF (DE [156] at ¶¶ 36–37)). In response, Plaintiff cites to evidence that its employees were duped by the ID cards into admitting out of network patients without prepayment. *See* (Pl.s' Opp. (DE [155] at 11) ("[an] employee testified that the hospital was 'misled in general by the whole GPA, ELAP relationship because the ID card . . . doesn't denote

how this claim was going to be paid.  So we render services and find out what's behind them after those services have been rendered." (internal quotations omitted)). Defendants also point to two instances in which Memorial called Defendant GPA and GPA informed Memorial in no uncertain terms that the claim would be audited by ELAP. *See* ((Defs.' SOMF (DE [150] at ¶¶ 46–47)).[3]  Plaintiff responds that the "low-level" employees who placed the calls to GPA could not have appreciated the importance of ELAP's involvement.  See (Pl.'s Opp. (DE [156] at ¶¶ 46–47)).  Considered collectively, the parties raise factual issues regarding ELAP's transparency (or lack thereof) which are not fit for resolution at this stage.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.").

Plaintiff's allegations regarding the unfairness of Defendants' RBP scheme are similarly unfit for resolution through summary judgment.  In short, Plaintiff argues that Defendants' RBP program is arbitrary and consistently underpays facilities like Plaintiff. *See* (Am. Compl. (DE [24] at ¶¶ 33–47)).  ELAP's Reference Based Pricing, or RBP program, audits hospital claims and applies a formula to determine the Allowable Claim Limit that its clients will pay.  *See* (Defs.' Mot. (DE [149] at 6)).  The formula, Defendants maintain, is calculated as the "greater of (a) the hospital's actual cost to provide the service plus 12% ('Cost +12%') or (b) the Medicare allowed amount for the services in the hospital's geographic region plus an additional 20% ('Medicare+20%')."  (Defs.' SOMF (DE [150] at ¶ 8)).  The parties differ considerably in their understanding of how

---

[3] Plaintiff disputes the authenticity of the call transcripts and asks this Court to strike the two Statements of Material Fact that rely on the unauthenticated evidence.  See (Pl.'s Opp. (DE [156] at ¶¶ 46–47)).  This Court finds that, even if it were to strike both paragraphs, it would not change the Court's ultimate determination that the parties' arguments are better reserved for a trier of fact.

the RBP program came into effect.   Plaintiff cites to record evidence that ELAP's Cost+12% methodology was a "judgment call," which ELAP green-lit without any expertise in hospital operations or management.   *See id.* at ¶ 10.   Defendants, on the other hand, contend that ELAP used anything [they] could get [their] hands on" and "anyone whose path [it] crossed regarding the operation of employee benefits or hospitals" to formulate its ACL methodology.   *See* (Defs.' SOMF (DE [150] at ¶ 8)).   ACL origins aside, the parties disagree as to the actual amounts calculated by respective ACL formulae.   Plaintiff contends that ELAP's first ACL formula, Cost+12%, relies on hospital-specific cost-to-charge ratios, which hospitals report to the federal government annually, and which does not reflect the actual cost to hospitals.   *See* (Pl.'s SOMF (DE [156] at ¶¶ 8–9)).   According to Plaintiff, ELAP's Medicare+20% formula also results in underpayment where ELAP uses a Medicare base rate that "excludes payments for outliers and disproportionate share hospital ('DSH') payments."   *Id.* at ¶ 8.   Defendants suggest that "Memorial's contention that ELAP's ACL is too low is simply a difference of opinion."   *See* (Defs.' Mot. (DE [149] at 14)).   The Court is unconvinced.   *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481-UU, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) ("If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment.").   Given the factual disparities surrounding ELAP member ID cards and ELAP's ACL formula, the Court declines to rule on whether Defendants' actions were deceptive or unfair.

ii.      Whether Defendants' Actions Caused Consumer Harm

Defendants argue that Plaintiff's inability to demonstrate consumer harm is fatal to its FDUTPA claim.   This Court agrees.   While FDUTPA does not require an entity to be a consumer to have standing to sue under the Act, all claimants must "prove . . . an injury

or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim."
*Caribbean Cruise Line, Inc*, 169 So. 3d at 169; *see Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-CV-21484, 2021 WL 2658693, at *3 (S.D. Fla. June 22, 2021), report and recommendation adopted, No. 21-21484-CIV, 2021 WL 3403208 (S.D. Fla. Aug. 4, 2021) ("While an entity other than a consumer can bring a FDUTPA claim, harm to consumers is still a required element."). Plaintiff originally alleged that underpayment by Defendants results in greater patient financial responsibility because ELAP members can be balance billed for what Memorial is unable to recoup from self-funded healthcare plans. *See* (Am. Compl. (DE [24] at ¶¶34–47, 64–72)). In its Opposition, however, Plaintiff argues that Defendants' actions cause two different forms of consumer harm: namely, to Memorial as a consumer and to ELAP members. *See* (Pl.'s Opp. (DE [155] at 13–14)). Neither is persuasive.

