```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF FLORIDA
 2
                        Case No. 20-CV-61007-SINGHAL
 3


 4   SOUTH BROWARD HOSPITAL DISTRICT,)
                                     )
 5          Plaintiff,               )
                                     )
 6      -v-                          )
                                     )
 7   ELAP SERVICES, LLC, et al,      )
                                     )
 8          Defendants.              )   Fort Lauderdale, Florida
                                     )   November 27, 2023
 9   _____)   3:19 p.m.

10                  TRANSCRIPT OF MOTION HEARING

11             BEFORE THE HONORABLE RAAG SINGHAL

12                     U.S. DISTRICT JUDGE

13   Appearances:

14

15   For the Plaintiff:        KOZYAK TROPIN & THROCKMORTON, LLP
                                BY:  BRANDON SADOWSKY, ESQ.
                                BY:  TAL LIFSHITZ, ESQ.
16                              BY:  BENJAMIN WIDLANSKI, ESQ.
                                2525 Ponce de Leon Boulevard
17                              Miami, Florida  33134

18   For the Defendants:       FISHER BROYLES, LLP
                                BY:  IRENE ORIA, ESQ.
19                              199 East Flagler Street
                                Miami, Florida  33131
20                                   -and-
                                THE SUMMERVILLE FIRM, LLC
21                              BY:  KRISTOPHER ALDERMAN ESQ.
                                1226 Ponce de Leon Avenue
22                              Atlanta, Georgia  30306

23
     Reporter:                 Karl Shires, RMR, FCRR
24   (954) 769-5496            Official Court Reporter
                               299 East Broward Boulevard, # 110B
25                             Fort Lauderdale, Florida  33301
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1          (Call to Order of the Court.)

 2          THE COURT:  Nice to see you all, and nice to be able

 3  to hear arguments on this case, which is sure to be a lot

 4  different than my last case.

 5          This is South Broward Hospital District versus ELAP.

 6  If I can just get appearances, first for the plaintiff.

 7          MR. SADOWSKY:  Brandon Sadowsky for the plaintiff.

 8          MR. LIFSHITZ:  Good morning, Judge.  Good afternoon.

 9  Tal Lifshitz from Kozyak, Tropin, Throckmorton on behalf of

10  plaintiff.  And I have my partner Ben Widlanski.  I'll let him

11  introduce himself.

12          MR. WIDLANSKI:  Good afternoon, Your Honor.  I'm just

13  here to observe today.

14          THE COURT:  Nice to see the three of you.  I

15  appreciate your patience.  Sorry we're getting started a little

16  bit late.

17          How about for ELAP?

18          MS. ORIA:  Irene Oria and Kris Alderman.  I'm from

19  Fisher Broyles, and Mr. Alderman is from The Summerville Firm.

20  We're for the defendants.  And he will be handling the argument

21  for the defense.

22          THE COURT:  Okay.  Great.  Thank you all very much.  I

23  don't mind if you split it up.  And similarly, you know, for

24  both sides as well.

25          So we're here regarding the plaintiff's motion for
```

1   reconsideration.  This is found at docket entry 185.  It's

2   reconsideration of the Court's order granting the defendants'

3   motion for summary judgment, which is found at docket entry

4   183.

5            I just want to begin by really thanking both sides for

6   the excellent briefing not just on the reconsideration part but

7   throughout the case and just the strong legal work on the case.

8            Obviously, I've read everything that's been filed.

9   But I think that reconsideration motions are things that serve

10  multiple purposes.  One, obviously, you want to try to get the

11  Court to change the Court's opinion.  But, two, even if the

12  Court doesn't do that, it just helps lay out the record for the

13  next stage, if it stays the same.

14           So keeping all of that in mind, whenever you're ready,

15  if you want to take it away, I'm happy to hear.

16           MR. SADOWSKY:  Thank you, Judge.  Is it okay to go to

17  the podium?

18           THE COURT:  Sure.  I'm assuming by electronics that

19  you -- are you already hooked in, ready to go?

20           MR. SADOWSKY:  We're hooked in.  I think we just need

21  it on the screen turned on over there.

22           THE COURT:  And are you using a laptop from where

23  you're sitting?

24           MR. SADOWSKY:  Yes.

25           THE COURT:  Okay.

1      MR. SADOWSKY:  And if you would like, we have a copy

2  of the PowerPoint, if you would like it.

3      THE COURT:  That would be great.  Thanks.

4      Oh, also, I should say -- I think you all heard me

5  tell the other folks we'll be back at 4 o'clock for them.  But

6  my priority is your hearing, and I'll be back with them when

7  you all are done.

8      MR. SADOWSKY:  Thank you, Judge.  We filed this case

9  because for years the defendants have deceptively shifted

10  medical expenses onto hospitals across the country.  How did

11  the defendants do this?  They did this by hiding ELAP's

12  identity at the point of treatment and then paying hospitals a

13  fraction of the reasonable value of their services when the

14  hospitals ultimately tried to collect.  The defendants hid

15  ELAP's identity because they knew that no hospital would

16  knowingly provide services to ELAP members.

17      As the defendants have admitted, their business model

18  depended on this deception.  This conduct has resulted in

19  serious damages to both hospitals and patients.  It harms

20  hospitals, including nonprofits like Memorial, who are paid

21  less than the reasonable value of their services, and it harms

22  patients who are left with balance bills, limited care, and

23  subpar insurance.  That's why we filed this case.

24      But why did we file this motion and why should the

25  Court grant it?  We filed this motion because there was

1   manifest error here and because we know that this Court wants

2   to get it right.  And, in the end, that's why the Eleventh

3   Circuit has placed it in this Court's sound discretion to grant

4   a motion for reconsideration.

5        There are three reasons, as we set out in our motion,

6   why the Court should exercise that discretion here.

7        First, Memorial is a consumer and Memorial was harmed.

8   Second, regardless of Memorial's status as a consumer, patients

9   were harmed.  And third, under the statute as written, FDUTPA

10  imposes no consumer harm requirement.

11       And so I thought I would start with our argument that

12  Memorial is a consumer and Memorial was harmed.  So starting

13  there, we know that Memorial is a consumer for two reasons.

14  First, Memorial is a consumer because the Florida legislature

15  has told us it is.

16       Looking at the first slide here, a "consumer" means --

17  and this is the definition from FDUPTA.  "Consumer" means "an

18  individual; child, by and through its parent; business; firm;

19  association; joint venture; partnership; estate; trust;

20  business trust; syndicate; fiduciary; corporation; any

21  commercial entity however denominated; or any other group or

22  combination."

23       Needless to say, the statute is broad.  And that's not

24  an accident.  In 1993 and again in 2001, the Florida

25  legislature amended this definition and made it broader and

1  broader.  And as the Supreme Court, the US Supreme Court has

2  explained, where the word "means" is employed in a statutory

3  definition, the term and its definition are to be

4  interchangeable equivalence.  So that means "consumer" and

5  "commericial entity" are interchangeable equivalence.  And here

6  Memorial is a consumer because it is a commercial entity under

7  the plain language of the statute and the definition that the

8  Florida legislature has provided us.

9       In its order, this Court parted from the legislative

10  definition reasoning that this definition strained credulity.

11  But the Court in its order never considered that this was a

12  statutory definition mandated by the legislature.  And when the

13  text of the statute is clear, we must follow it.

14       And for that reason, several courts have followed the

15  definition of "consumer" in FDUPTA.  We quoted some of those

16  cases in our summary judgment briefing.  We quoted another one,

17  Crmsuite and Skypoint, in our motion for reconsideration.  But

18  there's a bunch more cases out there that say the same thing.

19       So just to give one more.  XTEC v CardSmart, 2014

20  Westlaw, 10268426.  That was a Judge Rosenbaum decision when

21  she sat on the district court where she looked at the

22  definition of "consumer" in the statute and applied it straight

23  up.  And there are plenty of other decisions like that.  That's

24  the first reason why Memorial's a consumer.

25       But there's another reason.  Even if we were to look

1    past the statutory definition, which I don't think we should

2    because the language is quite clear about what a consumer is,

3    even if we were to look past that definition, a reasonable jury

4    could find that Memorial is a consumer under ordinary language.

5            So what is a "consumer" under ordinary language?

6    Well, when we look to dictionaries, which is often what we look

7    at when trying to determine what a word means, a "consumer"

8    under ordinary language is, quote, one that consumes.  That's

9    from Merraim-Webster's Unabridged.  That's from American

10   Heritage Dictionary.  And what is it "to consume"?  "To

11   consume" is to utilize an economic good and the satisfaction of

12   wants or the process of production.  That's also from

13   Merraim-Webster's Unabridged.

14           Here a reasonable jury could find that Memorial uses

15   the defendants' services in satisfying its wants.  That's the

16   exact definition.  For example, Memorial wants to get paid, and

17   Memorial uses the defendants' services to get paid.  In fact,

18   Memorial would never get paid without using ELAP Services.  And

19   that's exactly what this Court found at the motion to dismiss

20   stage, and it's exactly what the summary judgment evidence

21   showed as we presented in our motion for summary judgment.

22           What that evidence showed was that Memorial was

23   directly using ELAP Services and interacting with ELAP to

24   secure payment.  And just a few examples.  There's docket

25   entries 156-34 at page 523 and 156-35 at pages 738 to 50.

1 You'll see letters from Memorial to ELAP using its services to

2 get paid.

3       In short, Memorial's a consumer because the statute

4 says it is and, in any event, because it's a consumer based on

5 the ordinary meaning of what a consumer is.  That's the first

6 argument I wanted to address.

7       But regardless of whether Memorial itself is a

8 consumer, as this Court explained in its summary judgment

9 order, it would be enough for patients to have been harmed by

10 the defendants' conduct.  And as this Court recognized, the

11 standard here is actual or likely consumer harm.  That's the

12 summary judgment order at 23.  And a reasonable jury could find

13 that consumers have suffered harm because they were actually or

14 likely to be balance billed or turned away from a hospital.

15       And so what I thought I would do was just walk through

16 just a few pieces of evidence from which a reasonable jury

17 could find either that there was balance billing or that

18 patients were turned away from hospitals, both independently

19 sufficient.

20       All right.  So let's start with evidence that patients

21 were harmed when they were balance billed and saddled with

22 debt.  So what you'll see here is an excerpt from the

23 deposition of Woody Waters.  He's the cofounder of ELAP.  And

24 here Mr. Waters is talking about some of the effects ELAP has

25 on its plan members.

1          "Question:  So all of the ELAP members who have a

2     claim have exposure to the balance billing, to collection

3     efforts if the hospital is to pursue them, and to potential

4     legal exposure on breach of the contract?

5          "Answer:  Yes.

6          "Question:  They also have an exposure if the hospital

7     pursues the balance bill to potential credit impairments?

8          "Answer:  Yes.

9          "Question:  Potential debt collection efforts by debt

10    collectors, phone calls, harassment in that form?

11         "Answer:  Yes."

12         I think that a reasonable jury could find that

13    patients suffer actual or likely harm just like Mr. Waters,

14    ELAP's cofounder, said here.

15         And by the way, Judge, on the bottom of each of these

16    slides we cite where exactly we cited this evidence in our

17    summary judgment papers.

18         THE COURT:  So your argument, though, is that so long

19    as there's potential harm, even if the hospitals didn't balance

20    bill for whatever choice the hospital made, the fact that had

21    they balance billed, it could have led to harm, that's enough?

22         MR. SADOWSKY:  That's not our position.  Our position,

23    as this Court said, is actual or likely harm.  So there has to

24    be actual or likely harm.  And what Mr. Waters is saying here

25    is that all of the ELAP members, every ELAP member has exposure

1   to collection efforts, breach of contract.  And we think

2   viewing this evidence in the light most favorable to the

3   plaintiff, as Court has to do at summary judgment, if every

4   single ELAP member is exposed to this risk, then I think a

5   reasonable inference to be drawn is that at least some of those

6   members were harmed in exactly the way that Mr. Waters

7   described here.  But there's more.

8        So looking at this slide, what we're looking at is

9   internal ELAP documentation about -- just for all of the

10  hospitals it works with, and this is for some period of time,

11  and how often patients were balance billed at those hospitals.

12  So the very top row, that's Memorial.  And what we see is

13  there's 18 claims, three balance bills for 17 percent balance

14  bill rate.  And so here's evidence from the defendants' own

15  records of balance billing.

16       Finally, for evidence of balance billing, here is a

17  final balance bill.  And there really are just two lines I

18  wanted to focus on.  The first is that top line.  It says, "Our

19  records indicate several requests for payment have been made

20  and that your balance of $1,816 is still outstanding."  And

21  then later on it says, "Your failure to make payment may result

22  in one or more of the following extraordinary collection

23  actions to be taken:  Filing a lawsuit, filing a judgment,

24  reporting to one or more credit bureaus."

25       And so Your Honor talked about Memorial's business

1    decision not to balance bill, and what we're seeing here is a

2    balance bill from 2019 from Memorial to a patient.  And so even

3    if the policy by in large was not to balance bill, we have

4    evidence of at least some balance bills and, therefore, at

5    least some consumer harm.

6           Now, just a few pieces of evidence from which a

7    reasonable jury could find that patients were harmed when they

8    were turned away from hospitals when seeking treatment.  And

9    this Court, in its statement of facts in its order, mentioned

10   that there was evidence that patients were turned away from

11   hospitals.  And here's some of that evidence.

12          So first this is from the deposition of Ms. O'Leary.

13   That was ELAP's corporate representative.  And in this slide

14   Ms. O'Leary is talking about why ELAP made the decision not to

15   put its name or logo on any of its insurance cards for its plan

16   members.

17          My eyesight isn't as good as it once was.

18          THE COURT:  That's a little early for that.

19          MR. SADOWSKY:  "Question:  On what basis would ELAP be

20   concerned that the hospitals would object?

21          "Answer:  Because ELAP does not have a contract with

22   the hospital.

23          "Question:  So the hospital would say, hold on, ELAP,

24   you intend to audit our claims.  We don't have a contract with

25   you, so we object to providing service to your member.

1    "Answer:  I think that is a potential outcome.

2        "Question:  And when ELAP explained the specifics of

3    how it intended to audit the claim, another potential outcome

4    would be the provider saying, we don't agree, we're not going

5    to provide service?