First, Plaintiff broadly construes FDUTPA to argue that it is a consumer by virtue of its commercial relationship with ELAP. *See* (Pl.'s Opp. (DE [155] at 13–14)). In support, Plaintiff references this Court's Order denying Defendants' Motion to Dismiss, which recognized a "basic commercial relationship" between the parties, whereby Memorial "provides medical treatment to a patient, while Defendants provide a service to the facility in the form of coordinating payment for the treatment." (DE [37] at 10). Plaintiff similarly relies on caselaw to argue that "virtually any injury resulting from an unfair or deceptive practice occurring in trade or commerce is a 'consumer injury.'" *See* (Pl.'s Opp. (DE [155] at 13)) (citing *Crmsuite Corp. v. Gen. Motors Co.*, 2020 WL 5898970, at *6 (M.D. Fla. Oct. 5, 2020)). This Court disagrees with Plaintiff's expansive interpretation of FDUTPA. Plaintiff's read–that its business relationship with Defendants alone renders it a consumer–strains credulity. For one, Plaintiff cannot rest on this Court's findings in its

Order on Defendants' Motion to Dismiss where, at that stage, the Court was bound to accept Plaintiff's factual allegations as true.  Second, record evidence undercuts Plaintiff's argument where Memorial's corporate representative testified that Plaintiff received no "benefit or anything of value" from Defendants.  *See* (Defs.' Reply (DE [164-9] at 41:21–42:20)).  Even as a non-consumer, however, Plaintiff has standing to pursue FDUTPA claims so long as it can demonstrate "an injury or detriment to consumers."  *Caribbean Cruise Line, Inc.*, 169 So. 3d at 169.

Next is Plaintiff's original argument, that Defendants' practices harm ELAP members because the patients are liable for any unpaid portion of their medical bill.  *See* (Pl.'s Opp. (DE [155] at 14)).  Defendants contend that Plaintiff's argument fails where Memorial has not balance billed patients in nearly seven years.  *See* (Defs.' Mot. (DE [150] at 13)).  Defendants also cite to Plaintiff's admission that ELAP has insulated its clients from balance billing.  *See id*.  Plaintiff counters that it need not show actual injury for its FDUTPA claim to survive summary judgment.  *See* (Pl.'s Opp. (DE [155] at 14)) (citing *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) ([FDUTPA] requires "a showing of probable, not possible, deception that is *likely to cause injury* to a reasonable relying consumer.") (emphasis in original)).  Plaintiff, however, posits that it can demonstrate actual injury where it previously balance billed ELAP members and, in one case, sent member bills to debt collection agencies.  *See* (Pl.'s SOMF (DE [156] at ¶ 44)); *see also* (Pl.'s SOMF (DE [156] at ¶ 74 (ELAP members risk "balance billing, debt collection efforts and credit impairments, have exposure to legal claims by the hospital, and risk refusal of non-ER treatment."))).

Plaintiff has not established actual consumer harm or a substantial likelihood of consumer harm to ELAP members.  Plaintiff's corporate representative testified that the

hospital "stopped sending balance billing in July of 2016," and agreed that "if an ELAP or GPA plan member went to [a] Memorial facility after–or was discharged after July 1st, 2016, they would not have received a balance bill."  *See* (DE [150-15] at 165:6–167:11). Though Plaintiff offers five exhibits to evidence consumer harm, none are convincing. *See* (Pl.'s SOMF (DE [156] at ¶ 44) ("Defendants' internal data shoes Memorial balance billed members.")).  Plaintiff cites to two internal emails where its employees discuss the potential for balance billing, but do not actually issue a bill to patients.  *See* (DE [156-25]) (June 13, 2019 internal email noting that Memorial "would balance bill" patient); (DE [156-32]) (May 29, 2018 email noting that Memorial "can balance bill"); (DE [156-34]).  The remaining exhibits include a document referencing the hospital's 17% balance bill rate, *see* (DE [156-9]), a patient bill reflecting an outstanding balance of $235.66, *see* (DE [156-32]), and an account history report for one patient bill that Plaintiff transferred to bad debt collections, *see* (DE [156-33]).