6        "Answer:"  And then Ms. O'Leary agrees that that's

7    more likely than not.

8        And so here you have ELAP's corporate representative

9    conceding that it's more likely than not that hospitals would

10   turn away ELAP members whenever they were recognized.

11       And here we're looking at internal emails from

12   Memorial employees.  And really there's just one line.  What's

13   happening here is a Memorial employee is saying, we code ELAP

14   members to commercial generics so that we only see ED,

15   emergency department, and no outpatient services, OP.

16   Pre-services has been pretty good at catching them during

17   scheduling.  In other words, the hospital's been pretty good at

18   catching ELAP members so that we don't see them for outpatient

19   services.  Patients being turned away.  Patients are harmed

20   when they're turned away.

21       Finally, just one more exhibit on this.  And this

22   actually goes to both balance billing and to patients being

23   turned away.  And I think this is an interesting document.

24       So this is an exchange between ELAP and GPA employees.

25   And so starting from the bottom, we have an email from a GPA

employee saying, Hi, Heather.  Below is the response from ELAP.

And this table lists all the facilities that have refused

patients or refused to work with ELAP.

And then you see the top row of that chart that's

right below it.  It says, facility, address, phone, balance

bill, PSA, patient refusal, and so on.  And so what this chart

is doing is tracking all of the hospitals that balance bill or

refuse patients.  And the reason why ELAP does this and GPA

does this is so they know where to direct their plan members to

and they know what hospitals to send their patients to.

And so two rows here.  We have Memorial Hospital West,

Memorial Regional Hospital.  These are two rows in that long

chart.  These are both the plaintiff Memorial.  And in each row

we have balance bill, yes; patient refusal, yes.  And so I

think a reasonable jury could find from this evidence that

Memorial, in fact, had balance billed and turned patients away

because they were ELAP members.  That's what ELAP's own records

say.

And the defendants argue that balance billing isn't

enough.  They don't address so much patients being turned away,

but they argue that balance billing isn't enough.  But the

Florida Supreme Court in Allstate v Kaklamanos, we talk about

it in our briefs, found that patients are injured when they're

balance billed.  They found in that case patients went to a

hospital and they later sued their insurer when the insurer

1    refused to pay the medical bills.

2         The insurer argued that the patient suffered no injury

3    because the hospital never collected and never sued the

4    patient.  Same thing as in our case; never collected.  And

5    despite that, the Florida Supreme Court rejected the insurer's

6    argument there explaining that, quote, an insured may be

7    damaged by an insurance company's failure to pay a claim even

8    if the insured has not already paid or been sued by the medical

9    provider.  And we cite Colomar, which says the same thing.

10   That was a Judge Seitz decision.

11        And, really, all the defendants rely on is Hunstein.

12   And in our reply brief we explain that's obviously an

13   Article III injury in fact case.  It has nothing to do with

14   what -- you know, what it is to be injured or suffered a

15   consumer harm under FDUPTA, under state law.  Nothing to do

16   with that.

17        But the other thing is that Hunstein is not even about

18   whether a plaintiff is injured when they receive a letter.

19   Hunstein was about a debt collector sending information to a

20   third-party letter sender.  And the Eleventh Circuit held that

21   that exchange of information, not an injury in fact.  But the

22   Eleventh Circuit en banc just this year in Drazen v Pinto,

23   74 F.4th 1336, held that a plaintiff who, quote, received a

24   single unwanted illegal telemarketing text message suffered a

25   concrete injury.  Again, an Article III case.

```
 1            But if we want to talk about what an injury is under
 2   Article III, a single unwanted text message.  And if a single
 3   unwanted text message is an injury, then so is receiving phone
 4   calls, debt collection letters, and being harassed to pay
 5   medical debts after you've had to go to a hospital.  And I
 6   think a reasonable jury would understand that.  In short,
 7   there's actual or likely harm here.
 8            Finally -- and we don't think the Court needs to get
 9   to our final argument.  We think that the first two arguments
10   that we've been talking about today are enough, and so this
11   Court doesn't need to get here.  But what we also see is that
12   the text of the statute is clear that there is no consumer harm
13   requirement.  And here's the text of the statute, which is the
14   first thing we should always look to when --
15            THE COURT:  So I don't disagree with you about that in
16   terms of what the text says on that.  I did want to ask you a
17   question, though, because you had just talked about
18   establishing actual harm or substantial likelihood of harm, and
19   I remember there was something in the facts about a balance
20   bill not having been sent after some period of time in 2016,
21   and so I do -- I recognize everything that you've shown, but
22   how does that get me to a substantial likelihood, if that's
23   really the standard, if there hasn't been balance billing for
24   seven years?
25            MR. SADOWSKY:  So two points on that.  I think the
```

1    standard is just likely.  I don't think it's substantial

2    likelihood.  I think this order says just actual or likely

3    harm.  I think that's what all the case law says, too.  I

4    haven't seen the words "substantial likelihood."

5           THE COURT:  Okay.

6           MR. SADOWSKY:  And the second thing to say about that

7    is it's actual or substantial likely harm.  And what we've

8    shown is that there's actual harm, is that consumers have

9    actually been harmed because they have actually been balance

10   billed and they have actually been turned away from hospitals.

11   And so we don't have to get to likely harm because there's

12   actual harm here.

13          Actually, one more point is when we're talking about

14   likely harm, I don't think it means likely that a lot of

15   consumers are going to be harmed.  It's just a consumer harm

16   requirement.  It's not in a lot of consumer harm requirement.

17   It's not in a little consumer harm requirement.  It's just a

18   consumer harm requirement.  And so, so long as a consumer is

19   likely to be harmed.  And here, as we're saying, even if it's

20   likely that one consumer is going to be harmed, that satisfies

21   the consumer harm requirement.  And there's no case law that

22   says otherwise.  And I don't think the defendants suggest

23   otherwise.

24          I know this -- I know the Court said that the language

25   of the statute is clear.  And so just a couple of quick points

 1   then.  I won't belabor the point.

 2          Yeah, we think the text is clear that there is no

 3   consumer harm requirement there.  And we think that's

 4   intentional.  The Florida legislature has amended the statute

 5   in 1993 and again in 2001 to eliminate any consumer harm

 6   requirement.

 7          In 501.211 it used to say in any action brought by a

 8   consumer who has suffered a loss, and that such consumer may

 9   recover actual damages.  The legislature removed that from the

10   definition.  And the obvious import is that a consumer doesn't

11   have to suffer loss anymore.  Any person who suffers loss is

12   sufficient.

13          And we talk about it in our briefs, but the statute's

14   purpose provision we think confirms that.  The provision about

15   governmental enforcement actions.  There the legislature sought

16   to talk about consumer harm.  But in the private cause of

17   action it didn't.

18          And ultimately I think what happened here is a little

19   bit like what happened in a Judge Altman case.  It was Torres v

20   Walmart.  And in that case --

21          THE COURT:  I'm pretty familiar with that one

22   actually, but go ahead.

23          MR. SADOWSKY:  There is a long line of cases that

24   interpreted Rule 26 a certain way.  And in 2010, that rule was

25   amended, and you still had that unbroken chain of how Rule 26

| | |
|---|---|
| 1 | was interpreted.  And then a case came before Judge Altman, and |
| 2 | he actually looked at the statute as -- instead of the case |
| 3 | law, he looked at the statute, what it said.  And he said that |
| 4 | the statute spoke rather clearly on what Rule 26 requires for |
| 5 | expert reports and for treating physicians.  And the Eleventh |
| 6 | Circuit in Cedant later adopted essentially Judge Altman's |
| 7 | position here. |
| 8 | And I think that's kind of a great analogy for what's |
| 9 | happened here.  I think the text changed, and we have a lot of |
| 10 | decisions that continue to apply the old consumer harm test |
| 11 | based on the old language, when that made total sense, but now |
| 12 | based on the new language it doesn't make any sense at all. |
| 13 | So in finishing up, I just note one thing.  In |
| 14 | reviewing all of the Eleventh Circuit decisions on motions to |
| 15 | for reconsideration, I couldn't find a single decision from the |
| 16 | Eleventh Circuit reversing a district court for granting a |
| 17 | motion for reconsideration.  And I think there's an obvious |
| 18 | reason for that.  It's because the Eleventh Circuit recognizes |
| 19 | that the district court is in the best position to correct any |
| 20 | mistakes in its original ruling and to get it right.  This |
| 21 | Court should grant the motion for reconsideration and get it |
| 22 | right here. |
| 23 | THE COURT:  A question before you sit down.  So kind |
| 24 | of taking me beyond the textual argument of the statute, what's |
| 25 | your thought about the Steward Agency case, which is the 2019 |

1    case that suggests that there is a consumer harm requirement?

2         And kind of a follow-up to that.  That case,

3    obviously, is a DCA case.  It's not an Eleventh Circuit case.

4    Can I rule consistently with the statute and Stewart Agency and

5    still give you what you want?

6         MR. SADOWSKY:  I think the answer is no.  I don't

7    think you can rule consistently with Stewart Agency.  But I

8    think there are good reasons not to follow the Stewart Agency.

9         So if you read Stewart Agency, all the Court did there

10   was just follow Caribbean Cruise Line which cited to PNR which

11   had absolutely nothing to do with consumer harm requirement or

12   a requirement that there be any consumer.  And the court there

13   latched onto the Florida Supreme Court's language like you

14   would reading a statute, which we know we're not supposed to

15   do.

16        And then you have Caribbean Cruise Line that got it

17   wrong in dicta, as we explain in our briefs.  And then you

18   have -- you have Stewart just following that decision.  And the

19   Eleventh Circuit is clear that when you have a DCA decision,

20   obviously, you have to follow it unless there's persuasive data

21   showing that the Florida Supreme Court would rule otherwise.

22   And the text of the statute is pretty persuasive data that this

23   consumer harm requirement is in some sense made up.  And it

24   doesn't come from the statute.  It's not there.

25        I mean, the defendants' argument is that this comes

1    from some DCA case that applied a Seventh Circuit language that

2    got it from 1976 FTC policy language on what an unfair practice

3    was.  But I think that's a little bit of a stretch, and I

4    think --

5         Mr. Lifshitz makes a good point, is you could accept

6    Stewart and still rule for us by accepting Memorial as a

7    consumer.  That's obviously -- we could go through --

8    either accepting Memorial as a consumer or accepting that

9    patients were harmed.  The Court doesn't need to reach the

10   question of whether there's a consumer harm required.

11        And so those are obvious ways for the Court not to

12   have to address any conflict with Stewart, create any conflict

13   with Stewart, would be to rule on this issue through the fact

14   that Memorial is a consumer or that patients were harmed.

15        THE COURT:  But didn't Stewart require a showing of

16   harm?

17        MR. SADOWSKY:  Yes.

18        THE COURT:  So if I found, like you're saying by the

19   statute, that Memorial is a consumer and you're asking me,

20   look, just read the text and the text is clear, and I

21   completely follow that, but then if -- but it's like Stewart

22   requires more than the statute.  Stewart is a DCA case.  But,

23   you know, FDUPTA -- the "F" is Florida.  So I'm looking at a

24   Florida Appellate Court, State Court.  And even though we're a

25   federal court, can I disregard that and kind of go a different

1    way because I'm a federal court?  What's your thought on that?

2            MR. SADOWSKY:  The answer is, yes, you can go another

3    way if there's persuasive data that the Florida Supreme Court,

4    the final authority on Florida State law, would rule otherwise.

5            And I think the Florida Supreme Court takes the text

6    of statutes pretty seriously.  And we cited at least one case

7    in our motion for reconsideration briefs where the Eleventh

8    Circuit said essentially that when the text of the statute is

9    clear, that weighs pretty heavily on the Erie question of what

10   the State Supreme court would do.

11           And the other thing to say about that is, Stewart

12   spoke about -- Stewart applied a consumer harm requirement.

13   But Stewart never described what it is to be a consumer.  So

14   for our argument that Memorial is a consumer, I don't think

15   Stewart has any bearing on that question, and in some sense

16   this Court is writing on a clean slate.

17           THE COURT:  Okay.  And the reason I ask that too is

18   your Torres example -- I mean, I followed Judge Altman's

19   analysis, but a lot of district court judges didn't.  Then, of

20   course, it went to the Eleventh Circuit, and now we all do;

21   right?  So I guess that's kind of really what I would be

22   thinking about then.

23           I appreciate your argument.  Thank you so much.

24           MR. SADOWSKY:  Thank you, Judge.

25           THE COURT:  And response?

1      MR. ALDERMAN:  Thank you, Your Honor.  And I -- you

2   probably know, just looking around the room, but you don't

3   recognize me because I've never been in front of you.  I'm

4   admitted pro hac, and I know you guys sign those routinely as

5   they come in, but it does mean something when we get admitted.

6   So I appreciate that.

7      THE COURT:  Oh, sure.  Well, we're only supposed to do

8   it I think three times for any lawyer.  So it's not as routine

9   as you might think.

10     MR. ALDERMAN:  Okay.  Well, I'm only on one, at least

11   in this Court, so we should be good.  So I appreciate the

12   opportunity to be here and talk.  I know we didn't get that

13   opportunity at the summary judgment stage, but I'm glad we can

14   address these today and get some resolution.  Because,

15   ordinarily, once you enter your summary judgment order, that is

16   the resolution.  But now we've got a motion asking you to

17   change your mind, and I appreciate the opportunity to be heard.

18     THE COURT:  Sure.

19     MR. ALDERMAN:  You heard at the outset of Memorial's

20   presentation what they think this case is about, so I'll start

21   there as well.

22     I think this case is about a hospital system that is

23   gouging patients, employers, the local economy with charges

24   that it knows are excessive.  In fact, from this case what

25   we've been able to discern is it knows that its billed charges

1    for the 626 claims at issue are almost two and a half times

2    greater than what it even thinks is reasonable.

3            What this case is about is that same hospital system

4    suing the companies they're helping patients and health plans

5    deal with those excessive charges.  In other words, the exact

6    practices that Memorial is complaining about in this case are

7    the practices that helped consumers, their clients, and

8    patients by paying less.