This Court cannot reconcile Plaintiff's purported damages, which Plaintiff's expert estimates at more than $2 million, with the miniscule sum that Plaintiff has sought or actually recouped from ELAP members.  *See* (Pl.'s Opp. (DE [155] at 14)).  Plaintiff's exhibits merely show that it has considered balance billing patients and, in a few instances, has issued balance bill statements.  The exhibits do not reflect that Plaintiff received any amount from ELAP members.  And even if Plaintiff could show consumer harm, this Court strains to see how purported damages done to ELAP members – a few hundred dollars, at most, according to Plaintiff's exhibits – relate to the $2 million in damages sought by Plaintiff.  *See Tymar Distribution LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1289 (S.D. Fla. 2021) ("plaintiffs must point to specific damages done to consumers in the market" to allege consumer harm under FDUTPA) (cleaned up).

Plaintiff's failure to demonstrate actual or likely consumer harm, after full discovery and extensive briefing, entitles Defendants to summary judgment on Plaintiff's FDUTPA claim.

### iii.   Whether Defendants' Actions Caused Plaintiff's Damages

Defendants also attack Plaintiff's FDUTPA claim for its failure to demonstrate that Defendants' allegedly unfair or deceptive practices caused Memorial's damages.  *See* (Defs.' Mot. (DE [149] at 15–17)).  Causation is a required element of any consumer FDUTPA claim.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (citations omitted).  To demonstrate causation, a plaintiff "need not prove reliance on the allegedly false statement . . . but rather a plaintiff must simply prove that an objectively reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir.2011).   "Causation must be direct, rather than remote or speculative."  *Hennegan Co. v. Arriola*, 855 F.Supp.2d 1354, 1361 (S.D. Fla. 2012).

Plaintiff alleges damages of over $2 million, which it calculates as the difference in what ELAP paid Memorial under its ACL formula and what Memorial's expert determined to be reasonable.  *See* (Pl.'s Opp. (DE [155] at 18–19)).  Defendants argue that Plaintiff's FDUTPA claim fails where "none of the allegedly deceptive or unfair acts caused Plaintiff to be paid less than their expert's reasonable value calculation."  *See* (Defs.' Mot. (DE [149] at 16)).  For non-emergent claims, Defendants maintain that Plaintiff could not have been deceived by ELAP's claim auditing because Memorial was aware of ELAP's involvement and still opted to treat ELAP patients. *See id.* at 16–17.  On the other hand, for emergent claims, Defendants argue that Plaintiff cannot establish causation where Memorial treats emergency patients regardless of their insurer.  *See id.* at 17.

As set forth above, factual issues preclude a finding of unfair or deceptive acts under FDUTPA. *See supra* Section III.A.i.   The Court, therefore, cannot determine

whether the alleged unfair or deceptive acts caused Plaintiff's damages.  Nevertheless, Plaintiff has failed to show actual or likely consumer harm as required under FDUTPA and, as a result, Summary Judgment on Count I is **GRANTED**.

### B. Unjust Enrichment

Defendants move for summary judgment on Plaintiff's unjust enrichment claim on the basis that Memorial conferred no direct benefit upon Defendants.  *See* (Defs.' Mot. (DE [149] at 17–19)).  In its Amended Complaint, Plaintiff alleges that it conferred a benefit on Defendants by "rendering services to plan members, which Defendants and their plans are legally and contractually obligated to provide and pay for."  *See* (Defs.' Mot. (DE [149] at 18)) (citing Am. Compl. (DE [24] at ¶ 186)).  Defendants maintain that Plaintiff's allegation has been contradicted by record evidence.  Specifically, Defendants argue that they are under no legal obligation to provide or pay for services to its plan members.  *See* (Defs.' SOMF (DE [150] at ¶ 61)).  Plaintiff disputes Defendants' position and notes that ELAP has "historically . . . funded or co-funded settlement payments" in instances where hospitals pursued payment above the ACL.  *See* (Pl. SOMF (DE [156] at ¶ 61)).  Plaintiff also maintains that it has conferred a direct benefit upon Defendants where ELAP receives a fee based on a percentage of the hospital's billed charges.  *See* (Pl.'s Opp. (DE [155] at 23)).  The more Memorial treats ELAP members, Plaintiff contends, the more Defendants profit.  *See id.*  Plaintiff notes that Defendants enrich themselves by underpaying Plaintiff for its services despite retaining the benefits (via fees) from billed charges.  *See id.*