9            I told you there's 626 claims at issue in this case.

10   They billed $8.8 million for those services.  They have been

11   paid about 1.6.  The 8.8 million is two and a half times what

12   they say is reasonable.  It's eight times what Medicare would

13   pay.  And I know that's a summary judgment question that's not

14   up for debate today and really wasn't up for debate at summary

15   judgment.  I never expected the Court to decide what's

16   reasonable or not.  But there may be some room in the margins

17   to argue about what's reasonable.  Eight times Medicare is not

18   reasonable.  They know that.  They've admitted that through

19   their expert opinion.  So they know what they're charging is

20   not reasonable.

21           Their billing practices.  When they charge these

22   amounts that are egregious and they know are not fair are what

23   has caused this situation.  They created a space in the market

24   for a company like ELAP or a company like GPA to come help

25   health plans and patients with excessive charges.

1          Now, ELAP not only audits hospital bills for its

2   clients, it also provides an additional service to its clients

3   and their members, which is defending them against collection

4   efforts, which is very important for this hearing because it's

5   all about consumer harm.

6          And my understanding of the allegations, the arguments

7   is that Memorial concedes in all 626 cases there's no evidence

8   that any patient has ever paid more than what ELAP says is

9   reasonable.  You certainly haven't seen it.  I haven't seen it.

10  We didn't hear them argue about that today.  What we heard them

11  argue is they may have asked some patients for it, but they

12  haven't actually collected it because one of the things that

13  ELAP does is they defend those patients against the balance

14  bills to ensure that they don't pay more.

15         The bottom line for today's purposes is ELAP saves its

16  clients, those are the self-funded health plans, and their

17  patients money.  In fact, millions of dollars in this case.

18  ELAP helps its customers.  That's their health plans.  It helps

19  the patients.  ELAP helps consumers.

20         Memorial -- and we'll get into this.  You know it's a

21  major topic of debate.  But Memorial is not a consumer.  The

22  consumers here are the consumers of ELAP Services:  The health

23  plans and the patients.

24         THE COURT:  So would you agree Memorial just --

25  Memorial is a consumer, but you're saying they're not a

1    consumer in this case?

2          MR. ALDERMAN:  I'm sure that Memorial purchases things

3    and transactions that have absolutely nothing to do with this

4    case.  And if they were filing a FDUPTA action over their

5    Band-Aid supplier or their gown supplier, their medical device

6    supplier, then they could be certainly viewed as a consumer.  I

7    would think they would be.  But in this case they're not

8    consuming anything.  And you have to look at the transaction to

9    figure out whether someone's a consumer or not.

10         THE COURT:  So your argument is that I could look at

11   the text of the statute and still find that Memorial is not a

12   consumer in terms of how this case is before the Court?

13         MR. ALDERMAN:  Yes, Your Honor.  The definition -- if

14   you're interested in that, I'm going to jump right to that

15   portion of my discussion here.  But the -- sorry.  Let me get

16   to the right place in my notes.

17         So in order to figure out who's a consumer, you have

18   to look at the transaction involved, and there has to be some

19   relationship between what they claim was wrong, the purportedly

20   unlawful act or practice, and the consumer harm.  So you have

21   to look at the actual transaction.

22         This argument about whether or not Memorial is a

23   consumer was actually one of the three arguments they really

24   actually forcefully raised below.  And they don't change it at

25   all.  It's the same argument that they made.  I'm sorry.  I

1    said "below."  But earlier at summary judgment.  It's the same

2    argument.  For the same reasons that it was rejected at summary

3    judgment, it should be rejected again.

4         To the large extent, this argument that it is a

5    consumer is the same as the argument that there's no consumer

6    harm.  Because what they're really saying is anyone and

7    everyone is a consumer under the FDUPTA statute because that

8    definition that they pointed to is very broad.  It includes

9    persons, children, any sort of business entity whatsoever.

10        But that begs a question because what were those

11   nonconsumer standing cases about if everyone's a consumer?

12   They really blow that argument out of the water because there

13   wouldn't be such a thing as nonconsumer standing, which is well

14   accepted and, in fact, the Supreme Court of Florida has weighed

15   in on that.  There is nonconsumer standing.  So the fact that

16   there's nonconsumer standing means there has to be a

17   nonconsumer.

18        The cases they rely on -- most prominently they rely

19   on Crmsuite.  I get those confused because I think there's a

20   CMR Construction case that we rely on.  But this is Crmsuite.

21   The language from that case is virtually any injury resulting

22   from an unfair deceptive trade practice occurring in trade or

23   commerce is a consumer injury.

24        To some extent that language is circular, but -- and

25   I'll get back to that.  But the real issue with relying on

1  Crmsuite is that the court found that there was alleged

2  consumer harm in that case.  What they specifically found was

3  the plaintiff's customers were alleged to have suffered a harm

4  because they would have to buy a software they're selling at a

5  higher price and it would be an inferior product because of the

6  defendant's actions.  So Crmsuite has that language that they

7  like, but it doesn't go so far as they think it does.

8        I also want to talk about the text of the statute.

9  Their textual analysis, it focuses on two amendments.  One is

10 substituting person for consumer -- you saw the statute.

11 That's in the private right of action provision -- and deleting

12 the definition of consumer transaction from the statute

13 altogether.

14       Those statutory amendments, though, didn't alter the

15 consumer harm requirement.  Those merely permitted, as the

16 courts have recognized, nonconsumer standing.  That's clearly

17 what the private right of action did.  That's what Caribbean

18 Cruise Line decided.  That's what a number of courts after

19 Caribbean Cruise Line have adopted and not really questioned.

20       The consumer harm requirement is found in

21 Section 501.204.  On your screen earlier you saw provision (1)

22 of that section.  Provision (2) is the important one.  And that

23 provision (2) says, it is the intent of the legislature that in

24 construing subsection (1), due consideration and great weight

25 shall be given to the interpretations of the Federal Trade

1   Commission in federal courts relating to the Federal Trade

2   Commission Act in construing language that is identical

3   essentially to 501.2041.  So what the text of the statute says

4   is look at these Federal Trade Commission interpretations.  And

5   you heard from Memorial that it was a stretch to do that.  But,

6   in fact, that's exactly what the text says to do, is look at

7   those interpretations.

8          We've looked at I think a 1964 interpretation and a

9   1980 interpretation.  I think those are the only two that are

10  available from the FTC, because I searched for more and

11  couldn't find them.  But those are the ones that have stood the

12  test of time essentially.  They all require -- both the

13  definitions require substantial consumer injury.  And that's

14  where the word "substantial" does come in.  There's a lot of

15  formulations.  I don't think there's a substantial likelihood,

16  but there is a substantial injury requirement, and that may

17  have been what you were asking about earlier.

18         So 501.204 establishes what's unlawful under FDUPTA.

19  To do so it tells the courts to looks at these FTC

20  interpretations, which in turn say there has to be a consumer

21  injury.

22         The timing of the amendments is also important.

23  Because in 2015 we had the Caribbean Cruise case that said

24  there could be nonconsumer standing, but there has to be in all

25  cases a consumer injury or consumer harm.

1            In 2017 the legislature amended the definition of an

2    unlawful act.  But they did so in a very, very narrow way.

3    What they did is said continue looking at FTC interpretations

4    through July 1, 2017.  So this is coming after the Florida

5    Courts of Appeal have said there's a consumer harm requirement.

6    The statute had been amended saying you've done this in the

7    past, continue doing it.

8            THE COURT:  Let me ask you this then, going back to

9    your previous argument.  If the requirement is substantial

10   consumer injury as opposed to substantial likelihood of injury,

11   so wouldn't what's a substantial consumer injury be a question

12   for the jury?

13           MR. ALDERMAN:  It could be if they had evidence of an

14   injury or a harm.  They just haven't presented any evidence for

15   you.  I do want to walk through point by point the evidence

16   that they -- I think I've cobbled together everything between

17   the summary judgment and their two reconsideration briefs.  So

18   I think I've culled it all together, and I want to walk through

19   that.  Because they have to have evidence.  It's not

20   automatically a jury question.

21           So, yeah, the problem that they have on getting past

22   summary judgment is all they've talked about is the possibility

23   of sending a balance bill.  They've testified they didn't send

24   any balance bills since 2016.  They've shown you a balance bill

25   that -- literally one.  There's also a collection record that

1    we'll look at that shows they didn't collect any of that money.

2          You saw in the letter they said, if you don't pay this

3    $1,800 -- they don't mention that they know it's excessive.

4    But if you don't pay that excessive $1,800, they may file a

5    lawsuit, they may file a judgment.  I'm not really sure what

6    that means.  Or they may send it to a collection agency.  So I

7    think actually what they said is they may impair their credit.

8    But they didn't do any of those things.

9          And the fact that they don't have any evidence to show

10   you that they did any of these things is really compelling.

11   Because if they did collect any more money, if they did impair

12   someone's credit, they would know about it because they don't

13   have to get that discovery from us.  We're not the ones

14   possessing it.  They have that information.  They didn't show

15   it to you because they don't have any evidence of it happening

16   because it didn't.

17         I do want to go back.  And I know you're interested in

18   getting this question right.  That's certainly what you want to

19   do.  But the legal standard here is important.  This isn't a

20   second chance at summary judgment.  This is a Rule 59(e)

21   motion.  And you do have discretion to change your mind.  I'm

22   not going to tell you otherwise.

23         I just wanted to say that I think for the orderly

24   practice of our courts, it's important that parties come

25   forward with their evidence at summary judgment, with their

1   arguments at summary judgment, not waiting for the Court to

2   issue an order and then ask for it to be reconsidered.  And

3   because of that, I think the courts have said there are only

4   three grounds for granting a Rule 59(e) motion.  It's a change

5   in controlling law, it's new evidence, or it's manifest error.

6        I think Memorial concedes there's no change in

7   controlling law and there's no newly discovered evidence.  So

8   what they're hanging their hat on here is manifest error.  But

9   your order doesn't come close to manifest error.  Manifest

10  error has been described as the wholesale disregard,

11  misapplication, or failure to recognize controlling precedent.

12       There's not error, let alone manifest error here.  And

13  it's easy to see that because there's no precedent that

14  supports the rulings that Memorial asks you to make.  For

15  example, to find that there is no consumer harm requirement.

16  There's no case out there that says that.  In fact, every case

17  says that there is a consumer harm requirement.  We cited 12 in

18  our briefing that specifically not just recognize the

19  requirement exists but dismissed cases because there was no

20  consumer harm.

21       In other words, the Court can't commit manifest error

22  if there's no controlling precedent that requires a different

23  result.  And there's not.  We know that there's not any

24  controlling precedent that you violated; meaning, there's no

25  change in controlling law, there's no newly discovered

1    evidence, there's no manifest error, and the motion should be

2    denied.

3           So turning to the consumer harm requirement argument,

4    their position that there is no consumer harm requirement.

5    We've got to talk again about waiver because they didn't just

6    not raise it at summary judgment.  They told you the opposite.

7    They told you in their brief there is a consumer harm

8    requirement, and they said it very clearly.

9           That implicates the invited error doctrine.

10   Obviously, they can't complain about a decision you make when

11   they tell you that's the right decision to make.

12          And then certainly there is a waiver issue.  They've

13   cited a case that said -- even though there's a long list of

14   cases saying it's inappropriate and improper to raise new legal

15   arguments at a Rule 59 motion, they've cited the Jefferson

16   case.  That's an employment discrimination case.

17          In that case what happened is a little bit hard to

18   gather from the record, but it sounds like the plaintiff was a

19   little bit sloppy in the way she describes some of her

20   evidence.  And she describes some of her evidence as

21   circumstantial when it should have been described as direct.

22   She argued about the McConnell Douglas factors which, as you

23   may know, are applicable only to circumstantial evidence.  But

24   importantly she also said that that burden shifting analysis

25   shouldn't be applied.  So she actually did raise that argument

1    at summary judgment.  And what the Eleventh Circuit said is if

2    we know the right test, we're not going to apply the wrong one.

3         It's a lot different than what they're asking you to

4    do here.  They're asking you to ignore DCA cases that have said

5    there is a consumer harm requirement, which to answer -- to

6    give you my answer to your question can you just ignore that,

7    no.  The Eleventh Circuit law is clear that if the DCA has

8    decided a case and decided an issue, that unless there's

9    persuasive evidence that the highest state supreme court would

10   decide otherwise, then you have to follow it, it's binding.

11        So those cases are binding.  There's no -- the fact

12   that they don't want you to make that ruling isn't persuasive

13   evidence.  There's no reason to think that anything has

14   changed, that the Supreme Court would do something different.

15   They're just simply making an argument which doesn't raise to

16   the standard for disregarding a DCA opinion.

17        So there's a bigger problem than just waiver and

18   invited error on their argument about consumer harm.  FDUPTA

19   does require consumer harm.  As I've said a couple of times, no

20   court has ever held otherwise.  Many courts have held that it

21   does, including Caribbean Cruise, including Stewart.  Both of

22   those cases have held that Caribbean Cruise is not dicta.  It

23   resolved an important split among the courts about nonconsumer

24   standing.  And in doing so, the way it resolved the issue that

25   the courts were clearly grappling with was to say based on

1    those amendments, nonconsumer does have standing.  However,

2    they still have to show a consumer harm.  Which was important

3    because it reconciled all of the things that the courts were

4    grappling with.  And then four yours later we have the Stewart

5    case where that court did dismiss the claim because there was

6    no showing of consumer harm.

7         Memorial has argued several times, including today,

8    that your adjudication of the motion to dismiss on whether or

9    not it was a consumer is somehow evidence that they are a

10   consumer.  They've cited it many times.  But the reality is,

11   what you found in your order is, they allege that and you

12   accepted it as true.  However, the record evidence cuts against

13   their allegations.  They've said we don't get anything of

14   benefit, we don't get anything of value.

15        There's not necessarily a benefit or value

16   requirement.  And they brief that issue.  Their position was,

17   hey, what if we've got someone who tells us they're going to

18   give us something of benefit or value, but then they don't.  So

19   there can't really be a benefit or a value.

20        I agree that that's true.  But the fact that they know

21   they don't get anything from ELAP makes it impossible for them

22   to argue that they do.  And you heard them early say they do.

23   You heard them say they utilize ELAP Services to satisfy their

24   wants or desires.  What they're saying is when ELAP audits

25   their excessive hospital bills, tells their client what to pay,

1   that they are consuming ELAP Services, and that just couldn't

2   be farther from the truth.