To state a claim for unjust enrichment, a plaintiff "must allege (1) the plaintiff conferred a benefit on the defendant, (2) the defendant had knowledge of the benefit, (3)

the defendant accepted or retained the benefit conferred, and (4) the circumstances indicate that it would be inequitable for the defendant to retain the benefit without paying fair value for it."  *Surgery Ctr. of Viera, LLC v. UnitedHealthcare, Inc.*, 465 F. Supp. 3d 1211, 1224 (M.D. Fla. 2020) (quoting *Dyer v. Wal-Mart Stores, Inc.*, 535 F. App'x 839, 841–842 (11th Cir. 2013)).

Plaintiff argues that a benefit may be "inferred when an entity enriches itself unjustly to the detriment of another."  (Pl.'s Opp. (DE [155] at 122)) (quoting *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013)).  Defendants, however, maintain that any benefit must be conferred directly.  *See* (Defs.' Mot. (DE [149] at 18) (citing *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017)).  Defendants also recognize a split in authority on whether a provider conferred a direct benefit on a health plan by treating its members.  *See* (Defs.' Mot. (DE [149] at 18) (citing *Fla. Emergency Physicians Kang & Assocs. M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1303 (S.D. Fla. 2021)).  Nevertheless, Defendants argue, the split has been resolved in the two years following this Court's Order denying Defendants' Motion to Dismiss.  The recent decisions cited by Defendants hold that any benefit conferred by a healthcare provider to a health plan for treating its member is "indirect at best."  *See* (Defs.' Mot. (DE [149] at 18–19)) (citing *Vanguard Plastic Surgery, PLLC v. UnitedHeatlhcare Ins. Co.*, No. 21-62403-CIV, 2022 WL 19037216, at *4 (S.D. Fla. Feb. 9, 2022)).

The Florida Supreme Court has held that a plaintiff "must *directly* confer the benefit to the defendant" to prevail on an unjust enrichment claim.  *Kopel,* 229 So. 3d at 818 (emphasis added) (citing *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So.2d 876, 879 (Fla. 3d DCA 1996); *see also Steven L. Steward & Assocs. P.A. v. Truist Bank,* 2020 WL 5939150, at *2 (M.D. Fla. Oct. 6, 2020) (noting that under

a claim for unjust enrichment, "the benefit conferred must be a direct benefit"); *see also Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1236 (S.D. Fla. 2015) ("Under Florida law, no unjust enrichment claim will lie unless the plaintiff conferred a direct benefit on the defendant."). Defendant is correct that any benefit conferred by Plaintiff upon Defendants is "indirect at best." *Vanguard Plastic Surgery, PLLC*, 2022 WL 19037216, at \*4. Although this Court previously held that Plaintiff could state a claim for unjust enrichment, the factual and legal circumstances have shifted in the two years since that opinion. First, the factual record does not support that Defendants "are legally obligated" to provide and pay for services rendered by Plaintiff to ELAP members. *See* (Defs.' SOMF (DE [150] at ¶ 61)). Though Plaintiff points to prior instances where ELAP has settled claims with hospitals demanding payment above the ACL, Plaintiff does not establish any legal obligation for Defendants to do so. *See* (Pl.'s SOMF (DE [156] at ¶ 61)). Second, the Court is not convinced by Plaintiff's argument that ELAP "profit[s] directly" from Memorial by virtue of its fee arrangement. *See* (Pl.'s Opp. (DE [155] at 19)). While ELAP generally calculates its fees as 12% of a hospital's billed charges, it ultimately receives payment from the self-funded healthcare plans. *See* (Defs.' SOMF (DE [150] at ¶ 53). Even then, ELAP occasionally arranges different fee structures with its clients. *See id*. at ¶ 55. Third and finally, the Court agrees with recent opinions in this District and finds that the benefit that flows from a healthcare provider to the insurer is indirect. *See Vanguard Plastic Surgery, PLLC*, 2022 WL 19037216, at \*4; *N. Shore Med. Ctr., Inc. v. Cigna Health & Life Ins. Co.*, No. 1:20-CV-24914-KMM, 2021 WL 3419356, at \*5 (S.D. Fla. May 10, 2021) (collecting cases); *Boca Raton Reg'l Hosp., Inc. v. Celtic Ins. Co.*, No. 19-80650-CIV, 2020 WL 9458896, at \*10 (S.D. Fla. Feb. 6, 2020) ("[A] medical provider who treats a patient does not confer a direct benefit on the patient's health insurer."). Here, any benefit