3         They're certainly not a customer.  They're certainly

4   not paying anything to ELAP.  They aren't getting ELAP's

5   products downstream.  They are actually the service provider in

6   this relationship because, stepping back for a minute, what we

7   have is we've got a patient who's covered by a health plan who

8   goes to a hospital to receive services.  That's a consumer.

9   They're receiving services from Memorial.  When Memorial

10  provides those services, they're a service provider.  When

11  they're paid for those services, they're still a service

12  provider.  They don't become a consumer because they're paid

13  and they consume payments.

14        At the summary judgment stage the only thing that

15  Memorial argued was as consumer harm to ELAP plan members was

16  the possibility of a balance bill.  In the motion for

17  reconsideration briefing we had -- they introduced a lot of

18  documents.  They were submitted in the record.  They just

19  didn't talk about them in terms of consumer harm.

20        So the Court went and found some documents that seem

21  to be implicated by their sentence recitation on why there's

22  consumer harm, and did a thorough job of going through it, much

23  more thorough then they did in arguing that there was harm to a

24  patient, but now they've raised all of these new ones.  And if

25  you don't mind, I'd like to give you those exhibits and walk

1    through and show why none of those show consumer harm.

2           THE COURT: Sure. You think like five minutes' worth

3    of argument or how long do you think?

4           MR. ALDERMAN: There's not many. There's only nine.

5    So five to ten minutes.

6           THE COURT: Okay. Before you get into that, just

7    going back to the definition of "consumer." So your position

8    that really the only thing that's excluded from that definition

9    would be a government?

10          MR. ALDERMAN: I don't even know that the government

11    is excluded. They're a governmental entity as well. But the

12    definition says any type of commercial entity. I think that's

13    where -- and they can correct me on that, but I think that's

14    where they think they fall.

15          THE COURT: Okay.

16          MR. ALDERMAN: All right. So I've got these tabbed.

17    And I apologize. We had a printing error that I had to hastily

18    fix this morning. But the tabs on the right, that's why

19    they're in handwriting, but they identify the docket entry

20    number.

21          So first tab is 156-28. These are all plaintiff's

22    exhibits. This particular document is internal communications

23    among Memorial employees about billing the patient and

24    potentially pursuing collection accounts. That's the first

25    two, really. And what's missing from these that doesn't get us

1   to consumer harm is any evidence that they actually collected

2   any money.  It doesn't even really tell you that they did

3   pursue any patients for any balances.  And then if you look at

4   the second to last or third to the last page in the exhibit,

5   there's an email from Deborah Doyle.  And what she says they're

6   going to do is pursue the employers for the money, not the

7   patients.

8           The next exhibit, 156-31.  This is an email from John

9   Scozzaro.  He says because the patient is elective, we would

10  bill the patient for the difference up to total charges, not

11  just the $40 copay.  Again say what they would do, not what

12  they actually did.

13          And it's important when we're looking at these

14  exhibits and thinking about balance billing what we're talking

15  about is what Memorial would do.  So what they need to show

16  actually is that ELAP's business or practice -- I'm sorry,

17  ELAP's acts or practice caused consumer harm.  And the way

18  they're trying to establish consumer harm is by their action in

19  balance billing, pursuing through collections, all efforts that

20  they decide to take even though they know the charges are

21  excessive.

22          The next exhibit is 156-26.  This is again talking

23  about a patient who's scheduled for a procedure.  Mr. Scozzaro

24  says they shouldn't be scheduling those patients.  And then a

25  representative from the hospital says I'll have someone call

1  the patient and either offer to let them pay or cancel the

2  procedure.  So all they're saying -- they're not saying they

3  wouldn't treat him.  They've not saying they didn't treat him.

4  They're just saying if the patient won't pay what we want them

5  to pay, then we'll just tell them they have to cancel it.  We

6  don't know what happened there.

7        Next exhibit, 156-9.  What this shows is that over

8  some period of time, I don't know what period of time, but some

9  period of time there were 18 claims.  We know that in over all

10 of the relevant time period there's 626 claims.  And we know

11 that during that time there were three balance bills.  But

12 again, it just shows that there was a balance bill, not that

13 anything was collected, not any actual harm.

14        The next two exhibits we can go over quickly.  156-33

15 is a collection history.  And basically what this shows is for

16 this particular patient -- this is the only patient they've

17 shown you anything about out of the 626.  But for this

18 particular patient it shows at one time they were billing her

19 for $635, they later changed that, they later sent that to a

20 collection agency, and they never collected any money from her.

21        The next exhibit relates to the same patient.  It's

22 just the first one was notes, the second one -- or the

23 documents.  The first page shows that $235 bill.  There's a

24 later bill for a larger amount.  There's documents showing what

25 ELAP said should be paid, which was the amount of the original

1    bill.  None of this shows that it was paid.  In fact,

2    everything shows that that particular patient didn't pay

3    anything else because she was protected against the balance

4    billing by ELAP.

5         156-30 is the next exhibit.  You saw a piece of this

6    in the PowerPoint presentation where they showed you that

7    table, which is on ELAP 112751, that says that basically

8    Memorial doesn't like ELAP.  That's essentially what it says.

9    That's what this whole email chain is about, is about letting

10   members know that there are some hospitals that have a higher

11   balance bill rate, there's some hospitals that refuse patients.

12   And this was about getting that information out to members so

13   that they wouldn't go to those hospitals.

14        Memorial is on that list because ELAP doesn't want to

15   have these fights anymore than Memorial does.  But certainly no

16   showing of harm here.  This was also just months before the

17   lawsuit was filed.  So it was no surprise at this point that

18   Memorial was unhappy with ELAP.

19        The next exhibit, 156-39, is an email where they're

20   talking about a patient who has a credit impairment.  This is

21   not one of the 626 claims at issue in this case.  This is some

22   other patient who went to a different hospital.  What they're

23   saying is they've found this problem and ELAP is prepared to

24   fund the settlement 100 percent to remove that credit

25   impairment.  We don't know what happened.  We don't know any

1    details other than what's on the face of this, which is pretty

2    little.  But what's important is that they can't show consumer

3    harm through some patients that didn't go to their hospital

4    because it's their claims that are at issue on summary

5    judgment.  I know they filed a putative class action.  I know

6    they've asked to certify that class, but that's not at issue

7    for summary judgment purposes.

8              And then the next is very similar, although it's not a

9    credit impairment.  It's just a balance bill that ELAP is

10   talking about settling where they would pay a share and the

11   employer would pay a share, but the patient would pay zero of

12   that settlement.

13             We also saw some deposition testimony.  Mr. Waters

14   said, as of course he would, that in a situation where there's

15   an out-of-network hospital, there's certainly exposure to a

16   balance bill.  "Exposure" meaning the possibility of getting a

17   balance bill.  He also testified extensively about the things

18   ELAP does to protect members from those balance bills.  And

19   you've seen no evidence, because as far as I'm aware there is

20   none, that any patient wasn't protected, meaning any patient

21   actually had to pay anything.

22             You also saw some testimony from Katie O'Leary.  Her

23   testimony was about likely to object.  You'd have to read about

24   15 pages of that deposition to fully understand that testimony.

25   What she was talking about is they do track what they call

| | |
|---|---|
| 1 | "preservice provider pushback."  And if a hospital objects and |
| 2 | tells ELAP they object in advance, they do track that |
| 3 | information.  They have that information for about 1 percent of |
| 4 | all the claims they look at, meaning it only happens 1 percent |
| 5 | of the time.  And they have the data. |
| 6 | And so I'm not going to get this exactly right, but |
| 7 | there's some percentage where the patients get treated for the |
| 8 | normal price, ELAP's normal allowable claim limit.  There's |
| 9 | some that go somewhere else.  There's some that are treated |
| 10 | through a single patient contract.  And if you put those |
| 11 | numbers together, more than 50 percent either were treated |
| 12 | somewhere else or were treated at a higher rate.  So she said, |
| 13 | yeah, more likely than not.  That's all that was.  But it |
| 14 | doesn't mean that they didn't get treated.  These are all |
| 15 | things that ELAP deals with. |
| 16 | When you look at ELAP, ELAP member, ELAP patient harm, |
| 17 | it's important to remember that everything they claim is harm |
| 18 | is an action that they took or could take.  It's not an action |
| 19 | ELAP took or GPA took.  It's all hospital collection efforts. |
| 20 | And they can't claim that ELAP's actions caused consumer harm |
| 21 | if they're actions that they decide to take or not to take. |
| 22 | That's all I have, Your Honor. |
| 23 | THE COURT:  Thank you very much. |
| 24 | Mr. Sadowsky, anything you want to add before I let |
| 25 | you all go? |

```
 1              MR. SADOWSKY:  Just two quick points, if that's okay.

 2              THE COURT:  Of course.

 3              MR. SADOWSKY:  So first thing on whether patients were

 4    harmed.  What we just heard was a methodical look through the

 5    evidence viewing every single piece of evidence in the light

 6    most favorable to the defendants.  But that's not the standard.

 7    We're at summary judgment.  The defendants filed the motion.

 8    And so all the evidence has to be viewed in the light favorable

 9    to the nonmoving party.  And when viewed in that inference --

10    when viewed in that inference, we see consumer harm, patients

11    were harmed here.

12              Another thing on patients being harmed.  I know the

13    Court, Your Honor, asked about substantial consumer harm.

14    There's not a case that I've read where that language shows up

15    in the case law.  That's not the standard.  It's likely

16    consumer harm.  That's what Caribbean Cruise Line said.  That's

17    what Stewart says.  That's what all the district courts who

18    have followed those decisions have said.  Not substantial

19    consumer harm.

20              And then just the second point I wanted to make on

21    whether Memorial is a consumer.  You asked whether the

22    definition means that Memorial is a consumer in some

23    situations.  But the language of the statute says "means," and

24    the Supreme Court has said when the word "means" is used, we

25    have interchangeable equivalence.  That's that.
```

```
 1          And one other thing on that.  So the defendants have
 2    tried, I think, to give a different definition of "consumer"
 3    other than the one that shows up in the statute or in
 4    dictionaries.  And so we heard here something about maybe not
 5    paying anything, maybe that's the standard.
 6          But we know that's not the standard because in PNR, in
 7    the Fourth DCA, the court found -- so what happened in that
 8    case is you had a business, and then you had a -- the business
 9    renting space from a building owner, and then you had a
10    maintenance company.  And there was no direct relationship
11    between the business and the maintenance company, nothing.  But
12    the court still held that that business was a consumer and can
13    state a claim against the business company.  It was the
14    building owner that had the contract with the maintenance
15    company.  The case is clear on that point.
16          And so Memorial is a consumer.  Memorial was harmed.
17    Patients were harmed here.  And we think the statute is clear
18    that there is no consumer harm requirement in any event.
19          So for all of those reasons the motion for
20    reconsideration should be granted.
21          THE COURT:  All right.  Thank you so much for your
22    argument, both sides.  I really appreciate it.
23          You know, the order itself on the motion for summary
24    judgment wasn't the easiest order for us to do.  We really went
25    over it quite a bit.  And certainly we'll go over all of the
```

1    arguments that were made here, quite a bit as well, and get you

2    out a ruling as soon as we can.  It won't be as long as it took

3    for motion for summary judgment.  So I'll get you an order as

4    soon as I can.  So it's great to see you all in person.

5            MR. SADOWSKY:  Thank you, Judge.

6            THE COURT:  Thank you.

7        (Proceedings concluded at 4:31 p.m.)

8

9                    C E R T I F I C A T E

10       I, Karl Shires, Registered Merit Reporter and Federal

11   Certified Realtime Reporter, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14       Dated this 21st day of January , 2024.

15

16   _____

17   Karl Shires, RMR FCRR

18

19

20

21

22

23

24

25

**MR. ALDERMAN: [9]**
22/1 22/10 22/19 25/2
25/13 29/13 36/4
36/10 36/16
**MR. LIFSHITZ: [1]**
2/8
**MR. SADOWSKY:**
**[18]** 2/7 3/16 3/20
3/24 4/1 4/8 9/22
11/19 15/25 16/6
17/23 19/6 20/17 21/2
21/24 42/1 42/3 44/5
**MR. WIDLANSKI: [1]**
2/12
**MS. ORIA: [1]** 2/18
**THE COURT: [29]**
2/2 2/14 2/22 3/18
3/22 3/25 4/3 9/18
11/18 15/15 16/5
17/21 18/23 20/15
20/18 21/17 21/25
22/7 22/18 24/24
25/10 29/8 36/2 36/6
36/15 41/23 42/2
43/21 44/6

**$**
**$1,800 [2]** 30/3 30/4
**$1,816 [1]** 10/20
**$235 [1]** 38/23
**$40 [1]** 37/11
**$635 [1]** 38/19
**$8.8 [1]** 23/10
**$8.8 million [1]** 23/10

**-**
**-and [1]** 1/20
**-v [1]** 1/6

**1**
**1 percent [2]** 41/3
41/4
**1.6 [1]** 23/11
**100 percent [1]**
39/24
**10268426 [1]** 6/20
**110B [1]** 1/24
**112751 [1]** 39/7
**12 [1]** 31/17
**1226 [1]** 1/21
**1336 [1]** 14/23
**15 [1]** 40/24
**156-26 [1]** 37/22
**156-28 [1]** 36/21
**156-30 [1]** 39/5
**156-31 [1]** 37/8
**156-33 [1]** 38/14
**156-34 [1]** 7/25
**156-35 [1]** 7/25
**156-39 [1]** 39/19
**156-9 [1]** 38/7
**17 percent [1]** 10/13
**18 [1]** 10/13 38/9

**185 [1]** 3/1
**1964 [1]** 28/8
**1976 [1]** 20/2
**1980 [1]** 28/9
**199 [1]** 1/19
**1993 [2]** 5/24 17/5

**2**
**20-CV-61007-SINGH**
**AL [1]** 1/2
**2001 [2]** 5/24 17/5
**2010 [1]** 17/24
**2014 [1]** 6/19
**2015 [1]** 28/23
**2016 [2]** 15/20 29/24
**2017 [2]** 29/1 29/4
**2019 [1]** 11/2 18/25
**2023 [1]** 1/8
**2024 [1]** 44/14
**21st [1]** 44/14
**23 [1]** 8/12
**2525 [1]** 1/16
**26 [4]** 17/24 17/25
18/4 37/22
**27 [1]** 1/8
**28 [1]** 36/21
**299 [1]** 1/24

**3**
**30 [1]** 39/5
**30306 [1]** 1/22
**31 [1]** 37/8
**33 [1]** 38/14
**33131 [1]** 1/19
**33134 [1]** 1/17
**33301 [1]** 1/25
**34 [1]** 7/25
**35 [1]** 7/25
**39 [1]** 39/19
**3:19 [1]** 1/9

**4**
**4 o'clock [1]** 4/5
**4:31 [1]** 44/7

**5**
**50 [1]** 7/25
**50 percent [1]** 41/11
**501.204 [2]** 27/21
28/18
**501.2041 [1]** 28/3
**501.211 [1]** 17/7
**523 [1]** 7/25
**5496 [1]** 1/24
**59 [3]** 30/20 31/4
32/15

**6**
**626 [6]** 23/1 23/9
24/7 38/10 38/17
39/21

**738 [1]** 7/25
**74 F.4th [1]** 14/23
**769-5496 [1]** 1/24

**8**
**8.8 million [1]** 23/11

**9**
**954 [1]** 1/24

**A**
**able [2]** 2/2 22/25
**above-entitled [1]**
44/13
**absolutely [2]** 19/11
25/3
**accept [1]** 20/5
**accepted [2]** 26/14
34/12
**accepting [3]** 20/6
20/8 20/8
**accident [1]** 5/24
**accounts [1]** 36/24
**act [3]** 25/20 28/2
29/2
**action [9]** 17/7 17/17
25/4 27/11 27/17
37/18 40/5 41/18
41/18
**actions [5]** 10/23
17/15 27/6 41/20
41/21
**acts [1]** 37/17
**actual [13]** 8/11 9/13
9/23 9/24 15/7 15/18
16/2 16/7 16/8 16/12
17/9 25/21 38/13
**add [1]** 41/24
**additional [1]** 24/2
**address [5]** 8/6 13/5
13/20 20/12 22/14
**adjudication [1]** 34/8
**admitted [4]** 4/17
22/4 22/5 23/18
**adopted [2]** 18/6
27/19
**advance [1]** 41/2
**afternoon [2]** 2/8
2/12
**agency [7]** 18/25
19/4 19/7 19/8 19/9
30/6 38/20
**agree [3]** 12/4 24/24
34/20
**agrees [1]** 12/6
**ahead [1]** 17/22
**Aid [1]** 25/5
**al [1]** 1/7
**ALDERMAN [3]** 1/21
2/18 2/19
**allegations [2]** 24/6
34/13
**allege [1]** 34/11

**alleged [2]** 27/3
**allowable [1]** 41/8
**Allstate [1]** 13/22
**alter [1]** 27/14
**Altman [2]** 17/19
18/1
**Altman's [2]** 18/6
21/18
**altogether [1]** 27/13
**amended [5]** 5/25
17/4 17/25 29/1 29/6
**amendments [4]**
27/9 27/14 28/22 34/1
**American [1]** 7/9
**amount [2]** 38/24
38/25
**amounts [1]** 23/22
**analogy [1]** 16/8
**analysis [3]** 21/19
27/9 32/24
**answer [10]** 9/5 9/8
9/11 11/21 12/1 12/6
19/6 21/2 33/5 33/6
**anymore [2]** 17/11
39/15
**apologize [1]** 36/17
**Appeal [1]** 29/5
**appearances [2]**
1/13 2/6
**Appellate [1]** 20/24
**applicable [1]** 32/23
**applied [4]** 6/22 20/1
21/12 32/25
**apply [2]** 18/10 33/2
**appreciate [6]** 2/15
21/23 22/6 22/11
22/17 43/22
**argue [6]** 13/19 13/21
23/17 24/10 24/11
34/22
**argued [4]** 14/2
32/22 34/7 35/15
**arguing [1]** 35/23
**argument [24]** 2/20
5/11 8/6 9/18 14/6
15/9 18/24 19/25
21/14 21/23 25/10
25/22 25/25 26/2 26/4
26/5 26/12 29/9 32/3
32/25 33/15 33/18
36/3 43/22
**arguments [7]** 2/3
15/9 24/6 25/23 31/1
32/15 44/1
**Article [1]** 14/13
14/25 15/2
**Article III [1]** 14/13
**asked [4]** 24/11 40/6
42/13 42/21
**asking [5]** 20/19
22/16 28/17 33/3 33/4
**asks [1]** 31/14
**association [1]** 5/19
**assuming [1]** 3/18

**audit [2]** 11/24 12/3
**audits [2]** 24/1 34/24
**authority [1]** 21/4
**automatically [1]**
29/20
**available [1]** 28/10
**Avenue [1]** 1/21
**aware [1]** 40/19

**B**
**back [7]** 4/5 4/6
26/25 29/8 30/17 35/6
36/7
**balance [45]**
**balances [1]** 37/3
**banc [1]** 14/22
**Band [1]** 25/5
**Band-Aid [1]** 25/5
**based [4]** 8/4 18/11
18/12 33/25
**basically [2]** 38/15
39/7
**basis [1]** 11/19
**bearing [1]** 21/15
**begs [1]** 26/10
**behalf [1]** 2/9
**belabor [1]** 17/1
**Ben [1]** 2/10
**benefit [4]** 34/14
34/15 34/18 34/19
**BENJAMIN [1]** 1/16
**best [1]** 18/19
**beyond [1]** 18/24
**bigger [1]** 33/17
**bill [23]** 9/7 9/20
10/14 10/17 11/1 11/2
11/3 13/6 13/7 13/14
15/20 29/23 29/24
35/16 37/10 38/12
38/23 38/24 39/1
39/11 40/9 40/16
40/17
**billed [9]** 8/14 8/21
9/21 10/11 13/16
13/24 16/10 22/25
23/10
**billing [14]** 8/17 9/2
10/15 10/16 12/22
13/19 13/21 15/23
23/21 36/23 37/14
37/19 38/18 39/4
**bills [10]** 4/22 10/13
11/4 14/1 24/1 24/14
29/24 34/25 38/11
40/18
**binding [2]** 33/10
33/11
**bit [7]** 2/16 17/19
20/3 32/17 32/19
43/25 44/1
**blow [1]** 26/12
**bottom [3]** 9/15
12/25 24/15

**B**

Boulevard [2] 1/16 1/24
BRANDON [2] 1/15 2/7
breach [2] 9/4 10/1
brief [3] 14/12 32/7 34/16
briefing [4] 3/6 6/16 31/18 35/17
briefs [5] 13/23 17/13 19/17 21/7 29/17
broad [2] 5/23 26/8
broader [2] 5/25 6/1
brought [1] 17/7
BROWARD [3] 1/4 1/24 2/5
BROYLES [2] 1/18 2/19
building [2] 43/9 43/14
bunch [1] 6/18
burden [1] 32/24
bureaus [1] 10/24
business [11] 4/17 5/18 5/20 10/25 26/9 37/16 43/8 43/8 43/11 43/12 43/13
buy [1] 27/4

**C**

call [3] 2/1 37/25 40/25
calls [2] 9/10 15/4
cancel [2] 38/1 38/5
cards [1] 11/15
CardSmart [1] 6/19
care [1] 4/22
Caribbean [8] 19/10 19/16 27/17 27/19 28/23 33/21 33/22 42/16
case [53]
cases [12] 6/16 6/18 17/23 24/7 26/11 26/18 28/25 31/19 32/14 33/4 33/11 33/22
catching [2] 12/16 12/18
cause [1] 17/16
caused [3] 23/23 37/17 41/20
Cedant [1] 18/6
certain [1] 17/24
certainly [9] 24/9 25/6 30/18 32/12 35/3 35/3 39/15 40/15 43/25
Certified [1] 44/11
certify [2] 40/6 44/11
chain [2] 17/25 39/9
chance [1] 30/20
change [1] 3/11
changed [3] 18/9 33/14 38/19
charge [1] 23/21
charges [6] 22/23 22/25 23/5 23/25 37/10 37/20
charging [1] 23/19
chart [3] 13/4 13/6 13/13
child [1] 5/18
children [1] 26/9
choice [1] 9/20
Circuit [14] 5/3 14/20 14/22 18/6 18/14 18/16 18/18 19/3 19/19 20/1 21/8 21/20 33/1 33/7
circular [1] 26/24
circumstantial [2] 32/21 32/23
cite [2] 9/16 14/9
cited [7] 9/16 19/10 21/6 31/17 32/13 32/15 34/10
claim [9] 9/2 12/3 14/7 25/19 34/5 41/8 41/17 41/20 43/13
claims [9] 10/13 11/24 23/1 23/9 38/9 38/10 39/21 40/4 41/4
class [2] 40/5 40/6
clean [1] 21/16
clear [11] 6/13 7/2 15/12 16/25 17/2 19/19 20/20 21/9 33/7 43/15 43/17
clearly [4] 18/4 27/16 32/8 33/25
client [1] 34/25
clients [4] 23/7 24/2 24/2 24/16
close [1] 31/9
CMR [1] 26/20
cobbled [1] 29/16
code [1] 12/13
cofounder [2] 8/23 9/14
collect [3] 4/14 30/1 30/11
collected [6] 14/3 14/4 24/12 37/1 38/13 38/20
collection [12] 9/2 9/9 10/1 10/22 15/4 24/3 29/25 30/6 36/24 38/15 38/20 41/19
collections [1] 37/19
collector [1] 14/19
collectors [1] 9/10
Colomar [1] 14/9
combination [1] 5/22
Company [1] 1/8
22/17 25/24 30/21 31/4 31/6 31/25
comes [1] 19/25
coming [1] 29/4
commerce [1] 26/23
commercial [4] 5/21 6/6 12/14 36/12
commericial [1] 6/5
Commission [3] 28/1 28/2 28/4
commit [1] 31/21
communications [1] 36/22
companies [1] 23/4
company [6] 23/24 23/24 43/10 43/11 43/13 43/15
company's [1] 14/7
compelling [1] 30/10
complain [1] 32/10
complaining [1] 23/6
completely [1] 20/21
concedes [2] 24/7 31/6
conceding [1] 12/9
concerned [1] 11/20
concluded [1] 44/7
concrete [1] 14/25
conduct [2] 4/18 8/10
confirms [1] 17/14
conflict [2] 20/12 20/12
confused [1] 26/19
consideration [1] 27/24
considered [1] 6/11
consistently [2] 19/4 19/7
Construction [1] 26/20
construing [2] 27/24 28/2
consume [3] 7/10 7/11 35/13
consumer [113]
consumers [7] 8/13 16/8 16/15 23/7 24/19 24/22 24/22
consumes [1] 7/8
consuming [2] 25/8 35/1
continue [3] 18/10 29/3 29/7
contract [6] 9/4 10/1 11/21 11/24 41/10 43/14
controlling [6] 31/5 31/7 31/11 31/22 31/24 31/25
copay [1] 37/11
copy [1] 4/1
corporate [2] 11/13 12/8
correct [3] 18/19 36/13 44/12
country [1] 4/10
couple [2] 16/25 33/19
course [3] 21/20 40/14 42/2
court [57]
Court's [4] 3/2 3/11 5/3 19/13
courts [18] 6/14 27/16 27/18 28/1 28/19 29/5 30/24 31/3 33/20 33/23 33/25 34/3 42/17
covered [1] 35/7
create [1] 20/12
created [1] 23/23
credit [7] 9/7 10/24 30/7 30/12 39/20 39/24 40/9
credulity [1] 6/10
Crmsuite [5] 6/17 26/19 26/20 27/1 27/6
Cruise [8] 19/10 19/16 27/18 27/19 28/23 33/21 33/22 42/16
culled [1] 29/18
customer [1] 35/3
customers [2] 24/18 27/3
cuts [1] 34/12
CV [1] 1/2

**D**

damaged [1] 14/7
damages [2] 4/19 17/9
data [4] 19/20 19/22 21/3 41/5
Dated [1] 44/14
day [1] 44/14
DCA [8] 19/3 19/19 20/1 20/22 33/4 33/7 33/16 43/7
de [2] 1/16 1/21
deal [1] 23/5
deals [1] 41/15
debate [3] 23/14 23/14 24/21
Deborah [1] 37/5
debt [5] 8/22 9/9 9/9 14/19 15/4
debts [1] 15/5
deception [1] 4/18
deceptive [1] 26/22
deceptively [1] 4/9
decide [4] 23/15 33/10 37/20 41/21
decided [3] 27/18 33/8 33/8
decision [9] 6/20
18/15 19/18 19/19 32/10 32/11
decisions [4] 6/23 18/10 18/14 42/18
defend [1] 24/13
defendant's [1] 27/6
defendants [13] 1/8 1/18 2/20 4/9 4/11 4/14 4/17 13/9 14/11 16/22 42/6 42/7 43/1
defendants' [6] 3/2 7/15 7/17 8/10 14/14 19/25
defending [1] 24/3
defense [1] 2/21
definition [23] 5/17 5/25 6/3 6/3 6/7 6/10 6/10 6/12 6/15 6/22 7/1 7/3 7/16 17/10 25/13 26/8 27/12 29/1 36/7 36/8 36/12 42/22 43/2
definitions [1] 28/13
deleting [1] 27/11
denied [1] 32/2
denominated [1] 5/21
department [1] 12/15
depended [1] 4/18
deposition [4] 8/23 11/12 40/13 40/24
described [4] 10/7 21/13 31/10 32/21
describes [2] 32/19 32/20
desires [1] 34/24
despite [1] 14/5
details [1] 40/1
determine [1] 7/7
device [1] 25/5
dicta [2] 19/17 33/22
dictionaries [2] 7/6 43/4
Dictionary [1] 7/10
didn't [18] 9/19 17/17 20/15 21/19 22/12 24/10 27/14 29/23 30/1 30/8 30/14 30/16 32/5 35/19 38/3 39/2 40/3 41/14
difference [1] 37/10
different [7] 2/4 20/25 31/22 33/3 33/14 39/22 43/2
direct [3] 13/9 32/21 43/10
directly [1] 7/23
disagree [1] 15/15
discern [1] 22/25
discovered [2] 31/7 31/25
discovery [3] 30/13 5/3 5/6
discretion [1] 5/5

## D

discretion... [1] 30/21
discrimination [1] 32/16
discussion [1] 25/15
dismiss [3] 7/19 34/5 34/8
dismissed [1] 31/19
disregard [2] 20/25 31/10
disregarding [1] 33/16
district [10] 1/1 1/1 1/4 1/12 2/5 6/21 18/16 18/19 21/19 42/17
docket [4] 3/1 3/3 7/24 36/19
doctrine [1] 32/9
document [2] 12/23 36/22
documentation [1] 10/9
documents [4] 35/18 35/20 38/23 38/24
doing [3] 13/7 29/7 33/24
dollars [1] 24/17
Douglas [1] 32/22
downstream [1] 35/5
Doyle [1] 37/5
drawn [1] 10/5
Drazen [1] 14/22
due [1] 27/24

## E

earlier [3] 26/1 27/21 28/17
early [2] 11/18 34/22
easiest [1] 43/24
East [1] 1/19 1/24
easy [1] 31/13
economic [1] 7/11
economy [1] 22/23
ED [1] 12/14
effects [1] 8/24
efforts [6] 9/3 9/9 10/1 24/4 37/19 41/19
egregious [1] 23/22
eight [2] 23/12 23/17
either [4] 8/17 20/8 38/1 41/11
either accepting [1] 20/8
ELAP [57]
ELAP's [11] 4/11 4/15 9/14 11/13 12/8 13/17 35/4 37/16 37/17 41/8 41/20
elective [1] 37/9
electronics [1] 3/18
Eleventh [13] 5/2

14/20 14/22 18/3
18/14 18/16 18/18
19/3 19/19 21/7 21/20
33/1 33/7
eliminate [1] 17/5
email [12] 12/25 37/5 37/8 39/9 39/19
emails [1] 12/11
emergency [1] 12/15
employed [1] 6/2
employee [2] 12/13 13/1
employees [3] 12/12 12/24 36/23
employer [1] 40/11
employers [2] 22/23 37/6
employment [1] 32/16
en [1] 14/22
enforcement [1] 17/15
ensure [1] 24/14
enter [1] 22/15
entitled [1] 44/13
entity [6] 5/21 6/5 6/6 26/9 36/11 36/12
entries [1] 7/25
entry [3] 3/1 3/3 36/19
equivalence [3] 6/4 6/5 42/25
Erie [1] 21/9
error [12] 5/1 31/5 31/8 31/9 31/10 31/12 31/12 31/21 32/1 32/9 33/18 36/17
ESQ [5] 1/15 1/15 1/16 1/18 1/21
essentially [5] 18/6 21/8 28/3 28/12 39/8
establish [1] 37/18
establishes [1] 28/18
establishing [1] 15/18
estate [1] 5/19
et [1] 1/7
event [2] 8/4 43/18
everyone's [1] 26/11
evidence [36] 7/20 7/22 8/16 8/20 9/16 10/2 10/14 10/16 11/4 11/6 11/10 11/11 13/15 24/7 29/13 29/14 29/15 29/19 30/9 30/15 30/25 31/5 31/7 32/1 32/20 32/20 32/23 33/9 33/13 34/9 34/12 37/1 40/19 42/5 42/5 42/8
exact [2] 7/16 23/5
exactly [6] 7/19 7/20 9/16 10/6 28/6 41/6
example [3] 7/16

examples [1] 7/24
excellent [1] 3/6
excerpt [1] 8/22
excessive [7] 22/24 23/5 23/25 30/3 30/4 34/25 37/21
exchange [2] 12/24 14/21
excluded [2] 36/8 36/11
exercise [1] 5/6
exhibit [8] 12/21 37/4 37/8 37/22 38/7 38/21 39/5 39/19
exhibits [4] 35/25 36/22 37/14 38/14
exists [1] 31/19
expected [1] 23/15
expenses [1] 4/10
expert [2] 18/5 23/19
explain [2] 14/12 19/17
explained [3] 6/2 8/8 12/2
explaining [1] 14/6
exposed [1] 10/4
exposure [6] 9/2 9/4 9/6 9/25 40/15 40/16
extensively [1] 40/17
extent [2] 26/4 26/24
extraordinary [1] 10/22
eyesight [1] 11/17

## F

F.4th [1] 14/23
face [1] 40/1
facilities [1] 13/2
facility [1] 13/5
fact [16] 7/17 9/20 13/16 14/13 14/21 20/13 22/24 24/17 26/14 26/15 28/6 30/9 31/16 33/11 34/20 39/1
factors [1] 32/22
facts [2] 11/9 15/19
failure [3] 10/21 14/7 31/11
fair [1] 23/22
fall [1] 36/14
familiar [1] 17/21
far [2] 27/7 40/19
farther [1] 35/2
favorable [3] 10/2 42/6 42/8
FCRR [2] 1/23 44/16
FDUPTA [8] 5/17 6/15 14/15 20/23 25/4 26/7 28/18 33/18
FDUTPA [1] 5/9
federal [7] 20/25 21/1 27/25 28/1 28/1 28/4

fiduciary [1] 5/20
fights [1] 39/15
figure [2] 25/9 25/17
file [3] 4/24 30/4 30/5
filed [7] 3/8 4/8 4/23 4/25 39/17 40/5 42/7
filing [3] 10/23 10/23 25/4
final [3] 10/17 15/9 21/4
Finally [3] 10/16 12/21 15/8
find [11] 7/4 7/14 8/12 8/17 9/12 11/7 13/15 18/15 25/11 28/11 31/15
finishing [1] 18/13
firm [3] 1/20 2/19 5/18
first [15] 2/6 5/7 5/14 5/16 6/24 8/5 10/18 11/12 15/9 15/14 16/21 36/24 38/22 38/23 42/3
FISHER [2] 1/18 2/19
five [2] 36/2 36/5
fix [1] 36/18
Flagler [1] 1/19
FLORIDA [20] 1/1 1/8 1/17 1/19 1/25 5/14 5/24 6/8 13/22 14/5 17/4 19/13 19/21 20/23 20/24 21/3 21/4 21/5 26/14 29/4
focus [1] 10/18
focuses [1] 27/9
folks [1] 4/5
follow [7] 6/13 19/2 19/8 19/10 19/20 20/21 33/10
follow-up [1] 19/2
followed [3] 6/14 21/18 42/18
following [2] 10/22 19/18
forcefully [1] 25/24
foregoing [1] 44/11
form [1] 9/10
formulations [1] 28/15
Fort [2] 1/8 1/25
forward [1] 30/25
found [13] 3/1 3/3 7/19 13/23 13/24 20/18 27/1 27/2 27/20 34/11 35/20 39/23 43/7
four [1] 34/4
Fourth [1] 43/7
fraction [1] 4/13
front [1] 22/3
FTC [4] 20/2 28/10 28/19 29/3

fund [1] 39/24
funded [1] 24/16

## G

gather [1] 32/18
generics [1] 12/14
Georgia [1] 1/22
getting [6] 2/15 29/21 30/18 35/4 39/12 40/16
give [6] 6/19 19/5 33/6 34/18 35/25 43/2
given [1] 27/25
glad [1] 22/13
go [15] 3/16 3/19 15/5 17/22 20/7 20/25 21/2 27/7 30/17 38/14 39/13 40/3 41/9 41/25 43/25
go through [1] 20/7
goes [2] 12/22 35/8
going [12] 12/4 16/15 16/20 25/14 29/8 30/22 33/2 34/17 35/22 36/7 37/6 41/6
good [10] 2/8 2/8 2/12 7/11 11/17 12/16 12/17 19/8 20/5 22/11
gouging [1] 22/23
government [2] 36/9 36/10
governmental [2] 17/15 36/11
gown [1] 25/5
GPA [5] 12/24 12/25 13/8 23/24 41/19
grant [3] 4/25 5/3 18/21
granted [1] 43/20
granting [3] 3/2 18/16 31/4
grappling [2] 33/25 34/4
great [5] 2/22 4/3 18/8 27/24 44/4
greater [1] 23/2
grounds [1] 31/4
group [1] 5/21
guess [1] 21/21
guys [1] 22/4

## H

hac [1] 22/4
had a [1] 43/8
half [2] 23/1 23/11
handling [1] 2/20
handwriting [1] 36/19
hanging [1] 31/8
happened [7] 17/18 17/19 18/9 32/17 38/6 39/25 43/7
happening [1] 12/13

48

## H

happening... [1] 30/15
happens [1] 41/4
happy [1] 3/15
harassed [1] 15/4
harassment [1] 9/10
hard [1] 32/17
harm [75]
harmed [19] 5/7 5/9 5/12 8/9 8/21 10/6 11/7 12/19 16/9 16/15 16/19 16/20 20/9 20/14 42/4 42/11 42/12 43/16 43/17
harms [2] 4/19 4/21
hastily [1] 36/17
hat [1] 31/8
health [6] 23/4 23/25 24/16 24/18 24/22 35/7
hear [3] 2/3 3/15 24/10
heard [9] 4/4 22/17 22/19 24/10 28/5 34/22 34/23 42/4 43/4
hearing [3] 1/10 4/6 24/4
Heather [1] 13/1
heavily [1] 21/9
held [6] 14/20 14/23 33/20 33/20 33/22 43/12
help [1] 23/24
helped [1] 23/7
helping [1] 23/4
helps [4] 3/12 24/18 24/18 24/19
Heritage [1] 7/10
hey [1] 34/17
Hi [1] 13/1
hid [1] 4/14
hiding [1] 4/11
higher [3] 27/5 39/10 41/12
highest [1] 33/9
history [1] 38/15
hold [1] 11/23
Honor [6] 2/12 10/25 22/1 25/13 41/22 42/13
HONORABLE [1] 1/11
hooked [2] 3/19 3/20
hospital [25] 1/4 2/5 4/15 8/14 9/3 9/6 9/20 11/22 11/23 13/11 13/12 13/25 14/3 15/5 22/22 23/3 24/1 34/25 35/8 37/25 39/22 40/3 40/15 41/1 41/19
hospital's [1] 12/17
hospitals [19] 4/10

happening... [1] 30/15
8/18 9/19 10/10 10/11 11/8 11/11 11/20 12/9 13/7 13/10 16/10 39/10 39/11 39/13
Hunstein [3] 14/11 14/17 14/19

## I

I'd [1] 35/25
I'll [6] 2/10 4/6 22/20 26/25 37/25 44/3
I'm [18] 2/12 2/18 3/15 3/18 17/21 20/23 21/1 22/3 22/10 22/13 25/2 25/14 25/25 30/5 30/21 37/16 40/19 41/6
I've [7] 3/8 22/3 29/16 29/18 33/19 36/16 42/14
identical [1] 28/2
identify [1] 36/19
identity [2] 4/12 4/15
ignore [2] 33/4 33/6
III [3] 14/13 14/25 15/2
illegal [1] 14/24
impair [2] 30/7 30/11
impairment [3] 39/20 39/25 40/9
impairments [1] 9/7
implicated [1] 35/21
implicates [1] 32/9
import [1] 17/10
important [10] 24/4 27/22 28/22 30/19 30/24 33/23 34/2 37/13 40/2 41/17
importantly [1] 32/24
imposes [1] 5/10
impossible [1] 34/21
improper [1] 32/14
inappropriate [1] 32/14
includes [1] 26/8
including [4] 4/20 33/21 33/21 34/7
independently [1] 8/18
indicate [1] 10/19
individual [1] 5/18
inference [3] 10/5 42/9 42/10
inferior [1] 27/5
information [6] 14/19 14/21 30/14 39/12 41/3 41/3
injured [3] 13/23 14/14 14/18
injury [16] 14/2 14/13 14/21 14/25 15/1 15/3 26/21 26/23 28/13 28/16 28/21 28/25

## J

29/14
insurance [1] 4/23 11/15 14/7
insured [2] 14/6 14/8
insurer [3] 13/25 13/25 14/2
insurer's [1] 14/5
intend [1] 11/24
intended [1] 12/3
intent [1] 27/23
intentional [1] 17/4
interacting [1] 7/23
interchangeable [3] 6/4 6/5 42/25
interested [2] 25/14 30/17
interesting [1] 12/23
internal [3] 10/9 12/11 36/22
interpretation [2] 28/8 28/9
interpretations [5] 27/25 28/4 28/7 28/20 29/3
interpreted [2] 17/24 18/1
introduce [1] 2/11
introduced [1] 35/17
invited [2] 32/9 33/18
involved [1] 25/18
IRENE [2] 1/18 2/18
issue [12] 20/13 23/1 23/9 26/25 31/2 32/12 33/8 33/24 34/16 39/21 40/4 40/6
it's [41] 3/1 7/20 8/4 12/9 16/1 16/7 16/15 16/16 16/17 16/17 16/19 18/18 19/3 19/24 20/21 22/8 23/12 24/4 24/20 25/25 26/1 29/19 30/3 30/24 31/4 31/5 31/5 31/13 32/14 33/3 33/10 37/13 38/21 40/4 40/8 40/9 41/17 41/18 41/19 42/15 44/4

## J

January [1] 44/14
Jefferson [1] 32/15
job [1] 35/2
John [1] 37/8
joint [1] 5/19
JUDGE [13] 1/12 2/8 3/16 4/8 6/20 9/15 14/10 17/19 18/1 18/6 21/18 21/24 44/4
judges [1] 21/19
judgment [29] 3/3 6/16 7/20 7/21 8/8 8/12 9/17 10/3 10/23

23/15 26/1 26/3 29/17 29/22 30/5 30/20 30/25 31/1 32/6 33/1 35/14 40/5 40/7 42/7 43/24 44/3
July [1] 29/4
jump [1] 25/14
jury [10] 7/3 7/14 8/12 8/16 9/12 11/7 13/15 15/6 29/12 29/20

## K

Kaklamanos [1] 13/22
Katie [1] 40/22
keeping [1] 3/14
kind [5] 18/8 18/23 19/2 20/25 21/21
knew [1] 4/15
know [39] 2/23 5/1 5/13 13/9 13/10 14/14 16/24 16/24 19/14 20/23 22/2 22/4 22/12 22/13 23/18 23/19 23/22 24/20 30/3 30/12 30/17 31/23 32/23 33/2 34/20 36/10 37/20 38/6 38/8 38/9 38/10 39/10 39/25 39/25 40/5 42/12 43/6 43/23
knowingly [1] 4/16
knows [2] 22/24 22/25
KOZYAK [2] 1/14 2/9
Kris [1] 2/18
KRISTOPHER [1] 1/21

## L

language [17] 6/7 7/2 7/4 7/5 7/8 16/24 18/11 18/12 19/13 20/1 20/2 26/21 26/24 27/6 28/2 42/14 42/23
laptop [1] 3/22
large [2] 11/3 26/4
larger [1] 38/24
latched [1] 19/13
late [1] 2/16
Lauderdale [2] 1/8 1/25
law [10] 14/15 16/3 16/21 18/3 21/4 31/5 31/7 31/25 33/7 42/15
lawsuit [3] 10/23 30/5 39/17
lawyer [1] 22/8
lay [1] 3/12
led [1] 9/21
left [1] 4/22
legal [4] 3/7 9/4

legislative [1] 6/9
legislature [9] 5/14 5/25 6/8 6/12 17/4 17/9 17/15 27/23 29/1
Leon [1] 1/16 1/21
letter [3] 14/18 14/20 30/2
letters [2] 8/1 15/4
letting [1] 39/9
LIFSHITZ [3] 1/15 2/9 20/5
light [3] 10/2 42/5 42/8
likelihood [6] 15/18 15/22 16/2 16/4 28/15 29/10
limit [1] 41/8
limited [1] 4/22
line [6] 10/18 12/12 17/23 19/10 19/16 24/15 27/18 27/19 42/16
lines [1] 10/17
list [2] 32/13 39/14
lists [1] 13/2
literally [1] 29/25
little [8] 2/15 11/18 16/17 17/18 20/3 32/17 32/19 40/2
LLC [2] 1/7 1/20
LLP [2] 1/14 1/18
local [1] 22/23
logo [1] 11/15
long [7] 9/18 13/12 16/18 17/23 32/13 36/3 44/2
look [17] 6/25 7/3 7/6 7/6 15/14 20/20 25/8 25/10 25/18 25/21 28/4 28/6 30/1 37/3 41/4 41/16 42/4
looked [6] 6/21 18/2 18/3 28/8
looking [8] 5/16 10/8 10/8 12/11 20/23 22/2 29/3 37/13
looks [1] 28/19
loss [3] 17/8 17/11 17/11
lot [8] 2/3 16/14 16/16 18/9 21/19 28/14 33/3 35/17

## M

maintenance [3] 43/10 43/11 43/14
major [1] 24/21
making [1] 33/15
mandated [1] 6/12
manifest [5] 5/1 31/5 31/8 31/9 31/9 31/12 31/21 32/1
margins [1] 23/16

**M**

market [1] 23/23
matter [1] 44/13
McConnell [1] 32/22
mean [4] 19/25 21/18
22/5 41/14
meaning [5] 8/5
31/24 40/16 40/20
41/4
means [11] 5/16 5/17
6/2 6/4 7/7 16/14
26/16 30/6 42/22
42/23 42/24
medical [5] 4/10 14/1
14/8 15/5 25/5
Medicare [2] 23/12
23/17
member [4] 9/25
10/4 11/25 41/16
members [16] 4/16
8/25 9/1 9/25 10/6
11/16 12/10 12/14
12/18 13/9 13/17 24/3
35/15 39/10 39/12
40/18
Memorial [55]
Memorial's [5] 5/8
6/24 8/3 10/25 22/19
mention [1] 30/3
mentioned [1] 11/9
merely [1] 27/15
Merit [1] 44/10
Merraim [2] 7/9 7/13
Merraim-Webster's
[2] 7/9 7/13
message [3] 14/24
15/2 15/3
methodical [1] 42/4
Miami [2] 1/17 1/19
million [2] 23/10
23/11
millions [1] 24/17
mind [5] 2/23 3/14
22/17 30/21 35/25
minute [1] 35/6
minutes [1] 36/5
minutes' [1] 36/2
misapplication [1]
31/11
missing [1] 36/25
mistakes [1] 18/20
model [1] 4/17
money [6] 24/17 30/1
30/11 37/2 37/6 38/20
months [1] 39/16
morning [2] 2/8
36/18
motion [24] 1/10 2/25
3/3 4/24 4/25 5/4 5/5
6/17 7/19 7/21 18/17
18/21 21/7 22/16
30/21 31/4 32/1 32/15
34/8 35/16 42/7 43/19

43/20 44/1
motions [2] 3/9 18/14
Mr. [9] 2/19 8/24 9/13
9/24 10/6 20/5 37/23
40/13 41/24
Mr. Alderman [1]
2/19
Mr. Lifshitz [1] 20/5
Mr. Sadowsky [1]
41/24
Mr. Scozzaro [1]
37/23
Mr. Waters [5] 8/24
9/13 9/24 10/6 40/13
Ms [1] 12/6
Ms. [2] 11/12 11/14
Ms. O'Leary [2]
11/12 11/14
multiple [1] 3/10

**N**

name [1] 11/15
narrow [1] 29/2
necessarily [1] 34/15
need [4] 3/20 15/11
20/9 37/15
Needless [1] 5/23
needs [1] 15/8
network [1] 40/15
never [9] 6/11 7/18
14/3 14/3 14/4 21/13
22/3 23/15 38/20
new [4] 18/12 31/5
32/14 35/24
newly [2] 31/7 31/25
nice [3] 2/2 2/2 2/14
nine [1] 36/4
nonconsumer [9]
26/11 26/13 26/15
26/16 26/17 27/16
28/24 33/23 34/1
nonmoving [1] 42/9
nonprofits [1] 4/20
normal [2] 41/8 41/8
note [1] 18/13
notes [2] 25/16 38/22
November [1] 1/8
number [2] 27/18
36/20
numbers [1] 41/11

**O**

o'clock [1] 4/5
O'Leary [4] 11/12
11/14 12/6 40/22
object [4] 11/20
11/25 40/23 41/2
objects [1] 41/1
observe [1] 2/13
obvious [3] 17/10
18/17 20/11
obviously [7] 3/8
3/10 14/12 19/3 19/20
20/7 32/10

Returning [1] 12/22
offer [1] 38/1
Official [1] 1/24
Oh [2] 4/4 22/7
okay [9] 2/22 3/16
3/25 16/5 21/17 22/10
36/6 36/15 42/1
old [2] 18/10 18/11
once [2] 11/17 22/15
ones [3] 28/11 30/13
35/24
OP [1] 12/15
opinion [3] 3/11
23/19 33/16
opportunity [2] 22/12
22/13 22/17
opposed [1] 29/10
opposite [1] 32/6
order [16] 2/1 3/2 6/9
6/11 8/9 8/12 11/9
16/2 22/15 25/17 31/2
31/9 34/11 43/23
43/24 44/3
orderly [1] 30/23
ordinarily [1] 22/15
ordinary [4] 7/4 7/5
7/8 8/5
ORIA [2] 1/18 2/18
original [2] 18/20
38/25
outcome [2] 12/1
12/3
outpatient [2] 12/15
12/18
outset [1] 22/19
outstanding [1]
10/20
owner [2] 43/9 43/14

**P**

p.m [2] 1/9 44/7
page [3] 7/25 37/4
38/23
pages [2] 7/25 40/24
paid [12] 4/20 7/16
7/17 7/18 8/2 14/8
23/11 24/8 35/11
35/12 38/25 39/1
papers [1] 9/17
parent [1] 5/18
part [1] 3/6
parted [1] 6/9
particular [4] 36/22
38/16 38/18 39/2
parties [1] 30/24
partner [1] 2/10
partnership [1] 5/19
party [2] 14/20 42/9
patience [1] 2/15
patient [26] 11/12
13/14 14/2 14/4 24/8
35/7 35/24 36/23 37/9
37/10 37/23 38/1 38/4
38/16 38/16 38/18

39/22 40/11 40/20
40/20 41/10 41/16
patients [41] 4/19
4/22 5/8 8/9 8/18 8/20
9/13 10/11 11/7 11/10
12/19 12/19 12/22
13/3 13/8 13/10 13/16
13/20 13/23 13/24
20/9 20/14 22/23 23/4
23/8 23/25 24/11
24/13 24/17 24/19
24/23 37/3 37/7 37/24
39/11 40/3 41/7 42/3
42/10 42/12 43/17
pay [16] 14/1 14/7
15/4 23/13 24/14 30/2
30/4 34/25 38/1 38/4
38/5 39/2 40/10 40/11
40/11 40/21
paying [4] 4/12 23/8
35/4 43/5
payment [3] 7/24
10/19 10/21
payments [1] 35/13
percent [5] 10/13
39/24 41/3 41/4 41/11
percentage [1] 41/7
period [6] 10/10
15/20 38/8 38/8 38/9
38/10
permitted [1] 27/15
person [3] 17/11
27/10 44/4
persons [1] 26/9
persuasive [5] 19/20
19/22 21/3 33/9 33/12
phone [3] 9/10 13/5
15/3
physicians [1] 18/5
piece [2] 39/5 42/5
pieces [2] 8/16 11/6
Pinto [1] 14/22
place [1] 25/16
placed [1] 5/3
plain [1] 6/7
plaintiff [10] 1/5 1/14
2/6 2/7 2/10 10/3
13/13 14/18 14/23
32/18
plaintiff's [3] 2/25
27/3 36/21
plan [5] 8/25 11/15
13/9 35/7 35/15
plans [5] 23/4 23/25
24/16 24/18 24/23
plenty [1] 6/23
PNR [2] 19/10 43/6
podium [1] 3/17
point [9] 4/12 16/13
17/1 20/5 29/15 29/15
39/17 42/20 43/15
pointed [1] 26/8
points [3] 15/25

policy [2] 11/3 20/2
Ponce [2] 1/16 1/21
portion [1] 25/15
position [7] 9/22 9/22
18/7 18/19 32/4 34/16
36/7
possessing [1] 30/14
possibility [3] 29/22
35/16 40/16
potential [6] 9/3 9/7
9/9 9/19 12/1 12/3
potentially [1] 36/24
PowerPoint [2] 4/2
39/6
practice [6] 20/2
25/20 26/22 30/24
37/16 37/17
practices [3] 23/6
23/7 23/21
Pre [1] 12/16
Pre-services [1]
12/16
precedent [4] 31/11
31/13 31/22 31/24
prepared [1] 39/23
presentation [2]
22/20 39/6
presented [2] 7/21
29/14
preservice [1] 41/1
pretty [7] 12/16 12/17
17/21 19/22 21/6 21/9
40/1
previous [1] 29/9
price [2] 27/5 41/8
printing [1] 36/17
priority [1] 4/6
private [3] 17/16
27/11 27/17
pro [1] 22/4
probably [1] 22/2
problem [3] 29/21
33/17 39/23
procedure [2] 37/23
38/2
proceedings [2] 44/7
44/12
process [1] 7/12
product [1] 27/5
production [1] 7/12
products [1] 35/5
prominently [1]
26/18
protect [1] 40/18
protected [2] 39/3
40/20
provide [2] 4/16 12/5
provided [1] 6/8
provider [6] 12/4
14/9 35/5 35/10 35/12
41/1
provides [2] 24/2
35/10

**P**

providing [1] 11/25
provision [6] 17/14 17/14 27/11 27/21 27/22 27/23
PSA [1] 13/6
purchases [1] 25/2
purportedly [1] 25/19
purpose [1] 17/14
purposes [3] 3/10 24/15 40/7
pursue [3] 9/3 37/3 37/6
pursues [1] 9/7
pursuing [2] 36/24 37/19
pushback [1] 41/1
put [2] 11/15 41/10
putative [1] 40/5

**Q**

question [17] 9/1 9/6 9/9 11/19 11/23 12/2 15/17 18/23 20/10 21/9 21/15 23/13 26/10 29/11 29/20 30/18 33/6
questioned [1] 27/19
quick [2] 16/25 42/1
quickly [1] 38/14
quite [3] 7/2 43/25 44/1
quote [3] 7/8 14/6 14/23
quoted [2] 6/15 6/16

**R**

RAAG [1] 1/11
raise [4] 32/6 32/14 32/25 33/15
raised [2] 25/24 35/24
rate [3] 10/14 39/11 41/12
reach [1] 20/9
read [5] 3/8 19/9 20/20 40/23 42/14
reading [1] 19/14
ready [2] 3/14 3/19
real [1] 26/25
reality [1] 34/10
really [19] 3/5 10/17 12/12 14/11 15/23 21/21 23/14 25/23 26/6 26/12 27/19 30/5 30/10 34/19 36/8 36/25 37/2 43/22 43/24
Realtime [1] 44/11
reason [7] 6/14 6/24 6/25 13/8 18/18 21/17 33/13
reasonable [18] 4/13

reasoning [1] 6/10
reasons [5] 5/5 5/13 19/8 26/2 43/19
receive [2] 14/18 35/8
received [1] 14/23
receiving [2] 15/3 35/9
recitation [1] 35/21
recognize [4] 15/21 22/3 31/11 31/18
recognized [3] 8/10 12/10 27/16
recognizes [1] 18/18
reconciled [1] 34/3
reconsideration [13] 3/1 3/2 3/6 3/9 5/4 6/17 18/15 18/17 18/21 21/7 29/17 35/17 43/20
reconsidered [1] 31/2
record [6] 3/12 29/25 32/18 34/12 35/18 44/12
records [3] 10/15 10/19 13/17
recover [1] 17/9
refusal [2] 13/6 13/14
refuse [2] 13/8 39/11
refused [3] 13/2 13/3 14/1
regarding [1] 2/25
regardless [2] 5/8 8/7
Regional [1] 13/12
Registered [1] 44/10
rejected [3] 14/5 26/2 26/3
relates [1] 38/21
relating [1] 28/1
relationship [3] 25/19 35/6 43/10
relevant [1] 38/10
rely [4] 14/11 26/18 26/18 26/20
relying [1] 26/25
remember [2] 15/19 41/17
remove [1] 39/24
removed [1] 17/9
renting [1] 43/9
reply [1] 14/12
Reporter [4] 1/23 1/24 44/10 44/11
reporting [1] 10/24
reports [1] 18/5
representative [3] 11/13 12/8 37/25

require [4] 20/15 28/12 28/13 33/19
required [1] 20/10
requirement [28] 5/10 15/13 16/16 16/16 16/17 16/18 16/21 17/3 17/6 19/1 19/11 19/12 19/23 21/12 27/15 27/20 28/16 29/5 29/9 31/15 31/17 31/19 32/3 32/4 32/8 33/5 34/16 43/18
requires [3] 18/4 20/22 31/22
resolution [2] 22/14 22/16
resolved [2] 33/23 33/24
response [2] 13/1 21/25
result [2] 10/21 31/23
resulted [1] 4/18
resulting [1] 26/21
reversing [1] 18/16
reviewing [1] 18/11
right [17] 5/2 8/20 13/5 18/20 18/22 21/21 25/14 25/16 27/11 27/17 30/18 32/11 33/2 36/16 36/18 41/6 43/21
risk [1] 10/4
RMR [2] 1/23 44/16
room [2] 22/2 23/16
Rosenbaum [1] 6/20
routine [1] 22/8
routinely [1] 22/4
row [3] 10/12 13/4 13/13
rows [2] 13/11 13/12
rule [13] 17/24 17/24 17/25 18/4 19/4 19/7 19/21 20/6 20/13 21/4 30/20 31/4 32/15
Rule 59 [1] 32/15
ruling [3] 18/20 33/12 44/2
rulings [1] 31/14

**S**

saddled [1] 8/21
SADOWSKY [3] 1/15 2/7 41/24
sat [1] 6/21
satisfaction [1] 7/11
satisfies [1] 16/20
satisfy [1] 34/23
satisfying [1] 7/15
saves [1] 24/15
saw [6] 27/10 27/21 30/2 39/5 40/13 40/22
saying [16] 9/24 12/4 12/13 13/1 16/19

32/14 34/24 38/2 38/2 38/3 38/4 39/23
says [24] 8/4 10/18 10/21 13/5 14/9 15/16 16/2 16/3 16/22 24/8 27/23 28/3 28/6 31/16 31/17 36/12 37/5 37/9 37/24 37/25 39/7 39/8 42/17 42/23
scheduled [1] 37/23
scheduling [2] 12/17 37/24
Scozzaro [2] 37/9 37/23
screen [2] 3/21 27/21
searched [1] 28/10
second [6] 5/8 16/6 30/20 37/4 38/22 42/20
section [2] 27/21 27/22
Section 501.204 [1] 27/21
secure [1] 7/24
see [12] 2/2 2/14 8/1 8/22 10/12 12/14 12/18 13/4 15/11 31/13 42/10 44/4
seeing [1] 11/1
seeking [1] 11/8
seen [4] 16/4 24/9 24/9 40/19
Seitz [1] 14/10
self [1] 24/16
self-funded [1] 24/16
selling [1] 27/4
send [3] 13/10 29/23 30/6
sender [1] 14/20
sending [2] 14/19 29/23
sense [4] 18/11 18/12 19/23 21/15
sent [2] 15/20 38/19
sentence [1] 35/21
serious [1] 4/19
seriously [1] 21/6
serve [1] 3/9
service [6] 11/25 12/5 24/2 35/5 35/10 35/11
services [20] 1/7 4/13 4/16 4/21 7/15 7/17 7/18 7/23 8/1 12/15 12/16 12/19 23/10 24/22 34/23 35/1 35/8 35/9 35/10 35/11
set [5] 5/5
settlement [2] 39/24 40/12
settling [1] 40/10
seven [1] 15/24

share [2] 40/10 40/11
shifted [1] 4/9
shifting [1] 32/24
short [2] 8/3 15/6
show [7] 30/9 30/14 34/2 36/1 36/1 37/15 40/2
showed [3] 7/21 7/22 39/6
showing [5] 19/21 20/15 34/6 38/24 39/16
shown [4] 15/21 16/8 29/24 38/17
shows [10] 30/1 38/7 38/12 38/15 38/18 38/23 39/1 39/2 42/14 43/3
sides [3] 2/24 3/5 43/22
sign [1] 22/4
similar [1] 40/8
similarly [1] 2/23
simply [1] 33/15
SINGHAL [2] 1/2 1/11
single [7] 10/4 14/24 15/2 15/2 18/15 41/10 42/5
sit [1] 18/23
sitting [1] 3/23
situation [2] 23/23 40/14
situations [1] 42/23
Skypoint [1] 6/17
slate [1] 21/16
slide [3] 5/16 10/8 11/13
slides [1] 9/16
sloppy [1] 32/19
software [1] 27/4
someone's [2] 25/9 30/12
soon [2] 44/2 44/4
sorry [4] 2/15 25/15 25/25 37/16
sort [1] 26/9
sought [1] 17/15
sound [1] 5/3
sounds [1] 32/18
SOUTH [2] 1/4 2/5
SOUTHERN [1] 1/1
space [2] 23/23 43/9
specifically [2] 27/2 31/18
specifics [1] 12/2
split [2] 2/23 33/23
spoke [2] 18/4 21/12
stage [3] 3/13 7/20 22/13 35/14
standard [9] 8/11 15/23 16/1 30/19 33/16 42/6 42/15 43/5

**standard... [1]** 43/6
**standing [8]** 26/11
26/13 26/15 26/16
27/16 28/24 33/24
34/1
**start [3]** 5/11 8/20
22/20
**started [1]** 2/15
**starting [2]** 5/12
12/25
**state [6]** 14/15 20/24
21/4 21/10 33/9 43/13
**statement [1]** 11/9
**STATES [1]** 1/1
**status [1]** 5/8
**statute [31]** 5/9 5/23
6/7 6/13 6/22 8/3
15/12 15/13 16/25
17/4 18/2 18/3 18/4
18/24 19/4 19/14
19/22 19/24 20/19
20/22 21/8 25/11 26/7
27/8 27/10 27/12 28/3
29/6 42/23 43/3 43/17
**statute's [1]** 17/13
**statutes [1]** 21/6
**statutory [4]** 6/2 6/12
7/1 27/14
**stays [1]** 3/13
**stepping [1]** 35/6
**Steward [1]** 18/25
**Stewart [18]** 19/4
19/7 19/8 19/9 19/18
20/6 20/12 20/13
20/15 20/21 20/22
21/11 21/12 21/13
21/15 33/21 34/4
42/17
**stood [1]** 28/11
**straight [1]** 6/22
**strained [1]** 6/10
**Street [1]** 1/19
**stretch [2]** 20/3 28/5
**strong [1]** 3/7
**submitted [1]** 35/18
**subpar [1]** 4/23
**subsection [1]** 27/24
**substantial [14]**
15/18 15/22 16/1 16/4
16/7 28/13 28/14
28/15 28/16 29/9
29/10 29/11 42/13
42/18
**substituting [1]**
27/10
**sued [3]** 13/25 14/3
14/8
**suffer [2]** 9/13 17/11
**suffered [6]** 8/13
14/2 14/14 14/24 17/8
27/3
**suffers [1]** 17/11

**Sufficient [2]** 8/20
17/12
**suggest [1]** 16/22
**suggests [1]** 19/1
**suing [1]** 23/4
**summary [27]** 3/3
6/16 7/20 7/21 8/8
8/12 9/17 10/3 22/13
22/15 23/13 23/14
26/1 26/2 29/17 29/22
30/20 30/25 31/1 32/6
33/1 35/14 40/4 40/7
42/7 43/23 44/3
**SUMMERVILLE [2]**
1/20 2/19
**supplier [3]** 25/5 25/5
25/6
**supports [1]** 31/14
**supposed [2]** 19/14
22/7
**supreme [13]** 6/1 6/1
13/22 14/5 19/13
19/21 21/3 21/5 21/10
26/14 33/9 33/14
42/24
**sure [7]** 2/3 3/18 22/7
22/18 25/2 30/5 36/2
**surprise [1]** 39/17
**syndicate [1]** 5/20
**system [2]** 22/22
23/3

## T

**tab [1]** 36/21
**tabbed [1]** 36/16
**table [2]** 13/2 39/7
**tabs [1]** 36/18
**take [5]** 3/15 37/20
41/18 41/21 41/21
**taken [1]** 10/23
**takes [1]** 21/5
**TAL [2]** 1/15 2/9
**talk [8]** 13/22 15/1
17/13 17/16 22/12
27/8 32/5 35/19
**talked [3]** 10/25
15/17 29/22
**talking [9]** 8/24 11/14
15/10 16/13 37/14
37/22 39/20 40/10
40/25
**telemarketing [1]**
14/24
**tell [5]** 4/5 30/22
32/11 37/2 38/5
**tells [4]** 28/19 34/17
34/25 41/2
**ten [1]** 36/5
**term [1]** 6/3
**terms [3]** 15/16 25/12
35/19
**test [3]** 18/10 28/12
33/2
**testified [2]** 29/23

**testimony [4]** 40/13
40/22 40/23 40/24
**text [18]** 6/13 14/24
15/2 15/3 15/12 15/13
15/16 17/2 18/9 19/22
20/20 20/20 21/5 21/8
25/11 27/8 28/3 28/6
**textual [4]** 18/24 27/9
11/8
**Thank [10]** 2/22 3/16
4/8 21/23 21/24 22/1
41/23 43/21 44/5 44/6
**thanking [1]** 3/5
**Thanks [1]** 4/3
**thing [6]** 6/18 14/4
14/9 14/17 15/14 16/6
18/13 21/11 26/13
35/14 36/8 42/3 42/12
43/1
**things [8]** 3/9 24/12
25/2 30/8 30/10 34/3
40/17 41/15
**think [57]**
**thinking [2]** 21/22
37/14
**thinks [1]** 23/2
**third [3]** 5/9 14/20
37/4
**third-party [1]** 14/20
**thorough [2]** 35/22
35/23
**thought [4]** 5/11 8/15
18/25 21/1
**three [7]** 2/14 5/5
10/13 22/8 25/23 31/4
38/11
**THROCKMORTON
[2]** 1/14 2/9
**time [10]** 10/10 15/20
28/12 38/8 38/8 38/9
38/10 38/11 38/18
41/5
**times [8]** 22/8 23/1
23/11 23/12 23/17
33/19 34/7 34/10
**timing [1]** 28/22
**today [6]** 2/13 15/10
22/14 23/14 24/10
34/7
**today's [1]** 24/15
**told [4]** 5/15 23/9
32/6 32/7
**top [3]** 10/12 10/18
13/4
**topic [1]** 24/21
**Torres [2]** 17/19
21/18
**total [2]** 18/11 37/10
**track [2]** 40/25 41/2
**tracking [1]** 13/7
**trade [5]** 26/22 26/22
27/25 28/1 28/4
**transaction [4]** 25/8
25/18 25/21 27/12

**transactions [4]** 24/3
24/5 24/7 24/8
**transcript [2]** 1/10
44/12
**treat [2]** 38/3 38/3
**treated [5]** 41/7 41/9
41/11 41/12 41/14
**treating [1]** 18/5
**treatment [2]** 4/12
11/8
**tried [2]** 4/14 43/2
**TROPIN [2]** 1/14 2/9
**true [2]** 34/12 34/20
**trust [2]** 5/19 5/20
**truth [1]** 35/2
**try [1]** 3/10
**trying [2]** 7/7 37/18
**turn [2]** 12/10 28/20
**turned [11]** 3/21 8/14
8/18 11/8 11/10 12/19
12/20 12/23 13/16
13/20 16/10
**turning [1]** 32/3
**two [15]** 3/11 5/13
10/17 13/11 13/12
15/9 15/25 23/1 23/11
27/9 28/9 29/17 36/25
38/14 42/1
**type [1]** 36/12

## U

**U.S [1]** 1/12
**ultimately [2]** 4/14
17/18
**Unabridged [2]** 7/9
7/13
**unbroken [1]** 17/25
**understand [2]** 15/6
40/24
**understanding [1]**
24/6
**unfair [2]** 20/2 26/22
**unhappy [1]** 39/18
**UNITED [1]** 1/1
**unlawful [3]** 25/20
28/18 29/2
**unwanted [3]** 14/24
15/2 15/3
**uses [2]** 7/14 7/17
**utilize [2]** 7/11 34/23

## V

**value [6]** 4/13 4/21
34/14 34/15 34/18
34/19
**venture [1]** 5/19
**versus [1]** 2/5
**viewed [4]** 25/6 42/8
42/9 42/10
**viewing [2]** 10/2 42/5
**violated [1]** 31/24
**virtually [1]** 26/21

## W

**waiting [1]** 31/1

**walk [4]** 8/15 29/15
29/18 35/25
**Walmart [1]** 17/20
**want [5]** 3/5 3/10
3/15 15/1 15/16 19/5
27/8 29/15 29/18
30/17 30/18 33/12
38/4 39/14 41/24
**wanted [4]** 8/6 10/18
30/23 42/20
**wants [5]** 5/1 7/12
7/15 7/16 34/24
**water [1]** 26/12
**Waters [6]** 8/23 8/24
9/13 9/24 10/6 40/13
**way [9]** 9/15 10/6
17/24 21/1 21/3 29/2
32/19 33/24 37/17
**ways [1]** 20/11
**we've [8]** 15/10 16/7
22/16 22/25 28/8 32/5
34/17 35/7
**Webster's [2]** 7/9
7/13
**weighed [1]** 26/14
**weighs [1]** 21/9
**weight [1]** 27/24
**well [8]** 2/24 7/6 22/7
22/10 22/21 26/13
36/11 44/1
**went [5]** 13/24 21/20
35/20 39/22 43/24
**West [1]** 13/11
**Westlaw [1]** 6/20
**whatsoever [1]** 26/9
**wholesale [1]** 31/10
**WIDLANSKI [1]** 1/16
2/10
**Woody [1]** 8/23
**word [4]** 6/2 7/7
28/14 42/24
**words [4]** 12/17 16/4
23/5 31/21
**work [2]** 3/7 13/3
**works [1]** 10/10
**worth [1]** 36/2
**wouldn't what's [1]**
29/11
**writing [1]** 21/16
**written [1]** 5/9
**wrong [3]** 19/17
25/19 33/2

## X

**XTEC [1]** 6/19

## Y

**yeah [3]** 17/2 29/21
41/13
**year [1]** 14/22
**years [2]** 4/9 15/24