conferred by Plaintiff upon Defendants is even more attenuated where Defendants audit hospital claims on behalf of the insurer.   Accordingly, the Court finds that Plaintiff conferred no direct benefit upon Defendants and, as such, Defendants' Motion to Dismiss Count II of Plaintiff's Amended Complaint is **GRANTED**.

### C. ERISA Preemption

Defendants' final claim is that ERISA preempts any argument by Plaintiff that (i) ELAP's ACL formulae result in underpayment, and (ii) ELAP's appeal process is improperly handled.  *See* (Defs.' Mot. (DE [149] at 20)).  Plaintiff responds that its claims are not ERISA-preempted where they do not rely on an ERISA plan or statute and where Plaintiff does not seek repayment under any ERISA plan terms.  *See* (Pl.'s Mot. (DE [155] at 24)).

ERISA contains "expansive preemption provisions, . . . which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quotations omitted).  Conflict, or defensive preemption, "arises from ERISA's express preemption provision, § 514(a), which preempts any state law claim that 'relates to' an ERISA plan." *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1344 (11th Cir. 2009) (citing 29 U.S.C. § 1144(a)); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987) ("If a state law 'relates to employee benefit plans,' it is preempted."  (brackets and ellipses omitted)).  A state law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." *Pilot Life Ins. Co.*, 481 U.S. at 47 (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985)).  "Complete preemption, also known as super preemption, is a judicially-recognized exception to the well-pleaded complaint rule.  It differs from defensive preemption because it is jurisdictional in nature rather than an affirmative

defense." *Conn. State Dental Ass'n*, 591 F.3d at 1344.

Defendants fail to advance any novel arguments as to why Plaintiff's claims are preempted under ERISA. Rather, Defendants contend that Plaintiff "signaled it may morph" its claims to allege that the ACL metrics within ERISA documents result in underpayment and that Defendants improperly handle appeals under the ERISA plans. *See* (Defs.' Mot. (DE [149] at 20)). This Court is also unpersuaded by Defendants' argument that the ERISA preemption-related case law underpinning this Court's Order on Defendants' Motion to Dismiss has since changed. *See* (DE [37] at 17–21). Defendants note that this Court partly relied on *Surgery Ctr. of Viera, LLC v. Cigna Health*, 2020 WL 4726864 (June 8, 2020) in determining that Plaintiff's cause of action did not "relate to" ERISA plans and that Plaintiff was not an ERISA entity. *See* (Defs.' Mot. (DE [149] at 21, n. 5)). Defendants then cite to two subsequent decisions involving the same serial litigant where the reviewing court found that the plaintiff's claims were, in fact, preempted under ERISA. *See id*. (citing *Surgery Ctr. of Viera, LLC v. Cigna Health*, 2020 WL 4227428, at *3 (M.D. Fla. July 23, 2020) ("*SCV I*"); *Surgery Ctr. of Viera, LLC v. UnitedHealthcare Ins. Co.*, 2020 WL 10501467, at *3 (M.D. Fla. July 30, 2020)) ("*SCV II*"). The two recent authorities cited by Defendants are distinguishable where the parties in each case agreed that the alleged plans were subject to ERISA. *See SCV I*, *5 (finding that the "pleadings show [plaintiff's] allegations are intrinsically tied to the [ERISA] Plan."); *SCV II*, at *4 ("Counts II through IV are each based on the Plan Contract, which is subject to ERISA."). This Court therefore finds that Plaintiff's claims are not ERISA-preempted. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (DE [149]) is **GRANTED**. Pursuant to Fed. R. Civ. P. 58, a separate final judgment will

be entered.  The Clerk of Court is directed to **CLOSE** this case and **DENY AS MOOT** any pending motions.

  **DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 29th day of September 2023.

Copies furnished counsel via CM/ECF

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE